# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.

BILL NELSON, in his official capacity as
Administrator of the National Aeronautics and
Space Administration; NATIONAL
AERONAUTICS AND SPACE
ADMINISTRATION; the UNITED STATES
OF AMERICA; JOSEPH R. BIDEN, JR., in
his official capacity as President of the United
States; FEDERAL ACQUISITION
REGULATORY COUNCIL; LESLEY A.
FIELD, in her official capacity as Acting
Administrator for Federal Procurement, Office
of Management and Budget; JOHN M.
TENAGLIA, in his official capacity as
Principal Director of Defense Pricing and
Contracting, Department of Defense; JEFFREY
A. KOSES, in his official capacity as Senior
Procurement Executive & Deputy Chief
Acquisition Officer, General Services
Administration; KARLA S. JACKSON, in her
official capacity as Assistant Administrator for
Procurement, National Aeronautics and Space
Administration; SHALANDA D. YOUNG, in
her official capacity as acting Director of the
Office of Management and Budget; OFFICE
OF MANAGEMENT AND BUDGET; the
GENERAL SERVICES ADMINISTRATION;
ROBIN CARNAHAN, in her official capacity
as General Services Administrator,

    *Defendants.*

_____/

No. 8:21-cv-2524

**COMPLAINT FOR DECLARATORY AND**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Relying on a statute authorizing the President to "prescribe policies and directives that the President considers necessary to carry out" the Federal Property and Administrative Services Act of 1949 (FPASA), 40 U.S.C. § 121(a), the Biden Administration seeks to compel millions of Americans who work for government contractors to receive a COVID-19 vaccine.

2. Nothing in that statute authorizes such a radical intrusion on the personal autonomy of American workers—especially, as is the case here, when many of those workers are officials of a sovereign state.

3. But even if FPASA did authorize such a mandate, the Biden Administration's vaccine requirements would still be unlawful because the manner in which they were enacted violates fundamental principles of administrative and procurement law.

4. The Federal Acquisition Regulatory Council (FAR Council) is the agency exclusively charged with creating "[g]overnment-wide procurement regulation[s]." 41 U.S.C. § 1303(a)(1). Other agencies may not enact such regulations. *Id.* § 1303(a)(2).

5. Yet that is precisely what the President's executive order contemplates. *See* Exec. Order No. 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50,985 (Sept. 9, 2021). The executive order directs the Safer Federal Workforce Task Force (Task Force) to draft federal contractor vaccine

requirements—along with other onerous mandates for federal contractors like masking and social distancing—subject only to approval by the Director of the Office of Management and Budget (OMB). *Id.*; *see also* Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021) [hereinafter Task Force guidance], https://www.saferfederalworkforce.gov/ downloads/Draft%20contractor%20guidance%20doc_20210922.pdf.

6. This not only violates the exclusivity provisions of § 1303(a), but also 41 U.S.C. § 1707(a)–(b), which requires notice and comment for any "procurement policy, regulation, procedure, or form," subject only to a narrow "urgent and compelling circumstances" exception, *id.* § 1707(d).

7. The government cannot satisfy that exception, but even if it could, it has not invoked it. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691 (Sept. 28, 2021) (approving the Task Force guidance); 41 U.S.C. § 1707(e) (requiring an agency invoking that exception to designate the action as "temporary" and provide a 30-day comment period after it becomes effective); *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (explaining that "post hoc rationalizations" are not "properly before" a reviewing court).

8. Moreover, the OMB rule approving the Task Force guidance is invalid under the Administrative Procedure Act (APA) because it does not reflect reasoned decisionmaking. In fact, it contains no reasoning at all. The entire rationale provided for requiring federal contractors to follow the Task Force's thirteen pages of single-

spaced "guidance" is as follows: The Task Force guidance "will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a [f]ederal [g]overnment contract." 86 Fed. Reg. at 53,692.

9. Such conclusory justifications do not satisfy the APA. *See Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made").

10. Meanwhile, even though the President has sought to circumvent the FAR Council's authority, he has separately instructed the FAR Council to amend federal procurement regulations to include a contract clause requiring federal contractors to comply with the Task Force guidance once approved by OMB. *See* 86 Fed. Reg. at 50,986. But the FAR Council, too, has ignored § 1707(a)–(b), instead promulgating the requested contract clause without notice and comment as "guidance." *See* Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021) [hereinafter FAR Council guidance], https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf.

11. The government is, of course, treating this "guidance" as binding, as multiple agencies are already including the contract provision drafted by the FAR Council in their contracts.

12. But even if the Administration were not treating it as binding, the FAR Council guidance would still violate § 1707(a)–(b) because, at a minimum, the guidance is a "procurement policy" subject to notice and comment. 41 U.S.C. § 1707(a)(1).

13. Making matters worse, the draft contract language violates the Spending Clause by conditioning Florida's receipt of appropriated funds on Florida agreeing to comply with the Task Force guidance *even if it changes* during the course of the contract. FAR Council guidance at 5.

14. On top of all these issues, the vaccine requirements are transparently pretextual. While the government pays lip service to the rationale of "improv[ing] economy and efficiency" in federal procurement, 86 Fed. Reg. at 53,692, it openly admits that its true purpose is to "get[] more people vaccinated and decrease the spread of COVID-19." FAR Council guidance at 3; *see also* Remarks by President Biden on Fighting the COVID-19 Pandemic, White House (Sept. 9, 2021) [hereinafter President Biden Remarks], https://www.whitehouse.gov/briefing-room/speeches-remarks/ 2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ ("As your President, I'm announcing tonight a new plan to require more Americans to be vaccinated, to combat those blocking public health.")

15. Having failed in its earlier attempts to dictate COVID policy from Washington, *see Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021), one can understand why the Executive Branch is no longer relying on its public health authorities to regulate public health. But doing so under the guise of efficient

procurement is pretextual and violates the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–76 (2019).

16. Because the government's unlawful vaccine requirements seek to interfere with Florida's employment policies and threaten Florida with economic harm and the loss of federal contracts, the State seeks relief from this Court.

## PARTIES

17. Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its sovereign interests, its public fisc, and the health, safety, and welfare of its citizens.

18. Defendants are the United States, the President of the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged actions.

19. Defendant Joseph R. Biden, Jr. issued the challenged executive order. *See* 86 Fed. Reg. at 50,985.

20. Defendant OMB is an agency within the Executive Office of the President. OMB issued the rule approving the Task Force guidance. *See* 86 Fed. Reg. at 53,691.

21. Defendant FAR Council is responsible for "manag[ing], coordinat[ing], control[ing], and monitor[ing] the maintenance of, issuance of, and changes in the Federal Acquisition Regulation." 41 U.S.C. § 1303(d). The FAR Council issued the challenged guidance. *See* FAR Council guidance.

22. Defendant National Aeronautics and Space Administration (NASA) frequently contracts with Florida, has current contractual relationships with Florida,

and is and will continue to seek to impose the Biden Administration's unlawful requirements on Florida.

23. Defendant General Services Administration (GSA) frequently contracts with Florida, has current contractual relationships with Florida, and is and will continue to seek to impose the Biden Administration's unlawful requirements on Florida.

24. Defendant Shalanda D. Young is the Acting Director of OMB. She is sued in her official capacity.

25. Defendants Lesley A. Field, John M. Tenaglia, Jeffrey A. Koses, and Karla S. Jackson are members of the FAR Council by virtue of their roles in their respective agencies. Defendant Lesley A. Field is the Acting Administrator for Federal Procurement of OMB. Defendant John M. Tenaglia is the Principal Director of Defense Pricing and Contracting of the Department of Defense. Defendant Jeffrey A. Koses is the Senior Procurement Executive & Deputy Chief Acquisition Officer of GSA. Defendant Karla S. Jackson is the Assistant Administrator for Procurement of NASA. They are sued in their official capacities.

26. Defendant Bill Nelson is the Administrator of NASA. He is sued in his official capacity.

27. Defendant Robin Carnahan is the Administrator of GSA. She is sued in her official capacity.

## JURISDICTION AND VENUE

28. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–03.

29. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

30. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).[1] Further, there is a related case pending in this division, which also challenges the vaccine requirements for federal contractors. *See Navy Seal 1 v. Biden*, 8:21-cv-2429-SDM-TGW (M.D. Fla.).

## FACTUAL BACKGROUND

### The Federal Property and Administrative Services Act

31. In the aftermath of World War II, during which the federal government amassed a substantial amount of war supplies and other property, there was an evident need for "an improved and efficient property management program," H.R. Rep. No. 81-670, at 1475, and an overhaul of the internal "housekeeping" activities of the world's largest buyer of goods and services in the world, *id.* at 1476. As one member

---

[1] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

of Congress explained, the federal procurement system was "largely uncoordinated, to some extent duplicative," and in desperate need of reform. 95 Cong. Rec. 7441 (June 8, 1949) (remarks of Rep. Holifield).

32. Congress enacted FPASA in 1949 "to provide the [f]ederal [g]overnment with an economical and efficient system for" certain enumerated activities, including "[p]rocuring and supplying property and nonpersonal services," "establish[ing] . . . pools or systems of transportation of [g]overnment personnel," and "manag[ing] of public utility services." 40 U.S.C. § 101(1).[2]

33. For example, FPASA charges GSA with returning excess foreign property, *id.* § 702, and donating surplus medical supplies owned by the federal government, *id.* § 703. It also prescribes rules for the use of proceeds from sales or transfers of property, *id.* § 571, and outlines procedures for the selection of architects and engineers, *id.* § 1103.

34. To effectuate FPASA, Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out" that statute. *Id.* § 121(a). Notably, Congress did not authorize the President to issue orders with the force or effect of law, as it authorized the GSA Administrator to do. *Compare* § 121(a) ("prescribe policies and directives"), *with* § 121(c) ("prescribe regulations"); *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain

---

[2] Although the relevant statutes have changed over time, Florida cites the current versions except when citing prior versions is necessary to explain historical developments.

language in one part of the statute and different language in another, the court assumes different meanings were intended.").

35. Over time, however, FPASA proved inadequate to control the lack of coordination across agencies, and the proliferation of procurement regulations by different agencies led to a morass of legal requirements.[3] In 1979, Congress directed the Office of Federal Procurement Policy (OFPP)—part of OMB—to "issue policy directives . . . for the purpose of promoting the development and implementation of [a] uniform procurement system," with concurrence of the OMB Director. *See* Office of Federal Procurement Policy Amendments of 1979, Pub. L. No. 96-83, § 4(e), 93 Stat. 650; *see also* Kate M. Manuel et al., Cong. Rsch. Serv., R42826, The Federal Acquisition Regulation (FAR): Answers to Frequently Asked Questions 10 (2015), https://sgp.fas.org/crs/misc/R42826.pdf.

36. In 1983, under the policy directive of the Administrator of OFPP, the Department of Defense, GSA, and NASA jointly promulgated the first version of the Federal Acquisition Regulation (FAR), 48 Fed. Reg. 42,102 (Sept. 19, 1983).

37. Even after creation of the FAR, however, the problems FPASA was designed to solve persisted. S. Rep. No. 100-424, at 13–14 ("Redundancies and inconsistencies continue to exist between the FAR and agency supplementing

---

[3] As early as 1972, the Commission on Government Procurement described the landscape as "a burdensome mass and maze of procurement and procurement-related regulations" with "no effective overall system for coordinating, controlling, and standardizing regulations." Kate M. Manuel et al., Cong. Rsch. Serv., R42826, The Federal Acquisition Regulation (FAR): Answers to Frequently Asked Questions 10 (2015) (quoting United States Comm'n on Gov't Procurement, Report of the Commission on Government Procurement, Vol. 1, at 33 (1972)), https://sgp.fas.org/crs/misc/R42826.pdf.

regulations implementing the FAR." (quoting study prepared by OMB Director Tom Daley (Nov. 1986))).

38. Finally, in 1988, after decades of failure by officials in the Executive Office of the President charged with coordinating government-wide procurement,[4] Congress established the FAR Council "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overnment-wide procurement regulatory activities in the [f]ederal [g]overnment." Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. No. 100-679, § 3, 102 Stat. 4056, *later codified* at 41 U.S.C. §1302(a).

39. The FAR Council consists of the OFPP Administrator, the Secretary of Defense, the Administrator of NASA, and the GSA Administrator. 41 U.S.C. § 1302(b).[5]

40. Subject to limited exceptions,[6] the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." *Id.* § 1303(a)(1). No other agency is authorized to issue government-wide procurement regulations. *Id.* § 1303(a)(2).

---

[4] *See* S. Rep. No. 100-424, at 4 ("OFPP's performance as the [f]ederal [g]overnment's procurement policy leader has been uneven. . . . [M]any of the procurement executives, industry officials and other procurement experts . . . rated OFPP's overall performance during this as being no more than marginally [e]ffective." (quoting Assessment of the Office of Federal Procurement Policy, GAO/NSIAD–88–35 (Nov. 1987))).

[5] These officials are authorized to designate another agency official to serve on the FAR Council. 41 U.S.C. § 1302(b)(2).

[6] For example, the OFPP Administrator may issue government-wide regulations if the Department of Defense, NASA, and GSA are unable to agree on or fail to issue regulations, 41 U.S.C. § 1121(d), and may remove a regulation if it is inconsistent with the FAR, *id.* § 1303(a)(5).

41. Finally, §1707 further protects Congress's reforms to government procurement practices by requiring that any "procurement policy, regulation, procedure, or form"—whether issued government wide by the FAR Council or for one agency by that agency—be subject to notice and comment. 41 U.S.C. § 1707(a)–(b). The relevant official may waive that requirement only if "urgent and compelling circumstances make compliance with the requirements impracticable." *Id.* § 1707(d).

<u>The Biden Administration's Vaccine Policies</u>

42. Despite pushing the envelope in numerous ways during the COVID-19 pandemic, *e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2485; *Florida v. Becerra*, 8:21-cv-839-SDM-AAS, 2021 WL 2514138 (M.D. Fla. June 18, 2021), the Biden Administration has made clear that mandating vaccines is "not the role of the federal government." Press Briefing by Press Secretary Jen Psaki, July 23, 2021, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

43. Since his press secretary made that statement, however, the President's "patience" has apparently been "wearing thin," and he has grown "angr[y] at those who haven't gotten vaccinated." President Biden Remarks.

44. On September 9, 2021, the President announced three new administrative actions aimed at compelling much, if not most, of the adult population in the United States to receive a COVID-19 vaccine. *Id.*

45. First, the President announced that the Department of Labor would develop an emergency rule mandating that private employers with 100 or more employees require their employees to become fully vaccinated or submit to weekly testing. *Id.*

46. Second, the President announced that the federal government would mandate vaccines for employees who work at healthcare facilities that accept Medicare and Medicaid. *Id.*

47. Finally, as relevant here, the President announced that he would issue an executive order requiring all executive branch employees and federal contractors to be vaccinated. As the President put it, "[i]f you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce." *Id.*

48. In making this announcement, President Biden claimed that these combined initiatives would affect about 100 million Americans. *Id.*

<u>The Challenged Actions</u>

49. On September 9, 2021, President Biden issued the challenged executive order. 86 Fed. Reg. at 50,985. The order relies on FPASA, as well as the Constitution and the President's power under 3 U.S.C. § 301 to delegate his statutory authorities. 86 Fed. Reg. at 50,985.

50. The executive order directs all agencies to ensure that "contracts and contract-like instruments [covered by the executive order] . . . include a clause [that specifies] that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations

published by the Safer Federal Workforce Task Force," subject to that guidance being approved by the OMB Director. 86 Fed. Reg. at 50,985.

51. The executive order instructs the Task Force to develop this guidance and asks the OMB Director, pursuant to the President's delegation of his FPASA power under 3 U.S.C. § 301, to determine whether the Task Force guidance will promote economy and efficiency in federal procurement. 86 Fed. Reg. at 50,985–86. If the OMB Director makes this determination and publishes it in the federal register, agencies are to include this clause in covered contracts. *Id.* The order contemplates that the Task Force will update the guidance on a continuing basis, subject to re-approval by the OMB Director. *Id.*

52. The executive order also instructs the FAR Council to "amend the [FAR] to provide for inclusion in [f]ederal procurement solicitations and contracts subject to this order" the contract clause discussed in the executive order and further instructs agencies to seek to implement the contract clause in contracts not covered by the FAR. *Id.* at 50,986.

53. The executive order exempts certain contracts such as those with a value below "the simplified acquisition threshold," which is typically $250,000. 86 Fed. Reg. at 50,986–87; FAR § 2.101.

54. The executive order applies to contracts entered into, renewed, or with an option to be exercised on or after October 15, 2021. 86 Fed. Reg. at 50,987.

55. On September 24, 2021, the Task Force issued its guidance. Task Force guidance. The Task Force guidance, which is over thirteen pages single-spaced,

outlines the following requirements: (1) vaccination of covered contractor employees,[7] except in limited circumstances where an employee is legally entitled to an accommodation, *id.* at 5–6; (2) compliance with CDC guidance for masking and physical distancing at contractor workplaces, including for visitors, *id.* at 6–7; and (3) designation of a person to coordinate compliance with the guidance and other COVID-19 safety protocols, *id.* at 7–8.

56. In a lengthy Q&A portion, the guidance makes clear that prior COVID-19 infection, even with an antibody test, does not satisfy the vaccination requirement. *Id.* at 10. The Q&A also makes clear that employees who work exclusively outdoors are subject to the same stringent requirements.[8] *Id.*

57. The Task Force guidance sets a deadline of December 8, 2021, for all covered contractor employees to be fully vaccinated. *Id.* at 5.

58. The guidance also declares that the Task Force will consider updates "based on future changes to [CDC] guidance and as warranted by the circumstances of the pandemic and public health conditions."[9] *Id.* at 2.

---

[7] A "covered contractor employee" is defined as "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace [including] employees of covered contractors who are not themselves working on or in connection with a covered contract." Task Force guidance at 3–4.

[8] Although the Task Force guidance excludes a person's residence from the definition of "covered contractor workplace," it does not exclude people who work exclusively from home from the definition of "covered contractor employee" and thus appears to require the vaccination of people who work exclusively from home. Task Force guidance at 3–4.

[9] To the extent the government seeks to require compliance with "updates" to the Task Force guidance that the OMB Director has not approved, this raises additional issues, including the Task Force's absence of authority, the fact that delegations under 3 U.S.C. § 301 must be made to officials appointed by the President and confirmed by the Senate, and the fact that the Task Force includes officials not appointed pursuant to the Appointments Clause.

59. On September 28, 2021, as contemplated by the executive order, the OMB Director published a notice of determination in the federal register, without reasoning or explanation, finding that the Task Force guidance "will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a [f]ederal [g]overnment contract." 86 Fed. Reg. at 53,692.

60. On September 30, 2021, the FAR Council—purporting to comply with the executive order—issued its "guidance" entitled "Issuance of Agency Deviations to Implement Executive Order 14042." *See* FAR Council guidance.

61. In its guidance, the FAR Council "encourage[s] [agencies] to make . . . deviations" to the FAR, which should be "effective until the FAR is amended." *Id.* at 3.

62. A deviation clause is a clause that is inconsistent with the FAR. FAR § 1.401. The FAR prescribes procedures for both individual deviations and class deviations. *Id.* § 1.403–04. Deviations are not an appropriate manner to implement a government-wide procurement policy, and "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision." *Id.* § 1.404.

63. The draft contract clause cites the executive order as the single authority for these deviations and contains little substantive content other than requiring compliance with the Task Force guidance, even if that guidance is amended during performance of the contract. FAR Council guidance at 3–5.

64. The FAR Council guidance "reminds" agencies that, under the executive order, they are "required to include an implementing clause" in new contracts awarded on or after November 14, new solicitations issued on or after October 15, extensions or renewals of existing contracts awarded on or after October 15, and options on existing contracts exercised on or after October 15. *Id.* at 2.

65. The FAR guidance also "strongly encourages" agencies to apply the guidance broadly by including the clause in contracts before those deadlines and on contracts not otherwise subject to the executive order. *Id.* at 3. This broad application is meant "[t]o maximize the goal of getting more people vaccinated and decreas[ing] the spread of COVID-19." *Id.* at 3.

<u>Florida is Irreparably Harmed by These Acts</u>

66.  Florida contracts with the federal government as a matter of course. Space Florida, an arm of the State, § 331.302(1), Fla. Stat., has several contracts with NASA, many of which involve leasing federal land, but others of which involve Space Florida providing services to the government. Florida's public universities also have many contracts with NASA, especially for research. And the Florida Department of Education has a number of contracts with GSA, including for providing vending and other food-related services in GSA buildings. These contracts are worth tens of millions of dollars, if not more.

67. Florida expects to continue pursuing government contracts in the future. Florida also has current contracts subject to renewal or the exercise of options—both

of which the federal government has said it will not do unless Florida acquiesces to the challenged actions.

68. Because Florida's employees are generally not required to be vaccinated, the challenged actions threaten Florida with the loss of millions of dollars in future contracting opportunities and put undue pressure on Florida to create new policies and change existing ones, each of which threatens Florida with imminent irreparable harm.

## CLAIMS

## COUNT 1

### Agency action that is not in accordance with law and is in excess of authority (OMB Rule)

69. Florida repeats and incorporates by reference ¶¶ 1–68.

70. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

71. The OMB rule adopting the Task Force guidance is contrary to law for at least four reasons.

72. *First*, the OMB rule violates 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

73. The executive order apparently seeks to circumvent § 1303 by delegating the President's FPASA power to the OMB Director. 86 Fed. Reg. at 50,985.

18

74. That attempt is unlawful because the President has no authority to issue regulations under § 1303—only the FAR Council may issue government-wide procurement regulations. *See Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

75. *Second*, and relatedly, the OMB rule is contrary to law because FPASA does not otherwise grant the President the power to issue orders with the force or effect of law. Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out" FPASA. 40 U.S.C. § 121(a). "[P]olicies and directives" describe the President's power to direct the exercise of procurement authority throughout the government. It does not authorize the President to issue regulations himself.

76. Congress knows how to confer that power, as it authorized the GSA Administrator, in the same section of the statute, to "prescribe regulations." *Id.* § 121(c); *see also Sosa*, 542 U.S. at 711 n.9 ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense. *E.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular

officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

77. *Third*, even if FPASA authorized the President to issue orders with the force or effect of law, it would not authorize approval of the Task Force guidance. The President appears to assume that FPASA authorizes him to issue any order that he believes, as FPASA's statement of purpose states, promotes "an economical and efficient" procurement system. 40 U.S.C. § 101; *see* 86 Fed. Reg. at 50,985 ("This order promotes economy and efficiency in [f]ederal procurement."). But that mistakes a prefatory purpose statement for a grant of authority. *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

78. And even if FPASA did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the OMB rule does not adequately do so. Providing the federal government with an "economic and efficient system for" procurement is not a broad enough delegation to impose nationwide social policy that Congress has not separately authorized. Further, the executive order is divorced from the practical needs of procurement. It will exclude otherwise competitive bidders, cause contractors to suffer labor shortages, and is substantially overbroad in, for example, refusing to account for natural immunity and ignoring the low transmission risk for COVID-19 outdoors.

79. *Fourth*, the OMB rule is inconsistent with the requirements of the Competition in Contracting Act, which requires federal agencies to "provide for full

and open competition through the use of competitive procedures." 41 U.S.C. § 3301; *see* 40 U.S.C. § 121(a) (requiring "policies" issued by the President pursuant to FPASA to be "consistent with this subtitle"); 40 U.S.C. § 111 (defining "this subtitle" to include portions of Title 41, including § 3301). The OMB rule precludes an entire class of contractors from obtaining federal contracts without regard to their capability to perform the contract. That is unlawful. *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 986 (Fed. Cir. 2019) (finding invalid an agency policy that "effectively exclude[ed] an offeror from winning an award, even if that offeror represent[ed] the best value to the government").

80. Because the OMB rule violates § 1303(a), seeks to exercise a delegated power the President does not possess, relies on a misreading of FPASA, and violates § 3301, it is contrary to law.

### COUNT 2

**Failure to conduct notice and comment**[10]
**(OMB Rule)**

81. Florida repeats and incorporates by reference ¶¶ 1–68.

82. Under 41 U.S.C. § 1707(a)–(b), procurement "polic[ies], regulation[s], procedure[s], or form[s]" must go through notice and comment, so long as they "relate to the expenditure of appropriated funds" and either (i) have "a significant effect

---

[10] Florida invokes both 41 U.S.C. § 1707 and 5 U.S.C. § 553, *see* 5 U.S.C. § 706(2)(D), but focuses on § 1707 because it is more stringent.

beyond the internal operating procedures of" the issuing agency, or (ii) have "a significant cost or administrative impact on contractors or offerors."

83. The OMB rule easily satisfies each of these requirements. Moreover, the government has not invoked the exception in § 1707(d), which requires "urgent and compelling circumstances" that "make compliance with the requirements impracticable." 41 U.S.C. § 1707(d); *see id.* § 1707(e) (requiring an agency invoking that exception to designate the action as "temporary" and provide a 30-day comment period after it becomes effective).

84. Even if it had, the COVID-19 pandemic has existed for over eighteen months, and the prospect of a vaccine has existed for at least a year. There is no reason that notice and comment was impracticable.

## COUNT 3

### Arbitrary and capricious agency action
### (OMB Rule)

85. Florida repeats and incorporates by reference ¶¶ 1–68.

86. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

87. An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

88. The OMB rule contains no explanation or reasoning at all. 86 Fed. Reg. at 53,691–92.

89. What is more, the OMB rule is arbitrary and capricious because the current Task Force guidance does not sufficiently promote economy and efficiency, or at least consider and address the shortfalls Florida has highlighted. *See* ¶¶ 78–79.

90. Moreover, the OMB rule ignores costs to the States, a "centrally relevant factor when deciding whether to regulate," *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015), and neither accounts for Florida's reliance interests nor considers lesser alternatives, *Regents*, 140 S. Ct. at 1913–14.

91. Finally, the OMB Director's conclusion that the Task Force guidance would improve procurement efficiency by reducing absenteeism and decreasing labor costs is blatantly pretextual. *See Dep't of Com.*, 139 S. Ct. at 2576 ("Accepting contrived reasons would defeat the purpose of the enterprise [of judicial review.]").

92. The OMB rule is a trojan horse for federal regulation of public health. President Biden, in his remarks announcing the executive order, stated that he was "frustrated with the nearly 80 million Americans who are still not vaccinated," referenced "overcrowd[ed] . . . hospitals" and "overrun[] . . . emergency rooms," and blamed "elected officials actively working to undermine the fight against COVID-19." President Biden Remarks.

93. The FAR Council guidance likewise admits that the goal of this effort is "getting more people vaccinated and decreas[ing] the spread of COVID-19." FAR Council guidance at 3.

94. For all these reasons, the OMB rule is arbitrary and capricious.

## COUNT 4

### Agency action that is not in accordance
### with law and is in excess of authority
### (FAR Council Guidance)

95. Florida repeats and incorporates by reference ¶¶ 1–68.

96. While the FAR Council claims to be issuing only "guidance," the guidance is being "applied . . . in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). It is therefore reviewable.

97. The guidance does not explain what authority would authorize the FAR Council to create a government-wide procurement regulation mandating vaccines for contractors. But to the extent the FAR Council relies on FPASA, it lacks that authority for the reasons described in count 1.

## COUNT 5

### Failure to conduct notice and comment
### (FAR Council Guidance)

98. Florida repeats and incorporates by reference ¶¶ 1–68.

99. As discussed in count 2, 41 U.S.C. § 1707(a)–(b) requires procurement "polic[ies], regulation[s], procedure[s], or form[s]" to go through notice and comment.

100. Even if the FAR Council guidance is not being treated as binding—and it is—the guidance is a procurement policy.

101. By requiring notice and comment—not just for regulations, but for policies—Congress subjected any government-wide pronouncements, whether

binding or not, to notice and comment. The FAR Council guidance is therefore invalid.

102. Moreover, the draft contract language in the guidance is a procurement form subject to notice and comment.

103. For these reasons, and those discussed in count 2, the FAR Council guidance is invalid.

## COUNT 6

### Arbitrary and capricious agency action
### (FAR Council Guidance)

104. Florida repeats and incorporates by reference ¶¶ 1–68.

105. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

106. The FAR Council guidance is arbitrary and capricious for the reasons explained in count 3.

## COUNT 7

### Ultra vires acts of the President

107. Florida repeats and incorporates by reference ¶¶ 1–68.

108. Apart from the APA, there is a nonstatutory cause of action to challenge unlawful procurement-related actions by the President. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) (discussing a government concession to that effect).

109. As explained in count 1, the President does not have the authority to issue the challenged executive order.

## COUNT 8

### Violation of the U.S. Constitution, Art. I, § 1
### Unconstitutional delegation of legislative power

110. Florida repeats and incorporates by reference ¶¶ 1–68.

111. Article I, § 1 of the U.S. Constitution states, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." Under Article I, § 1, only Congress may engage in lawmaking.

112. To the extent the Court agrees that FPASA authorizes the President to require contractors to mandate vaccines to their employees to promote economy and efficiency in procurement, FPASA lacks an intelligible principle and represents an unconstitutional delegation of legislative authority.

## COUNT 9

### Violation of the U.S. Constitution, Amend. X
### Unconstitutional exercise of the spending power

113. Florida repeats and incorporates by reference ¶¶ 1–68.

114. The challenged actions are unconstitutional conditions on the State's receipt of federal funds.

115. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

116. Federal contracts are an exercise of the Spending Clause, yet the challenged actions ask Florida to agree to an ambiguous contract term—specifically, agreeing to comply with uncertain Task Force guidance that can be changed at any time.

117. The challenged actions are invalid for that reason alone.

## COUNT 10

### Declaratory judgment that challenged actions are unlawful

118. Florida repeats and incorporates by reference ¶¶ 1–68.

119. For the same reasons described in each of the previous counts, Florida is entitled to a declaratory judgment that the Defendants are violating the law.

### PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the executive order, the OMB rule, and the FAR Council guidance.

b) Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the executive order, the OMB rule, and the FAR Council guidance.

c) Issue declaratory relief declaring the Defendants' actions unlawful.

d) Award Florida costs and reasonable attorney's fees.

e) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY
*Lead Counsel

Henry Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*