## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff,*

    v.                        No. 8:21-cv-2524-SDM-TGW

BILL NELSON, et al.,

    *Defendants.*

_____/

### FLORIDA'S MOTION FOR PRELIMINARY INJUNCTION

For its first six months in office, the Biden Administration assured the American people that mandating vaccines is "not the role of the federal government."[1] Since that time, however, the President's "patience" has apparently been "wearing thin," and he has grown "angr[y] at those who haven't gotten vaccinated."[2] He now openly mocks those who make the personal choice to refuse a COVID-19 vaccine, deriding that decision as claiming the "freedom to kill [others] with [their] COVID."[3]

While this Administration once declared that it could implement a nationwide vaccine mandate using its public health authorities,[4] the Supreme Court has now

---

[1] Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

[2] Remarks by President Biden on Fighting the COVID-19 Pandemic, White House (Sept. 9, 2021) [hereinafter President Biden Remarks], https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

[3] Transcript: CNN Presidential Town Hall with President Joe Biden, CNN (Oct. 21, 2021), https://transcripts.cnn.com/show/se/date/2021-10-21/segment/01.

[4] Ex. 1 at 29 (explaining that such a mandate "would fall within CDC's statutory authority").

clarified that those authorities are narrower than the Administration believed. *See Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021). Forced to look elsewhere, the President now seeks to compel millions of Americans who work for federal contractors—including officials and employees of the sovereign States—to receive a COVID vaccine that they do not want in the name of "promot[ing] economy and efficiency in procurement."

The President's procurement authorities are not a backdoor to a nationwide vaccine mandate. His use of those authorities is unprecedented in our history and intrudes radically on individual autonomy and state sovereignty. Making matters worse, the President's order runs roughshod over basic statutory procedural protections. For example, it delegates untrammeled authority to a shadowy White House-led "task force" and the Director of the Office of Management and Budget (OMB) to impose COVID-19 restrictions broadly on federal contractors, rather than the body that Congress entrusted with creating and implementing government-wide procurement policy, the Federal Acquisition Regulatory Council (FAR Council). And it does so without the notice and comment procedures that Congress also required.

Florida requests a preliminary injunction to prevent the immediate irreparable harm that it will suffer as a result of these unlawful actions.

## BACKGROUND

<u>The Federal Procurement Scheme</u>

Congress enacted the Federal Property and Administrative Services Act of 1949 (FPASA) "to provide the [f]ederal [g]overnment with an economical and efficient

system for" certain enumerated activities, including procurement.[5] 40 U.S.C. § 101. In FPASA, Congress authorized the President to "prescribe policies and directives that [he] considers necessary to carry out" that act. *Id.* § 121(a). Congress did not, however, authorize the President to issue regulations with the force or effect of law and impose requirements on private individuals, but instead charged him with directing the exercise of procurement powers by the relevant agency officials. *Compare id.* (authorizing the President to "prescribe policies and directives"), *with id.* § 121(c) (authorizing the Administrator of the General Services Administration (GSA) to "prescribe regulations").

Unsatisfied by the Executive Branch's management of federal procurement, Congress has made several reforms to the procurement scheme since 1949. As relevant here, Congress created the FAR Council, which controls the Federal Acquisition Regulation (FAR), 41 U.S.C. § 1303(d), and has the exclusive power to issue "[g]overnment-wide procurement regulation[s]," *id.* § 1303(a)(1)–(2). Congress also requires that any "procurement policy, regulation, procedure, or form"—whether issued government wide by the FAR Council or for one agency by that agency—be subject to notice and comment, *id.* § 1707(a)–(b), unless the government can show that "urgent and compelling circumstances make compliance . . . impracticable," *id.* § 1707(d).

---

[5] Florida explained FPASA's history and purpose in more detail in its complaint. *See* Compl. ¶¶ 31–41.

<u>The Biden Administration's Vaccine Policies</u>

On September 9, 2021, the President announced three new administrative actions aimed at compelling much, if not most, of the adult population in the United States to receive a COVID-19 vaccine. First, the President announced that the Department of Labor would issue an emergency rule mandating that private employers with 100 or more employees require their employees to become fully vaccinated or submit to weekly testing. *See* President Biden Remarks. Second, the President announced that the Centers for Medicare & Medicaid Services would issue a rule mandating vaccines for employees who work at healthcare facilities that accept Medicare and Medicaid. *Id.* Finally, the President announced that he would issue an executive order requiring all executive branch employees and federal contractors to be vaccinated. *Id.* As the President put it, "[i]f you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce." *Id.* In making this announcement, President Biden claimed that these combined initiatives would affect about 100 million Americans. *Id.*

That same day, President Biden issued the challenged executive order. *See* Exec. Order No. 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50,985 (Sept. 9, 2021). The order relies on FPASA, as well as the Constitution and the President's power under 3 U.S.C. § 301 to delegate his statutory authorities. 86 Fed. Reg. at 50,985. The executive order directs all agencies to ensure that all "contracts and contract-like instruments [covered by the executive

4

order] . . . include a clause [that specifies] that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force" (Task Force), subject to that guidance being approved by the OMB Director. *Id.*

The executive order instructs the Task Force to develop this guidance and directs the OMB Director, pursuant to the President's delegation of his FPASA power under 3 U.S.C. § 301, to determine whether the Task Force guidance will promote economy and efficiency in federal procurement. 86 Fed. Reg. at 50,985–86. If the OMB Director makes this determination and publishes it in the Federal Register, agencies must include this clause in covered contracts. *Id.* The order contemplates that the Task Force will update the guidance on a continuing basis, subject to approval by the OMB Director. *Id.*

The executive order also instructs the FAR Council to "amend the [FAR] to provide for inclusion in [f]ederal procurement solicitations and contracts subject to this order" the contract clause discussed in the executive order and further directs agencies to implement the contract clause in contracts not covered by the FAR. *Id.* at 50,986. The executive order applies to contracts entered into, renewed, or with an option to be exercised on or after October 15, 2021. *Id.* at 50,987.

On September 24, 2021, the Task Force issued its guidance (Task Force guidance).[6] The Task Force guidance, which is over thirteen pages single-spaced, outlines the following requirements: (1) vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation, Task Force guidance at 5–6; (2) compliance with CDC guidance for masking and physical distancing at contractor workplaces, including for visitors, *id.* at 6–7; and (3) designation of a person to coordinate compliance with the guidance and other COVID-19 safety protocols, *id.* at 7–8.

In a lengthy Q&A portion, the guidance makes clear that prior COVID-19 infection, even with an antibody test, does not satisfy the vaccination requirement. *Id.* at 10. The Q&A also explains that employees who work exclusively outdoors are subject to the same stringent requirements. *Id.* The Task Force guidance sets a deadline of December 8, 2021, for all covered contractor employees to be fully vaccinated. *Id.* at 5. The guidance declares that the Task Force will consider updates "based on future changes to [CDC] guidance and as warranted by the circumstances of the pandemic and public health conditions." *Id.* at 2.

On September 28, 2021, as contemplated by the executive order, the OMB Director published a notice of determination in the Federal Register (OMB rule), without reasoning or explanation, finding that the Task Force guidance "will improve

---

[6] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, Safer Federal Workforce Task Force (Sept. 24, 2021), https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20210922.pdf.

economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a [f]ederal [g]overnment contract." Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691–92 (Sept. 28, 2021).

On September 30, 2021, the FAR Council—in compliance with the executive order—issued its "guidance" (FAR Council guidance).[7] *See* 86 Fed. Reg. at 50,986 (instructing the FAR Council to "take initial steps to implement appropriate policy direction" by October 8). In its guidance, the FAR Council "encouraged [agencies] to make . . . deviations" to the FAR, which should be "effective until the FAR is amended." FAR Council guidance at 3.

The FAR Council guidance includes the text of a contract clause,[8] which contains little substantive content other than requiring compliance with the Task Force guidance, even if that guidance is amended during performance of the contract. FAR Council guidance at 4–5. The FAR Council guidance "remind[s]" agencies that, under the executive order, they are "required" to include an implementing clause in new contracts awarded on or after November 14, new solicitations issued on or after October 15, extensions or renewals of existing contracts awarded on or after October

---

[7] *See* Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf.
[8] Using the clause verbatim waives the requirement to consult with the Civilian Agency Acquisition Council. FAR Council guidance at 3; *see* FAR § 1.404(a)(1).

15, and options on existing contracts exercised on or after October 15. *Id.* at 2. The FAR Council guidance also "strongly encourages" agencies to apply the guidance broadly by including the clause in contracts before those deadlines and on contracts not otherwise subject to the executive order. *Id.* at 3. This broad application is meant "[t]o maximize the goal of getting more people vaccinated and decrease the spread of COVID-19." *Id.*

<u>The Effect of the Challenged Actions on Florida</u>

Florida's agencies and other state entities contract with the federal government as a matter of course, and these contracts are worth tens of millions of dollars or more. For example, last year the University of Florida won a contract from the National Aeronautics and Space Administration (NASA) worth over $12 million. Ex. 3 at 2. And Florida's Department of Education has several contracts with GSA to provide vending services at federal buildings, which Florida uses to give employment opportunities to blind individuals. Ex. 2 at 2–3. Florida has pending opportunities to enter into or renew a number of such contracts beginning as early as December. *Id.* at 3–4.

Defendants are already pressuring Florida to modify existing contracts, Ex. 4 at 3–6; Ex. 5 at 2–5; Ex. 6 at 2–7, and Florida understands that failing to do so will exclude Florida from consideration for future opportunities, Ex. 2 at 3. As a matter of Florida law, however, state entities may not require vaccination of state employees. *See* § 381.00316(2), Fla. Stat.; Ex. 7 at 2 (enforcing § 381.00316(2) against a local government); Ex. 8 at 3 (explaining that Florida's public universities lack authority to

mandate vaccines for employees). The challenged actions, therefore, require Florida to choose between changing or violating state law on the one hand or losing tens of millions of dollars in federal funds on the other.

Beyond the mandates on state officials and employees, the challenged actions' effect on private businesses will financially harm Florida. According to polling data, roughly two-thirds of the unvaccinated say they will quit their job in response to a vaccine mandate.[9] Because less than two-thirds of Floridians are fully vaccinated,[10] federal contractors in Florida will soon begin losing a substantial portion of their workforce as a direct result of the President's executive order. And this loss will cause Florida economic harm in the form of reduced corporate income tax revenues.[11] *See* § 220.11, Fla. Stat. (setting a corporate income tax rate of 5.5 percent).

Because Defendants imposed a deadline to be vaccinated of December 8, Florida's irreparable harm is imminent.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that

---

[9] Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: September 2021*, Kaiser Family Foundation (Sept. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-september-2021/.

[10] Florida COVID-19 Vaccine Tracker, Florida Today (last visited Nov. 1, 2021), https://data.floridatoday.com/covid-19-vaccine-tracker/florida/12/.

[11] Matthew Boyle, *Vaccine Mandates Reach 25% of Companies After Biden Order* (Sept. 30, 2021), https://www.bloomberg.com/news/articles/2021-09-30/one-in-four-companies-now-have-vaccine-mandate-after-biden-order.

an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[12]

I.   **FLORIDA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.**

   *a.  The challenged actions are contrary to law and in excess of statutory authority.*

Under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations" or "not in accordance with law." 5 U.S.C. § 706(2)(A), (C).[13] Because the executive order, the OMB rule, and the FAR Council guidance violate multiple statutes, Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).

   i.   <u>Only the FAR Council may issue government-wide procurement regulations.</u>

Section 1303(a) requires the FAR Council to "issue and maintain . . . a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1303(a)(1). Further, "[o]ther regulations relating to procurement issued by an executive agency [are] limited to" agency-specific regulations and regulations necessary to implement government-wide procurement policies. *Id.* § 1303(a)(2). The challenged actions violate these provisions.

---

[12] Jurisdiction in this Court is proper; although the Court of Federal Claims has jurisdiction over certain procurement-related matters, it does not have jurisdiction to consider Florida's claims here. *See Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021) ("Challenges to the validity of a regulation governing a procurement must be brought in federal district court under the Administrative Procedure Act." (citing *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998))).

[13] Florida's claim against the President for ultra vires action is not an APA claim, *see* Compl. ¶ 108 (discussing *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996)), but Florida discusses it here for ease of organization.

The executive order violates § 1303 because it asks OMB to issue a government-wide procurement regulation requiring vaccines—a task exclusively reserved to the FAR Council. 86 Fed. Reg. at 50,985–96. The OMB rule similarly violates § 1303 because it carries out the President's unlawful instruction. 86 Fed. Reg. at 53,691–92. And the FAR Council guidance violates § 1303 because it abdicates the FAR Council's responsibility to issue government-wide procurement regulations, instead "remind[ing]" agencies what the executive order "require[s]." FAR Council guidance at 2. Moreover, as further explained below, the FAR Council is not authorized to dictate government-wide procurement policy via "guidance." *See* Section I.b.

Because the President and OMB Director attempt to exercise authority exclusively reserved to the FAR Council and because the FAR Council acquiesces to and even encourages this intrusion, the challenged actions are contrary to law.[14]

ii.  <u>The President does not have the authority to issue procurement regulations under FPASA.</u>

The President's executive order appears to proceed on the premise that FPASA grants the President the power to issue government-wide procurement regulations with the force or effect of law himself. It does not. Section 121(a) only authorizes the President to "prescribe *policies and directives* that the President considers necessary to carry out" FPASA. 40 U.S.C. § 121(a) (emphasis added). "[P]olicies and directives"

---

[14] As best Florida can tell from monitoring the FAQs on saferfederalworkforce.gov, the government is updating the Task Force guidance without approval of the OMB Director, in flagrant violation of the Constitution. *See* Compl. at 15 n.9; FAR Council guidance at 5 (requiring compliance with the Task Force's "Frequently Asked Questions," even if "amended during the performance" of a contract).

describe the President's power to direct the exercise of procurement authority throughout the government. *See Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. O.L.C. 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President."). This authority is quite different from authority for the President himself to issue regulations imposing requirements on private parties.

Congress knows how to confer that power, as it authorized the GSA Administrator to "prescribe regulations" in the same section of the statute. 40 U.S.C. § 121(c). It even gave the President, in another section of FPASA, the power to "prescribe regulations establishing procedures to carry out" the establishment of motor vehicle pools and transportation systems. *Id.* § 603; *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realms of foreign affairs and national defense. *E.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

Because § 121(a) only authorizes the President to direct the exercise of agency authority, the challenged actions are ultra vires.

12

### iii.   FPASA does not authorize a vaccine mandate.

In any event, FPASA contains no authority for the President to leverage the federal government's procurement authorities into a nationwide vaccine mandate in the name of promoting "economy and efficiency." In suggesting otherwise, the government appears to assume that 40 U.S.C. § 101, which states that FPASA's purpose is to "provide the [f]ederal [g]overnment with an economical and efficient system" for activities that include procurement, is an affirmative grant of authority for the government to include in contracts anything it thinks "economical" or "efficient." But that mistakes a prefatory purpose statement for a grant of authority. *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."); *see also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 n.9 (D.C. Cir. 1995) ("[T]he agency may not simply disregard the specific scheme Congress has created . . . in order to follow a broad purpose statement.").

In fact, FPASA specifies when "economy and efficiency" define the scope of an official's authority. *See* 40 U.S.C. § 501(a)(1)(A); *id.* § 506(b); *id.* § 581(c)(4); *id.* § 584(a)(2)(C); *id.* § 603(a)(1). And those provisions—none of which Defendants have invoked here—would be surplusage if the President's authority under FPASA were a general grant to do anything with respect to contracting that promotes economy and efficiency. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are thus 'reluctan[t] to treat statutory terms as surplusage' in any setting." (quoting *Babbitt v. Sweet Home Chapter, Cmtys. for Great Ore*, 515 U.S. 687, 698 (1995))).

13

Similarly, when Congress authorizes the Executive Branch to implement social policy through its procurement authorities, it speaks clearly. *See, e.g.*, 41 U.S.C. § 8302(a)(1) (requiring the procurement of American-made materials unless the "head of the department . . . determines their acquisition to be inconsistent with the public interest or their cost to be unreasonable"); *id.* § 6703(1) (requiring contractors to pay employees a minimum wage set by the Secretary of Labor); *see also* 34 U.S.C. § 10102(a)(6) (discussing the Department of Justice's authority to "plac[e] special conditions on all grants").

Indeed, the grant of authority to the President in FPASA is quite narrow. Beyond the fact that he is not authorized to issue regulations, *see* Section I.a.ii, his power is limited to prescribing policies and directives he "considers *necessary* to carry out this subtitle." 40 U.S.C. § 121(a) (emphasis added). "Necessary" is a "word of limitation" and is synonymous with "required," "indispensable," and "essential." *Vorcheimer v. Phila. Owners Assoc.*, 903 F.3d 100, 105 (3d Cir. 2018); *accord In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004). The President's authority is therefore limited to that which he considers "essential" or "indispensable" to carry out FPASA.

The phrase in § 121(a)—even coupled with the purpose statement in § 101— cannot bear the weight the government has placed on it, especially because Congress does not delegate decisions of major economic and social significance "in so cryptic a

fashion."[15] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160–61 (2000). And nothing in FPASA overcomes the presumption that Congress "preserves the constitutional balance between the National Government and the States." *Bond v. United States*, 572 U.S. 844, 862 (2014). In short, coercing state officials and employees, and millions of American workers, to receive an injection that they do not want is an elephant far too large for the mousehole the government relies on here. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

To be sure, there is authority embracing a broader reading of FPASA, principally *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979), and its progeny. But *Kahn* is wrongly decided. Invoking the purpose statement in § 101, *Kahn* considers whether the President can impose wage and price standards on contractors based on the "'economy and efficiency' touchstone" of FPASA. *Kahn*, 618 F.2d at 788, 793. In addition to misreading § 101 as a grant of authority, the court conflates FPASA's legislative history with its statutory text, *id.* at 788–89 nn. 22–24, and turns basic statutory interpretation on its head by treating specific examples in which Congress authorized the use of the contracting power to advance policy—for example, setting aside certain purchases for small businesses—as evidence that Congress authorized the President to do so unilaterally in unrelated circumstances, *id.* at 789 & n.25.

---

[15] In addition to affecting millions of American workers, the challenged actions affect hundreds of billions of dollars in federal contracts. *See, e.g.*, Federal Government Awards Record-Breaking $145.7 Billion in Contracting to Small Businesses, U.S. Small Business Administration (July 28, 2021), https://www.sba.gov/article/2021/jul/28/federal-government-awards-record-breaking-1457-billion-contracting-small-businesses.

Regardless, the link between the challenged actions and economy and efficiency is far too attenuated. Immediately losing a substantial part of their workforce will not help contractors efficiently serve the government, *see supra* notes 9–11, especially in Florida, which has the lowest COVID cases per capita in the United States.[16] Moreover, even if the benefits of reduced COVID transmission could outweigh that cost, recent data call into question the degree to which vaccines mitigate the spread of the delta variant.[17] Finally, the challenged actions are at a minimum overbroad in refusing to account for natural immunity, subjecting those who work exclusively outdoors to the same requirements as those who work indoors and, as best Florida can tell, requiring vaccination of those who work exclusively from home, *see* Compl. at 15 n.8.[18]

---

[16] David Schutz, *Florida Has Lowest COVID Cases Per Capita in US, Data Shows*, South Florida Sun Sentinel (Oct. 28, 2021), https://www.sun-sentinel.com/coronavirus/fl-ne-florida-covid-19-lowest-case-rate-in-nation-20211028-gvcy2hxdnngufnv3vpwm23yuae-story.html.

[17] *See* Anika Singanayagam et al., *Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study*, Lancet (Oct. 29, 2021), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

[18] *See, e.g.*, Yair Goldberg et al., *Protection of Previous SARS-CoV-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience from Israel*, medRxiv (2021 preprint), https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (concluding that the "overall estimated level of protection from prior . . . infection" was comparable to that from vaccination); Nabin K. Shrestha et al., *Necessity of COVID-19 Vaccination in Previously Infected Individuals*, medRxiv, (2021 preprint), https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2 (concluding that those with natural immunity are "unlikely to benefit from COVID-19 vaccination"); Galit Perez et al., *A 1 to 1000 SARS-Cov-2 Reinfection Proportion in Members of a Large Healthcare Provider in Israel: A Preliminary Report*, medRxiv, (2021 preprint), https://www.medrxiv.org/content/10.1101/2021.03.06.21253051v1 (finding that approximately 1/1000 of participants in a study of persons who previously tested positive for COVID-19 were reinfected); Tommaso Celeste Bulfone et al., *Outdoor Transmission of SARS-CoV-2 and Other Respiratory Viruses: A Systematic Review*, Journal of Infectious Diseases (Nov. 29, 2020), https://academic.oup.com/jid/article/223/4/550/6009483 (concluding that "[e]xisting evidence supports the wide-held belief that risk of SARS-CoV-2 transmission is lower outdoors").

For these reasons, FPASA does not authorize the challenged actions.

### iv. The challenged actions violate the Competition in Contracting Act.

Federal agencies are required to provide for "full and open competition through the use of competitive procedures" in procurement. 41 U.S.C. § 3301(a)(1). The President's § 121(a) authority is expressly subject to that requirement. *See* 40 U.S.C. § 121(a) (requiring "policies" issued by the President pursuant to FPASA to be "consistent with this subtitle"); 40 U.S.C. § 111 (defining "this subtitle" to include portions of Title 41, including § 3301).

The challenged actions violate that provision because they "effectively exclude[] an offeror from winning an award, even if that offeror represents the best value to the government." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 990 (Fed. Cir. 2019). The COVID-19 pandemic has become part of normal life. A company may, for example, be able to have its employees work remotely in the case of an outbreak. But Defendants refuse to consider the specific situation of particular bidders, instead categorically excluding contractors that refuse to acquiesce to the Administration's preferred COVID policies.

By excluding an entire class of contractors without regard to their ability to perform the contract, the challenged actions violate § 3301.

### b. *Defendants failed to conduct notice and comment.*

Section 1707 requires procurement "polic[ies], regulation[s], procedure[s], or form[s]" to go through notice and comment, so long as they "relate[] to the

expenditure of appropriate funds" and either have "a significant effect beyond the internal operating procedures of" the issuing agency or "a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)–(b).

Federal contracts involve the expenditure of appropriated funds, and the vaccine mandate has both a significant effect beyond the internal operating procedures of the agencies and a significant cost and administrative impact on Florida and other contractors. Section 1707 therefore applies, and the challenged actions violate it.

This is true even as to the FAR Council guidance. Though framed as non-binding, agencies are treating it as binding. Ex. 4 at 5–6; Ex. 5 at 2–3; Ex. 6 at 2; *see Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019) (explaining that agency action treated as binding is reviewed as a regulation). It even gives government-wide preapproval of the draft contract clause, providing that "agencies that adopt the attached clause language without change in their deviations will be presumed to have consulted with the Chair of the Civilian Agency Acquisition Council" as "required by FAR 1.404(a)(1)." FAR Council guidance at 3.

And even if it were not binding, it is still a procurement "policy" subject to § 1707's requirements. Because Congress separately used the word "regulation," the word "policy" indicates an intent to cover non-binding government pronouncements. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").

18

Moreover, Defendants have not and cannot invoke the exception in § 1707(d). That exception, which applies when "urgent and compelling circumstances make compliance with the requirements impracticable," 41 U.S.C. § 1707(d), must be invoked by designating the action as "temporary" and providing a thirty-day comment period, *id.* § 1707(e). Defendants have not done so. And even if they had, there is no reason to think that notice and comment was impracticable. Neither the COVID-19 pandemic nor the availability of vaccines is a recent development. *Cf. Florida v. Becerra*, 8:21-cv-839-SDM-AAS, 2021 WL 2514138, at *45 (M.D. Fla. June 18, 2021) (concluding that the COVID-19 pandemic was insufficient for "good cause"); *Regeneron Pharms. v. HHS*, 510 F. Supp. 3d 29, 48 (S.D.N.Y. 2020) (similar).

For these reasons, the challenged actions are subject to notice and comment and violate § 1707.

       *c.   The OMB rule and FAR Council guidance are arbitrary and capricious.*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious," as Defendants' actions are here. 5 U.S.C. § 706(2)(A).

First, neither the OMB rule nor the FAR Council guidance provide any explanation for how they promote economy and efficiency in procurement other than a pro forma, conclusory statement. That is per se arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. . . . [C]onclusory statements do not suffice to explain [an agency's] decision.").

Second, the OMB rule and FAR Council guidance do not promote economy and efficiency for the reasons discussed above. *See supra* at 16–17. And at a minimum, Defendants were required to consider and address the shortfalls Florida has highlighted. But Defendants apparently did not even consider the possibility that their actions would cause a labor shortage. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 658 (2007) (stating the rule that an agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the OMB rule and FAR Council guidance ignore costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). In fact, neither the OMB rule nor the FAR Council guidance display an awareness that the government is imposing requirements on the States at all, which is reason alone to find them arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Fourth, the OMB Rule and FAR Council guidance neither account for Florida's reliance interests on the previous policy of not requiring vaccines, nor consider lesser alternatives, such as subjecting States like Florida with low COVID-19 rates to lesser burdens. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–14 (2020).

Fifth, the conclusion that the Task Force guidance and FAR Council guidance will improve procurement efficiency by reducing absenteeism and decreasing labor costs is blatantly pretextual and a trojan horse for regulation of public health. *See Dep't*

*of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019) ("Accepting contrived reasons would defeat the purpose of the enterprise [of judicial review.]"). President Biden, in his remarks announcing the executive order, stated that he was "frustrated with the nearly 80 million Americans who are still not vaccinated," referred to "overcrowd[ed] . . . hospitals" and "overrun[] . . . emergency rooms," and blamed "elected officials actively working to undermine the fight against COVID-19." President Biden Remarks. The FAR Council guidance likewise admits that the goal of this effort is "getting more people vaccinated and decreas[ing] the spread of COVID-19." FAR Council guidance at 3. That is smoking-gun evidence of pretext.

For these reasons, the OMB rule and FAR Council guidance are arbitrary and capricious.

> d.  *The challenged actions violate the Constitution.*

Even if the challenged actions are not in excess of authority, they are at a minimum unconstitutional.

If FPASA authorizes the President to condition procurement contracts on anything that he believes promotes economy and efficiency, and if that authority reaches as far as requiring contractors to force vaccination of their employees, then FPASA lacks an intelligible principle and violates the non-delegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42 (1935); *accord Becerra*, 2021 WL 2514138, at *31.

Further, the challenged actions would also violate the Spending Clause by conditioning the receipt of federal funds on the States agreeing to a contract term that

is subject to change. FAR Council guidance at 5. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Florida has no opportunity for a knowing choice here because the Task Force guidance is subject to change at any time.

## II.   FLORIDA HAS STANDING AND IS IRREPARABLY HARMED BY THE CHALLENGED ACTIONS.

States are entitled to "special solicitude" in establishing standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (recognizing the States' "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents"). Moreover, a "state has standing to sue in its sovereign capacity when it has suffered an economic injury" or must "expend[] any of its resources." *Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989). For example, the Eleventh Circuit "readily conclude[d]" that Florida has standing to challenge an allegedly illegal agency action that "*may* adversely impact" its "economy" and "thereby injur[e]" Florida. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (emphasis added).

Economic harm caused by federal agency action also establishes irreparable harm. These harms "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), because the United States has sovereign immunity, *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715

22

F.3d 1268, 1289 (11th Cir. 2013).[19] And sovereign injury—such as preemption of state law or interference with state policy—is also irreparable harm because it likewise cannot be addressed through monetary remedies. *See Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001).

As discussed, Florida faces the untenable choice between suffering widespread and irreparable economic harm through lost contracts with the federal government or violating state law and changing state policy. Florida's universities alone receive tens of millions from federal contracts, *e.g.*, Ex. 3 at 2, for which they will be ineligible if the challenged actions stand. And Florida's Department of Education will lose GSA contracts beginning next month, which will not only harm Florida economically, but will also frustrate Florida's policy of providing employment opportunities to blind individuals and force Florida to expend resources pursuing alternative means of doing so. Ex. 2 at 2–5. Finally, Florida faces lost corporate income tax revenue from businesses forced to fire employees who choose not to be vaccinated.

Beyond these direct harms, Florida has parens patriae standing to assert the injury of the thousands of Floridians who work for federal contractors and do not wish to receive a vaccine. While *Massachusetts v. Mellon*, 262 U.S. 447 (1923), recognized certain limits on the use of that standing theory against the federal government, "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to

---

[19] The procedural harm from the failure to provide notice and comment may also be irreparable. *See Becerra*, 2021 WL 2514138, at *47.

assert its rights under federal law (which it has standing to do)." *Massachusetts v. EPA*, 549 U.S. at 520 n.17. Because Florida asserts several federal rights here—such as the notice and comment guarantees of § 1707 and the full and open competition guarantees of § 3301—it has parens patriae standing. *See Texas v. United States*, 328 F. Supp. 3d 662, 697 (S.D. Tex. 2018); *Texas v. United States*, No. 1:18-cv-00086, 2021 WL 3025857, at *14 (S.D. Tex. July 16, 2021); *Aziz v. Trump*, 231 F. Supp. 3d 23, 31–32 (E.D. Va. 2017).

Absent this Court's intervention, Florida will suffer irreparable harm.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The equities and public-interest factors merge for federal-government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "Forcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). And "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). It also is "against the public interest to force a person out of a job." *Vencor, Inc. v. Webb*, 829 F. Supp. 244, 251 (N.D. Ill. 1993).

## IV. NO BOND IS REQUIRED UNDER RULE 65.

"[T]he amount of security . . . is a matter within the discretion of the trial court." *BellSouth Telecomm. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005). No bond should be required here.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Defendants from enforcing, implementing, or giving any effect to the executive order, OMB rule, or FAR Council guidance in Florida.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY
*Lead Counsel

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by e-mail on Kevin J. Wynosky of the U.S. Department of Justice, who has agreed to accept e-mail service for all Defendants.

*/s/ James H. Percival*
James H. Percival