### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA

STATE OF FLORIDA,

                    Plaintiff,

          v.

BILL NELSON, in his official capacity
as Administrator of NASA, et al.,

                    Defendants.

No. 8:21-cv-2524-SDM-TGW

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
### FOR A PRELIMINARY INJUNCTION

Plaintiff State of Florida has sued the President, the United States, and nearly a dozen federal agencies and officials.  Florida challenges Executive Order 14042, which, with respect to certain government contracts, directs federal agencies to include a clause requiring certain COVID-19 safety protocols—including vaccination requirements—in "any new contract," "new solicitation for a contract," "extension or renewal of an existing contract," and "exercise of an option on an existing contract." Executive Order 14042, 86 Fed. Reg. ("FR") 50,985 (Sept. 14, 2021) [hereinafter Executive Order" or "EO"].

Florida asks this Court to exercise its extraordinary emergency powers to enjoin this EO across the country—even outside the boundaries of Florida.  *See* Mot. Prelim. Inj., ECF No. 10 [hereinafter Mot.]; Proposed Order, ECF No. 10-9.  But Florida has failed to show how it has been harmed at all, much less that it faces irreparable harm. The EO does not apply to existing contracts.  And other than contracts that Florida has already agreed to modify, Florida provides no evidence that it is party to a federal

contract that already has this clause, or a party to an existing covered contract that is up for an option, extension, or renewal that must include the challenged clause. Nor does Florida identify any specific solicitations that it plans to bid on or contracts that it plans to enter into in the immediate future. For these reasons alone, Florida's motion should be denied.

Even if this Court reaches the merits, it should reject Florida's argument that the President has no power to direct federal contracting—an argument that conflicts with more than 50 years of precedent. The President's delegation of certain authority to the Director of the Office of Management and Budget (OMB) is consistent with applicable statutes. Florida's procedural and notice arguments are meritless and now are moot because the Director of OMB issued an updated Determination last week, rescinding her prior Determination and opening a period for comments. And the constitutional claims raised by Florida have been considered and rejected by courts many times over.

When COVID-19 first emerged in the United States, it ravaged the economy and severely compromised the Federal Government's operations. Just like private entities, the Federal Government's operations suffered when its contractors' employees became sick and died. Vaccines provide the hope that the government and its contractors can resume full operations. The Federal Government has therefore made a decision to require those with whom it contracts to take precautions to prevent the spread of this virulent, contagious disease. "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those

with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). "Those wishing to do business with the Government must meet the Government's terms; others need not." *AFL-CIO v. Kahn*, 618 F.2d 784, 794 (D.C. Cir. 1979) (en banc). The Court should reject Florida's request to impose its novel view of the ability of the Federal Government to set the terms of its own contracts.

## BACKGROUND

### I.   The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency because of COVID-19, a respiratory disease caused by the novel coronavirus, SARS-CoV-2. HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. 85 FR 15,337 (Mar. 13, 2020). In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 cases and hospitalization rates," driven by an especially contagious strain. *See* Centers for Disease Control and Prevention ("CDC"), *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1] To date, more than 47 million Americans have been infected with COVID-19 and more than 761,000 have died from COVID-19. CDC COVID Data Tracker

---

[1] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

(as of Nov. 17, 2021), https://perma.cc/UGE3-XZ7Q.

## II.  Vaccine Requirements for Federal Civilian Employees and Contractors

On September 9, 2021, President Biden issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument."  *See* EO 14042 § 1.  The President determined that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."  *Id.*  Those specific safeguards would be set forth in guidance issued by the Safer Federal Workforce Task Force ("Task Force").  *Id.*  But that guidance would not be binding until the OMB Director, acting pursuant to a delegation of the President's statutory authority, approves the guidance and determines the guidance "will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors."  *Id.* § 2(c) (citing 3 U.S.C. § 301).

The President, essentially acting as the U.S. Government's Chief Executive Officer, directed federal executive departments and agencies, "to the extent permitted by law," to incorporate a clause into certain types of contracts—new contracts, new solicitations for a contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract—if they also fall into one of the following categories (all requirements together, "covered contracts"): (i) a procurement contract for services, construction, or a leasehold interest in real property; (ii) a contract for services

4

covered by the Service Contract Act, 41 U.S.C. § 6701 *et seq.*; (iii) a contract for concessions, including any concessions contract excluded by Department of Labor regulations at 29 C.F.R. § 4.133(b); or (iv) a contract entered into with the Federal government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public.  EO 14042, § 5(a).  The required clause "shall specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by" the Task Force, provided the guidance is approved by the OMB Director, as described above.  *Id.* at § 2(a).  The clause also "shall apply to any workplace locations (as specified by the Task Force Guidance) in which an individual is working on or in connection with a Federal Government contract[.]"  *Id.*

    The EO, however, is targeted and contains exceptions.  Although EO 14042 provides that "agencies are strongly encouraged, to the extent permitted by law, to ensure that the safety protocols required under [existing] contracts . . . are consistent with" the Task Force Guidance, it includes no authority to force conforming changes to existing contracts.  *Id.* at § 6(c).  The EO does not apply to most contracts for procurement of goods (as opposed to services).  *See id.* at § 5; *see also* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 FR 63418, 63420 (Nov. 10, 2021) (affirming that "contract[s] or subcontract[s] for the manufacturing of products" are "not covered or directly addressed by" the EO).  And, as relevant here, the Executive Order does not apply to "contracts or subcontracts

whose value is equal to or less than the simplified acquisition threshold, as that term is defined in § 2.101 of the Federal Acquisition Regulation." EO 14043 § 5(b)(iii).

The Task Force issued guidance under EO 14042 on September 24, 2021. Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors (September Contractor Guidance), https://perma.cc/H2MY-K8RT. Exercising the authority delegated to her by the President, Acting OMB Director Young made the statutorily required determination that the Task Force Guidance would promote economy and efficiency in federal contracting. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 FR 53,691, 53,691–92 (Sept. 28, 2021).

On November 10, 2021, the Task Force issued revised Task Force Guidance. *See* 86 FR 63418, 63418-21. At the same time, OMB submitted a new Determination by the OMB Director for publication in the Federal Register. *See id.* The new Determination rescinded and superseded the previous September 24 notice (thus also superseding the earlier Task Force Guidance); included a determination by Acting OMB Director Young, exercising the authority delegated to her by the President, that the Task Force Guidance would promote economy and efficiency in federal contracting; published the Task Force Guidance; included economic analysis of the COVID-19-workplace safety protocols and the effect on economy and efficiency in federal procurement; and addressed procedural requirements. *Id.*

The updated Task Force Guidance requires federal contractors that are party to

a covered contract to "ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation." *Id.* at 63420. "Covered contractor employees means any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." *Id.* at 63419 (emphasis removed). A covered contractor workplace is "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." *Id.*

Covered contractor employees subject to the requirement must be fully vaccinated no later than January 18, 2022. *Id.* at 63420. After that date, covered contractor employees not subject to the requirement "must be fully vaccinated by the first day of the period of performance on a newly awarded covered contract, and by the first day of the period of performance on an exercised option or extended or renewed contract when the clause has been incorporated into the covered contract." *Id.* Covered contractors oversee compliance with the Task Force Guidance. Federal law may in some cases require covered contractor employers to provide accommodations to contractor employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id.*

The EO further directs the Federal Acquisition Regulatory Council ("FAR Council") to make corresponding amendments to the Federal Acquisition Regulation

("FAR") providing for inclusion of the COVID-19 safety clause in future covered contracts. Because that amendment process takes time, the EO also directs the FAR Council to issue interim guidance to federal agencies on how to incorporate this clause into new covered contracts until the FAR amendment takes effect.  EO 14042 § 3(a).

## III.   Procedural History

On October 28, 2021, Florida sued a dozen federal agencies and officers. Compl., ECF No. 1.  Florida brings ten claims: one claim challenging the President's authority to issue the Executive Order, three claims challenging OMB's determination adopting the Task Force Guidance, three claims challenging the interim guidance provided by the FAR Council, two claims alleging that the Executive Order and related implementation are unconstitutional, and one request for a declaratory judgment.  *See generally id.*  Florida moved for a preliminary injunction on November 2, 2021.  Defendants oppose that motion for the reasons set forth below.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To justify this "drastic remedy," the movants must "clearly establish[]" (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest.  *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).  "Failure to show any of the [] factors is fatal."  *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir.

2009).

## ARGUMENT

### I.    Florida lacks standing.

The Court lacks subject-matter jurisdiction over this case because Florida has not established standing to bring its claims. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam). "The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000).

The "irreducible constitutional minimum of standing contains three elements": (1) an "injury in fact—an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted). And where, as here, the case involves deciding "whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Florida has made no serious effort to carry its "especially rigorous" burden: claims about the potential loss of contracts or harm from hypothetical loss of potential tax revenue do not even begin to satisfy the requirement that Florida "clearly show" a concrete, particularized, and imminent injury that can be traced to the EO and is likely to be redressed by a favorable decision.

9

*NASA Contract*.  Florida first points to a NASA contract with the University of Florida running from January 2021 through July 2025.  Mot. Ex. 3.  But the Executive Order does not affect that contract: the Task Force Guidance can only be implemented in preexisting contracts through mutual agreement, which Florida has already given in multiple instances.  What a new or renewed contract might require in 2025 is a matter of pure speculation.  By that time, the government may not even require contractor employees to be vaccinated.  Florida's speculation that it might lose this contract more than three years from now is "conjectural" and "hypothetical," not "actual," "imminent," or "concrete."  *Lujan*, 504 U.S. at 560.

*Exempted Simplified Acquisition Contracts*.  Florida next points to twenty-one contracts for vending and food service between Florida's Department of Education and GSA involving blind workers.  Mot. Ex. 2.  But these contracts are not subject to EO 14042: they fall below the Simplified Acquisition Threshold (SAT) and are explicitly carved out from the scope of the EO and the Task Force Guidance.  *See* EO 14042 § 5(b)(iii); Ex. 1, Declaration of Demetria Summers at ¶¶ 9–10 [hereinafter Summers Decl.]; *see also infra* Part III.  Any attempt to include a COVID-19 safety clause in an existing or modified SAT contract is distinct from the policies being challenged here, and instead would be the result of arm's-length negotiations under agency-specific authorities.   And for these same reasons, Florida cannot show redressability because an injunction of the Executive Order, the OMB Determination, and the FAR Memo would not redress Florida's claimed harm regarding these SAT contracts.

In any event, this Court does not have jurisdiction over Florida's challenge to the inclusion of the COVID-19 safety clauses in existing SAT contracts. Because SAT contracts are exempted under the EO, any challenge would necessarily be a narrow challenge to a specific term in a particular SAT contract. *See Lockheed Martin Corp. v. Def. Cont. Audit Agency*, 397 F. Supp. 2d 659, 664 (D. Md. 2005). Those types of narrower challenges must be brought in the Court of Federal Claims under the Contract Disputes Act (CDA), which "applies to any express or implied contract entered into by an executive agency for the procurement of property, services, construction, repair, or the disposal of personal property." *Anselma Crossing, L.P. v. USPS*, 637 F.3d 238, 240 (3d Cir. 2011); *see* 28 U.S.C. § 1491(a)(2). As the Federal Circuit has explained, "[t]he CDA exclusively governs Government contracts and Government contract disputes," and, "[w]hen the [CDA] applies, it provides the exclusive mechanism for dispute resolution." *Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 898-99 (Fed. Cir. 2005) (quoting *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993) and *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995)).

For similar reasons, to the extent Florida challenges solicitation requirements for any new SAT contracts that include a COVID-19 safety clause, the Government Accountability Office has statutory authority to hear those bid protests, *see* 31 U.S.C. §§ 3551–57, and the Court of Federal Claims—not a district court—has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award

or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b).

*FAR Memo*.  Florida also lacks standing to challenge the FAR Memo because the Memo by itself caused Florida no harm, and enjoining the FAR Memo would not redress any injury.  *See* Memorandum from Lesley A. Field et al. 3 (Sept. 30, 2021), https://perma.cc/77L7-8TM8 [hereinafter FAR Memo].  If "a preliminary injunction would not redress the [plaintiff's] injuries, the [plaintiff] would lack standing to seek a preliminary injunction." *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1246 n.14 (11th Cir. 2021) (Branch, J., dissenting).  As the Supreme Court has made clear, "standing is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quoting *Davis*, 554 U.S. at 734).  The President instructed agencies and contracting officers to include certain provisions in new contracts.  EO 14042 § 2; *see* 41 U.S.C. § 1303(a)(2)(A) (agencies are authorized to implement regulations outside the FAR "to implement Government-wide policies").  The FAR Memo merely suggests a sample clause that agencies and contracting officers might use to implement the policies announced in the Executive Order.  FAR Memo 3.  But the FAR Memo itself does not affect the authority of agencies to include a COVID-19 safety clause in their contracts; agencies have authority to include a verbatim clause in contracts and solicitations even without the FAR Memo.

*Parens Patriae*.  Florida also invokes *parens patriae* standing "to assert the injury

of the thousands of Floridians who work for federal contractors and do not wish to receive a vaccine." Mot. at 23. Although a state may have standing to vindicate its own injuries, *see Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007), Florida has not itself suffered any injury, and "a state does not have standing as *parens patriae* to bring an action against the federal government to vindicate the rights of its citizens." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982)); *see also Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 676 (7th Cir. 2008) ("A state may not bring a *parens patriae* suit against the federal government . . . because there the United States, and not the state, represents the people's interests."). So Florida lacks standing to proceed on that basis.

*Tax Revenue*. Florida's fear of lost tax revenue or other economic injury arising from private contractors' dealings with the federal government is too conjectural and hypothetical to confer standing. A plaintiff's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). In other words, a plaintiff seeking a preliminary injunction cannot "rest on 'mere allegations,'" but rather "must 'set forth by affidavit or other evidence specific facts'" establishing standing. *Bischoff*, 222 F.3d at 878 (quoting *Lujan*, 504 U.S. at 561). Florida fails to meet its burden, leaving the Court with no basis to assess any claimed economic injury beyond a single sentence generally alleging a smaller corporate income tax base. *See*

13

Mot. 23.  And as described more in Part III, *infra*, any feared economic harm is speculative.  At bottom, Florida fails to invoke this Court's subject matter jurisdiction to vindicate this or any other claimed injury.

**II.     Florida is not likely to succeed on the merits.**

The Eleventh Circuit considers a movant's likelihood of success on the merits to be "the most important" factor when considering requests for preliminary relief. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).  Here, Florida advances various theories; none establishes a substantial likelihood of success.

**A.     The President has authority to direct government procurement policy.**

Florida first argues that the President lacks authority to issue binding guidance for government contracts.  Mot. at 10–12.  This argument ignores that Congress specifically authorized the President to manage federal procurement in the Federal Property and Administrative Services Act (FPASA).  40 U.S.C. § 121(a).  While Florida claims that the FPASA does not grant the President such authority, it cites no opinions interpreting the FPASA in the novel manner it is proposing.  Indeed, Florida's position ignores more than a half-century of precedent from all three branches of our constitutional system.

Since the 1960s, federal appellate courts have routinely held that the FPASA authorizes the President to manage the content of government contracts through executive orders.  *See, e.g.*, *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967).  Courts have concluded, for example, that the FPASA authorizes the President to require government contractors

14

to comply with wage and price controls, *Kahn*, 618 F.2d 784, to post notices at all of their facilities informing employees that they cannot be forced to join a union or to pay mandatory dues for costs unrelated to representational activities, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003), and to require contractors to confirm employees' immigration status through e-Verify, *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 729 (D. Md. 2009). *See also City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) (urban renewal); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis). Indeed, even cases relied on by Florida confirm that "the Procurement Act does vest broad discretion in the President." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330, 1333 (D.C. Cir. 1996) (affirming the "President's authority to pursue 'efficient and economic' procurement" through EOs, but holding the challenged order conflicted with another statute).

Florida asks the Court to adopt its cramped interpretation of the FPASA by purportedly relying on the text of the statute. But the text is actually quite broad—the FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act. 40 U.S.C. § 121(a). The President is given broad discretion to supervise government contracting "as he shall deem necessary" so long as the President does not act "inconsistent[ly] with the provisions" of the FPASA. Courts have "read this as requiring that the executive order have a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'" *Chao*, 325 F.3d 360, 366 (D.C. Cir.

2003) (quoting *Kahn*, 618 F.2d at 788, 792); *see also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 169 (4th Cir. 1981).[2]  And as discussed below, the challenged policies satisfy this nexus requirement.

Florida's argument that the President lacks authority to direct government contracting is further undermined by Congress's implicit endorsement of an expansive view of the President's power under the FPASA.  Presidents have regularly exercised their authority under the FPASA since it was enacted.  *See Kahn*, 618 F.2d at 790–91 ("Since 1941, though, the most prominent use of the President's authority under the FPASA has been a series of anti-discrimination requirements for Government contractors"); *see also, e.g.*, EO 12072, 43 FR 36869 (Aug. 18, 1978); EO 13465, 73 FR 33285 (June 11, 2008); EO 13950, 85 FR 60683 (Sept. 28, 2020).  "Past [Presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'"  *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).  "[T]he President's view of his own authority under a statute is not controlling, but when that

---

[2] Florida likewise fails to provide any legal authority that the President's authority to "prescribe[e] policies and directives" is less expansive than the GSA Administrator's authority to "prescribe regulations."  Mot. at 12; (citing 40 U.S.C. § 121(a) and (d)).  The words "regulation," "policy," and "directive" are neither statutorily defined words nor terms of art, and cases use them interchangeably.  *See, e.g., Liberty Mut.*, 639 F.2d at 173 (Butzner, J., concurring in part and dissenting in part) ("Implicit in [the FPASA], I believe, is authorization for the President to promulgate orders and regulations . . . .").  As a matter of ordinary meaning, all three are synonyms.  *See, e.g., Regulation*, Oxford English Dictionary (3d ed. 2009) ("[A] directive established and maintained by an authority.").  Although Florida plucks examples from the U.S. Code where Congress gives the President authority to issue "regulations," no inference of meaningful variation can be drawn from snippets of different statutes in different titles passed at different times.  *See Field v. Mans*, 516 U.S. 59, 67-69 (1995) (noting that the presumption of meaningful variation need not apply when there is a reasonable explanation for the variation).

view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect." *Kahn*, 618 F.2d at 790 (footnote omitted).

Congress, likewise, has long understood and accepted that the FPASA granted broad authority to the President.  While Congress has revised the FPASA since 1949, including a complete recodification in 2002, none of those amendments modified or restricted the power being used by the President here.[3]  "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-37 (2015) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)).

**B.    The Executive Order has the nexus with procurement efficiency required by the FPASA.**

Presidential policies to direct government procurement need only be "reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement." *Liberty Mut.*, 639 F.2d at 170.  Courts have "emphasized the necessary flexibility and 'broad-ranging authority'" that the FPASA provides. *Chao*, 325 F.3d at 366.  The standard is "lenient" and can be satisfied even when "the order might in fact increase procurement costs" in the short run. *Id.* at 366–67.  Courts

---

[3] *See, e.g.*, Pub. L. 99-500, §101(m) [title VIII, §832], Oct. 18, 1986, 100 Stat. 1783-345; Pub. L. 99-591, §101(m) [title VIII, §832], Oct. 30, 1986, 100 Stat. 3341-345§ 101(f) [Title VI, § 611], Sept. 30, 1996, 110 Stat. 3009-355Pub.L. 107-217, 116 Stat. 1068 (Aug. 21, 2002).

find a nexus even when "[t]he link may seem attenuated" and even if one can "advance an argument claiming opposite effects or no effects at all." *Id.* "[T]his close nexus requirement [] mean[s] little more than that President's explanation for how an Executive Order promotes efficiency and economy must be reasonable and rational." *Napolitano*, 648 F. Supp. 2d at 738 (one sentence explanation sufficient); *see also Reich*, 74 F.3d at 1333 ("The President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept of efficiency and economy in procurement.") (collecting examples).

Section one of EO 14042 explains the reasonable relationship between COVID-19 safety protocols and efficient, economic federal procurement:

> This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract . . . . These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government.

To anyone who has lived through the COVID-19 pandemic and its resulting economic turmoil, the nexus between reducing the spread of COVID-19 and promoting economy and efficiency in federal contracting is self-evident. While Florida may disagree with the President's policy or consider it unwise, the EO's explanation is sufficient to show the required nexus between the policy and promoting economy and efficiency. *Compare* EO § 1 *with Chao*, 325 F.3d at 366–67 (holding sufficiently close nexus to efficient and economic procurement based on two sentences: "When workers

18

are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.").

All told, EO 14042 and the OMB Director's related efficiency-and-economy determination clear the FPASA's "lenient" standard with plenty of room to spare. *Chao*, 325 F.3d at 367. COVID-19 hobbled the economy for months and continues to disrupt American life. Federal procurement is no exception. The President, as the ultimate manager of federal procurement operations, determined that workplace safeguards aimed at preventing COVID-19's spread will "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14042 § 1. Slowing COVID-19's spread promotes economy and efficiency because federal procurement—like any business endeavor—suffers when people contracting with the Federal Government get sick and miss work.

While the FPASA says nothing specific about vaccination or disease prevention, it also does not specifically authorize promoting urban renewal, promoting collective bargaining rights, conserving gasoline during an oil crisis, combating discrimination, verifying contractors' immigration status, or the other Presidential directives that have passed FPASA muster. *See, e.g.*, *City of Albuquerque*, 379 F.3d 901 (urban renewal); *Chao*, 325 F.3d 360 (collective bargaining rights); *Carmen*, 669 F.2d 815 (energy conservation during an oil crisis); *Kahn*, 618 F.2d at 790 (noting multiple

Presidents "prominent[ly]" used the FPASA to impose "a series of anti-discrimination requirements for Government contractors"); *Chamber of Com.*, 648 F. Supp. at 729 (employee work eligibility). Rather, the FPASA "emphasiz[es] the leadership role of the President in setting Government-wide procurement policy on matters common to all agencies" and expects "the President [to] play a direct and active part in supervising the Government's management functions." *Kahn*, 618 F.2d at 788.[4]

Florida is left to argue that all these cases are "wrongly decided." Mot. 15. But that uphill argument goes nowhere. For starters, this reading of the FPASA does not hide an elephant in a mousehole. Although Florida claims the government is "coercing state officials and employees, and millions of American workers, to receive an injection that they do not want," Mot. 15, this exercise of FPASA authority does not directly regulate anyone. Rather, it merely sets conditions on who the government wants to do business with—something private-sector business leaders do all the time. *Cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240–41 (Fed. Cl. 2007) (noting that when contracting with other parties, the government engages "as private parties, individuals or corporations also engage in among themselves"). Here, the government has chosen to do business with companies and entities that are requiring their employees to be vaccinated, because doing so will ensure those

---

[4] Pre-FPASA practice provides additional support. In 1941, President Franklin Roosevelt issued an executive order instructing that "[a]ll contracting agencies of the Government of the United States shall include in all defense contracts hereafter negotiated by them a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin." Executive Order 8802, 6 FR 3109 (June 27, 1941).

companies and entities can provide contracted-for services in a safe and efficient manner to the government. Nor is the FPASA a "mousehole": as discussed, it grants the President broad discretion to manage federal procurement. Florida provides no compelling reason why this Court should radically depart from the way that statute has been interpreted for decades.

### C. The President's delegation of authority to the OMB Director complies with the FPASA.

Florida also claims that the President's limited delegation of his FPASA authority to the OMB Director conflicts with the FAR Council's authority under 41 U.S.C. § 1303. Mot. at 10–11. But Florida's argument conflates two separate sources of authority: the President's authority pursuant to 40 U.S.C. § 121(a) to "prescribe policies and directives," and the FAR Council's responsibility to maintain the 2,000+ page procurement regulation (the FAR) pursuant to 41 U.S.C. § 1303. Courts have regularly reviewed the President's authority under FPASA; none have found that the exercise of Presidential authority violated Congress's separate grant of authority to the FAR Council to maintain the FAR. *See supra* p. 19.

The President has delegated to the OMB Director, pursuant to 3 U.S.C. § 301, the authority to determine whether Guidance from the COVID Task Force "will promote economy and efficiency in Federal contracting." *See* EO 14042, § 2(c). Section 301 authorizes the President to "to designate and empower the head of any department or agency in the executive branch, . . . to perform without approval, ratification, or other action by the President [] any function which is vested in the President by law."

And here, the President delegated his power to "prescribe policies and directives" pursuant to 41 U.S.C. § 121(a).

The delegation is entirely consistent with the text of 41 U.S.C. § 1303, which describes the role of the FAR Council.  Section 1303(a)(1) directs the FAR Council to maintain "a single Government-wide procurement regulation, to be known as the Federal Acquisition Regulation."  The EO separately instructs the FAR Council to amend the FAR.  EO 14042, § 3(a).  That authority was not delegated to the OMB Director.

But the FAR Council's authority is not exclusive.  Section 1303(a)(2)(A) specifically allows agencies to proscribe "regulations essential to implement Government-wide policies and procedures within the agency."  And, of course, the Presidential authority delegated to the OMB Director was to prescribe Government-wide "policies" pursuant to 40 U.S.C. § 121(a) ("The President may prescribe policies and directives . . . .").  Until the FAR Council revises the FAR, the President instructed agencies "to exercise any applicable authority" to implement the Government-wide policies and procedures described in the Executive Order and any subsequent OMB Determinations.  *See* 41 U.S.C. § 1303(a)(2)(A); EO 14042, § 3(b).  The steps agencies are taking now to include the COVID-19 safety clauses in covered contracts are being done pursuant to agency-specific authority under 41 U.S.C. § 1303(a)(2)(A).

### D.   Requiring contractor vaccination does not violate the Competition in Contracting Act.

Florida is also unlikely to show that the contractor vaccination requirement conflicts with the Competition in Contracting Act, which simply requires "full and open

competition" and "competitive procedures."  41 U.S.C. § 3301(a)(1).  Florida argues that requiring compliance with the Task Force Guidance violates this Act because some bidders may not qualify for solicitations requiring a vaccinated workforce.  Mot. at 17 (citing *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019)).  But *National Government Services* squarely rejected Florida's argument when it upheld "the unremarkable proposition that a solicitation requirement (such as a past experience requirement) is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement."  923 F.3d at 985-86 (holding a rule preventing bidders who already had a certain amount of agency contract work violated the Contracting Act because "the exclusion is not based on some capability or experience requirement" or any other substantive evaluation factor).  Setting requirements with which some contractors may refuse to comply does not violate the Act.

### E.   Florida's APA challenge to the OMB Guidance is moot and, in any event, not justiciable.

Acting OMB Director Young's rescission of her original determination and issuance of a new efficiency-and-economy determination moots Florida's challenges that the original determination supposedly failed to comply with the notice requirements of § 1707 and the APA.  Although neither § 1707 nor the APA applies to the OMB Determination, the new Determination fully complies with § 1707's procedural requirements and includes an APA good-cause waiver.  All told, Acting OMB Director Young has not just "substantially amended" her Determination after

this case was filed—she rescinded it entirely. *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982). So "the issue of the validity of the old [Determination] is moot," and this Court "lack[s] jurisdiction." *Id.*

This is not the sort of case where an agency is disabled from providing a new explanation for an already issued decision. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). As an initial matter, those cases arise under the APA, which does not apply to this action. The Director's decisions to issue the original Determination, to rescind it, and to issue a new Determination were all carried out with Presidential authority delegated to her under 3 U.S.C. § 301. When the President delegates his authority under § 301, the APA does not authorize judicial review of the action taken pursuant to that delegation. Officers exercising Presidential authority delegated to them through § 301 "stand[] in the President's shoes" and "exercis[e] purely presidential prerogatives." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 & n.5, 111 (D.D.C. 2009). So just as the President cannot be sued under the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992), the Director's actions "cannot be subject to judicial review under the APA" either. *Nat. Res. Def. Council*, 658 F. Supp. 2d at 109; *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (collecting cases from multiple jurisdictions "conclud[ing] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA."), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018).

Even if the APA applied, no principle of law prevents the Executive Branch from "'deal[ing] with [a] problem afresh' by taking *new* agency action." *Regents*, 140 S. Ct. at 1908 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).  The Director took that route here: rather than merely providing a fuller explanation of her prior Determination, her new Determination "rescinds and supersedes [her] prior notice." 86 FR at 63418.  Although the Director ultimately reached the same efficiency-and-economy conclusion, she properly rested that new conclusion on evidence and justifications relating to the revised Task Force Guidance.  *See Regents*, 140 S. Ct. at 1908 ("An agency taking th[e new-agency-action] route is not limited to its prior reasons.").  And the Director set a new date for contractor compliance, further underscoring the superseding nature of her action.

## F.    Florida's 41 U.S.C. § 1707 claims are not likely to succeed.

Setting mootness aside, Florida faults the EO and the previous OMB Determination for not complying with the notice-and-comment requirements of 41 U.S.C. § 1707.  To the extent this claim survives the new OMB Determination, it fails: Section 1707 does not apply to exercises of Presidential authority like the EO and OMB Determination.  Section 1707 applies only to an "executive agency," a defined term in the statute.  41 U.S.C. § 133.  That statutory definition does not include the President.  *See id.*  Because the President is not an agency under the statute, and because the OMB Director acted pursuant to a delegation from the President, § 1707's procedural requirements do not apply to either EO 14042 or to the OMB Director's Determinations.  *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100; *Nat. Res. Def.*

*Council*, 658 F. Supp. 2d at 109.

To the extent Florida challenges the new OMB Determination, it is unlikely to succeed because the new Determination invokes § 1707(d)'s waiver for "urgent and compelling circumstances."  Those circumstances exist because, among other reasons, "[t]he pandemic continues to present an imminent threat to the health and safety of the American people." 86 FR at 63423–24.   Nor would the rescission have to go through APA notice-and-comment.  The APA exempts "matter[s] relating to . . . contracts" from its notice-and-comment requirements.  5 U.S.C. § 533(a)(2).  Additionally, the APA waives notice-and-comment when "the agency for good cause finds" that those requirements would be "impracticable, unnecessary, or contrary to the public interest."  *Id.* § 533(b)(3)(B).  As explained in her new economy-and-efficiency determination, the Director concluded that notice-and-comment would be impracticable here, not least because delay "would result in harm."  86 FR at 63424–25.

## G.   Florida is not likely to succeed on its APA challenge to the new OMB Determination.

Nor is there any argument that the new OMB determination is arbitrary and capricious, in violation of the APA.  As noted above, the APA does not apply to the OMB Determination because it was taken pursuant to a delegation of Presidential authority under 3 U.S.C. § 301.  *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100; *Nat. Res. Def. Council*, 658 F. Supp. 2d at 109.   Even if the APA applied, the OMB Determination would plainly meet the "deferential" standard of arbitrary-and-capricious review.  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658

26

(2007). Under that standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

In particular, the new OMB Determination grapples with Florida's concern that implementing the Task Force Guidance would cause a labor shortage and comes to the opposite conclusion. *See, e.g.*, 86 FR at 63422. The new Determination repeatedly considers costs to employers and contractors. *See id.* at 63421–23. And it references CDC guidance about the vaccines' effectiveness against the Delta variant. *See, e.g.*, *id.* at 63423. Although the Determination does not specifically address reliance interests, there was no need to do so here: OMB was not changing a longstanding position. *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). To the extent there were any reliance interests, the EO protects them by exempting existing contracts from its scope. Nor must the government "explore 'every alternative device and thought conceivable by the mind of man'" before making a decision. *Regents*, 140 S. Ct. at 1915 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 551 (1978)); *see also Motor Vehicle Mrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (declining to "require an agency to consider all policy alternatives in reaching [a] decision"). Finally, the Administration's overarching goal of "getting more people vaccinated and decreas[ing] the spread of COVID-19," FAR Memo 3, does not constitute "smoking-gun evidence" that the new OMB Determination is "pretextual." Mot. at 20-21. To be sure, the Task Force Guidance applies broadly,

but that scope merely helps promote efficiency and economy in federal contracting. After all, given the way COVID-19 spreads, to adequately protect those working on federal contracts, the Guidance must protect their workplace.

### H. APA challenges to the FAR Memo are not likely to succeed.

Florida's challenge to the FAR Memo also fails. To begin, Florida lacks standing to challenge the FAR Memo because—as noted—it has not identified any potential contracts that are required to include the proposed provision and has not identified any injury that would be redressed by enjoining the FAR Memo. *See supra* pp. 9–13; *Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007) (no injury from guidance because "[t]he change caused nothing" to happen to the claimant).

Florida's APA claims are also unlikely to succeed, because the FAR Memo is not "final agency action." 5 U.S.C. § 704. The APA provides review only of *final* agency action: a decision (1) that marks the "consummation of the agency's decisionmaking process" and (2) by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Neither prong is met here.

*First*, the FAR Memo is not final agency action because it is not the FAR Council's final word on the contract clause. The FAR Memo was issued in accordance with the EO's instructions for the FAR to "take *initial* steps to implement" the contract clause described in the EO. EO 14042 § 3(a) (emphasis added); *see also* FAR Memo 1 ("The purpose of this memorandum is to provide agencies that award contracts under

the . . . [FAR] with *initial* direction.") (emphasis added).  The Memo suggests a clause for contracting officers to use in the interim, subject to agency- and contract-specific deviations to be developed by each agency.  FAR Memo 2.  The conclusion of the policymaking process set forth in the EO—the FAR Council's amendment to the FAR by providing the contract clause "for inclusion in Federal procurement solicitation and contracts" subject to the EO—has yet to occur.  EO 14042 § 3(a).

*Second*, the FAR Memo has no independent effect: none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract.  The FAR Council issued the Memo "to *support* agencies in meeting the applicability requirements and deadlines set forth in [EO 14042]" and to "encourage[]" agencies to "exercise their authority" to temporarily deviate from the FAR.  FAR Memo 2–3 (emphasis added).  The FAR Memo does not direct an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the Memo's guidance and exercise the agency's independent authority under 41 U.S.C. § 1303(a)(2).  *Id.*  Simply put, the Memo binds no one absent subsequent agency action.

In terms of APA final agency action, the FAR Memo is not a decision from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177–78 (citation omitted).  Florida cannot challenge guidance when it fails to show "any risk of future harm traceable to the . . .  Guidance itself, as opposed to the preexisting federal laws it describes."  *Klayman v. President of the U.S.*, 689 F. App'x 921, 924 (11th Cir. 2017).

Even if the FAR Memo was final agency action, Florida fails to challenge any

specific aspect of the guidance as unreasonable.  The FAR Council's guidance does nothing more than carry out the EO directive to "take initial steps to implement appropriate policy direction" for how agency acquisition offices can use the contract clause described in the EO pursuant to each agency's authority recognized in 41 U.S.C. § 1303(a)(2)(A).  EO 14042 § 3(a).  Florida claims that the Memo improperly reveals "the goal" of "'getting more people vaccinated and decreas[ing] the spread of COVID-19,'" Mot. at 21 (quoting FAR Memo 3), but it is difficult to see what is problematic about this intention, which dovetails with the EO's goal of "decreas[ing] the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."  EO 14042 § 1.

Section 1707's procedural notice requirements also do not apply to the FAR Memo because it is, at most, nonbinding guidance, and not "a procurement policy, regulation, procedure, or form" with "a significant effect beyond" the FAR Council's operating procedures.  § 1707(a).  As noted, the FAR Council issued the memo to develop a template COVID-19 safety clause "to *support* agencies in meeting the applicability requirements and deadlines set forth in [EO 14042]" and to "encourage[]" agencies to "exercise their authority" to temporarily deviate from the FAR by including similar clauses in their procurement contracts.  FAR Memo 2–3 (emphasis added); *see also* 41 U.S.C. § 1303(a)(2)(A).  The FAR Memo has no independent effect, however, and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract.  And again, the FAR Memo does not direct

an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the memo's guidance. *Id.* at 2.

## I.    Requiring contractor vaccination is constitutional.

Florida concludes its merits analysis with two perfunctory constitutional arguments.  Florida initially contends that the President's FPASA authority is an unconstitutional delegation of legislative power.  But Florida cites no cases holding that the FPASA violates the exceedingly deferential non-delegation doctrine—perhaps because every court to consider the question has held that the Congressional grant of contracting authority to the President passes constitutional muster.  *See City of Albuquerque*, 379 F.3d at 914; *Liberty Mut.*, 639 F.2d at 166; *Kahn*, 618 F.2d at 793 n.51; *Napolitano*, 648 F. Supp. 2d at 739.

Florida's Spending Clause argument fares no better.  As an initial matter, Florida cites no case subjecting a federal procurement policy or contract to the Spending Clause's requirement to "unambiguously" impose any "condition[s on] the States' receipt of federal funds."  *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987).  Indeed, Florida's sole Spending Clause authority is *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981).  But no court has ever applied *Pennhurst* to government contracts.

## III.    Florida does not face irreparable harm.

Florida argues that it faces "widespread and irreparable economic harm through lost contracts with the federal government" to the extent that Florida-based federal

contractors refuse to enter into contracts with the clause required by EO 14042. Mot. at 23. But EO 14042 is not self-executing; COVID-19 safety protocols do not become a requirement until they are incorporated into a given contract, through bilateral modification of an existing contract or through the inclusion of a provision as part of the solicitation for a new contract or the extension, renewal, or exercise of an option on an existing contract. To meet its burden to show "actual and imminent" harm, Florida must demonstrate as a threshold matter (i) that the United States has given notice that it intends to terminate an existing contract if Florida were to refuse a modification request; or (ii) that an existing contract is ending shortly, and renewal would be contingent on incorporation of a COVID-19 safety clause.[5] *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Although Florida notes that its state agencies have "contracts . . . worth tens of millions of dollars or more," Mot. at 8, Florida fails to identify any existing contract that the United States has threatened to terminate absent a bilateral modification. Florida's assertion of imminent harm appears predicated entirely on its "understand[ing] that failing to [accede to a bilateral modification request] will exclude it from consideration for *future* opportunities." *Id.* (emphasis added). In this respect, Florida identifies 21 GSA future vending contracts that it claims it would be ineligible

---

[5] Consistent with the EO, the Task Force Guidance set forth a phase-in period for the new requirements to be added to federal contracts, generally keyed to new contracts awarded on or after November 14 and any changes to existing contracts made on or after October 15. *See September Contractor Guidance* at 12.

to obtain were it to refuse existing bilateral modification requests for current GSA contracts.[6]  *See* Dkt. 19-2 at 2-3 (Declaration of William James Findley).

Florida's understanding of the scope of the EO is mistaken.  As explained above, federal contractual awards under the SAT are not subject to the normal contracting/procurement requirements under the FAR, and thus are not subject to EO 14042.  Summers Decl. at ¶¶ 9-10.  Each of the 21 potential future vending opportunities on which Florida relies to show imminent harm involves a GSA-administered vending contract (known as a permit) governed by the Randolph-Sheppard Act (RSA), 20 U.S.C. § 107 et seq.[7]  Because the issuance of RSA permits does not involve any outlay of funds by GSA, they categorically fall below the SAT and therefore are not governed by EO 14042.  Summers Decl. at ¶¶ 9-10.

Moreover, of the 21 GSA-directed vending opportunities on which Florida relies to show imminent harm, many would not go into effect until 2023 or 2024—far too attenuated to support the "extraordinary and drastic" relief that Florida seeks now.  *Mazurek v. Armstrong*, 520 U.S. 960, 972 (1997).  Only two of these putative opportunities will occur before April 2022.  Dkt. 19-2 at 2-3 (SSA, Tampa FL

---

[6] Florida also references a current $12 million NASA contract with the University of Florida. This performance term of this contract runs from January 1, 2021 through January 31, 2025.  *See* Dkt. 19-3.  As Florida has already assented to the inclusion of a COVID-19 safety clause in this contract, *see* Ex. 2, Declaration of Karla Smith Jackson ¶ 8(b), Florida cannot rely on this to show imminent harm, nor would this Court's issuance of a preliminary injunction prevent the operation of a contractual provision already in effect.  Inasmuch as any renewal of this contract would not take place for more than three years, Florida's reliance on it to show harm that is "actual and imminent" is unavailing.  *Siegel*, 234 F.3d at 1176.

[7] Under the RSA, individuals who are blind and in need of employment are given priority by GSA in the opportunity to operate vending facilities on federal property.

(beginning December 2021); IRS, Clearwater, FL (beginning January 2022)). Florida's assertions of injury are not only remote, they are speculative. While GSA does intend to seek bilateral modifications from its RSA permitees to include a COVID-19 safety clause, GSA cannot impose this change unilaterally for existing permits. Summers Decl. at ¶¶ 10, 12. GSA moreover does not intend to *require* the incorporation of a COVID-19 safety clause into any new RSA permit, including the ones on which Florida relies. *Id.* at ¶¶ 12-14.

In any event, as explained above, even the certainty of losing a contract would not be irreparable harm. Florida would have ample opportunity under the Contract Disputes Act to seek monetary redress. 28 U.S.C. § 1491(b)(1)–(2); *see Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). For these separate and independent reasons, Florida has failed to carry its burden to demonstrate irreparable harm. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983) ("The possibility [that] adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

## IV.   The equities and the public interest weigh against injunctive relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in the Federal

Defendants' favor.

*First*, enjoining EO 14042 would harm the public interest by hampering the efficiency of the contractors on which the Federal Government relies. The COVID-19 pandemic has interfered with numerous aspects of the government's work, *e.g.*, by forcing office closures; interfering with employees' access to paper-based or sensitive records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. These disruptions have affected the work of federal employees and federal contractors alike. Requiring federal covered contractor employees to become fully vaccinated against COVID-19, with exceptions only as required by law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in contracting efficiency. Enjoining EO 14042 would prevent these gains and would likely interfere with the government's ability to resume normal, pre-pandemic operations.

*Second*, enjoining EO 14042 would harm the public interest in slowing the spread of COVID-19 among millions of federal contractors and the members of the public with whom they interact. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Cuomo*, 141 S. Ct. at 67. Accordingly, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction. *Tigges v. Northam*, 473 F. Supp. 3d 559, 573–74 (E.D. Va.

2020); *see also, e.g.*, *Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *Valdez*, 2021 WL 4145746, at *13, *Harris*, 2021 WL 3848012, at *8; *Williams*, 2021 WL 4894264, at *10–11; *Wise v. Inslee*, No. 2:21-cv-0288, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021); *Mass. Corr. Officers*, 2021 WL 4822154, at *7–8; *Johnson*, 2021 WL 4846060, at *26–27; *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 840–41 (W.D. Tenn. 2020); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020); *Brnovich v. Biden,* 2:21-cv-01568 (D. Az.) (denying preliminary injunction regarding Federal Government contractor vaccine requirement).

Moreover, granting the requested injunction against the Federal Defendants would not preserve the relative positions of the parties since entering the requested relief would upend the status quo by (1) preventing further implementation of EO 14042, which has been in effect for over two months; and (2) interfering with the Federal Government's ability to determine the terms on which it will enter into contracts. *See, e.g.*, *Nken*, 556 U.S. at 428–29 (explaining that enjoining a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo").  Further, granting the relief sought against the Federal Defendants would generate the absurd result of allowing challengers to obtain a preliminary injunction against *any* new government policy, in order to maintain the prior "status quo" until a decision on the merits. *But see Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J.,

in chambers) (explaining that "an injunction against the enforcement of a presump-
tively valid" enactment should only be granted in extraordinary circumstances).

Against these weighty and substantial federal interests, Florida has presented
what is largely a mirage of impending economic calamity.  While Florida would have
this Court believe that EO 14042 portends a summary, across-the-board invalidation
of numerous federal contracts worth tens of millions of dollars, the reality bears no
resemblance to Florida's characterization.  As noted, Florida has identified no current
contract that Federal Defendants have threatened to terminate on pain of accepting a
COVID-19 safety clause to which Florida objects.  Florida has identified a handful of
(mostly distant) future vending opportunities—none of which are even governed by
EO 14042—under which, if awarded, Florida would be entitled to six percent of the
net proceeds.  *See* Dkt. 19-2 at ¶ 5.  While Florida unquestionably disagrees with the
policy determinations that undergird EO 14042, the harm to Federal Defendants to
allowing Florida (or any state) to dictate federal contract policy far outstrips any harm
to Florida from allowing the United States to supervise and direct the terms on which
it will enter contracts.

In sum, granting the pending motion would harm the public interest far more
than denying the motion would harm Florida, and the motion should therefore be
denied.

## V.   In all events, this court should not enter relief extending beyond federal contracts with the State of Florida.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Florida's alleged injuries.  Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted).  Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  EO 14042 and its implementing guidance have been challenged in numerous other cases, underscoring why this Court should not attempt to decide its legality for all parties. *See, e.g.*, *Smith v. Biden*, No. 1:21-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021) (denying preliminary injunction regarding government contractor vaccine mandate); *Brnovich v. Biden,* 2:21-cv-01568 (D. Az.) (same); *Texas v. Biden,* 3:21-cv-00309; *Georgia v. Biden*, 1:21-cv-163 (S.D. Ga.); *Missouri v. Biden*, 4:21-cv-1300 (E.D. Mo.); *Oklahoma v. Biden*, 5:21-cv-01069 (W.D. Okla.); *Louisiana v. Biden*, 1:21-cv-3867 (W.D. La.); *Hollis v. Biden*, 1:21-cv-163 (N.D. Miss.); *Navy Seal 1 v. Biden*, No. 21-2429 (M.D. Fla.).

Even assuming Florida identified a contract sufficient to confer standing to challenge (and this Court jurisdiction to consider) the EO, any relief should be tailored to that contract.   Moreover, any relief should merely block enforcement—not

inclusion—of a COVID-19 safety clause.  Allowing COVID-19 safety clauses to be included but not enforced during the pendency of this litigation would mean that contractors within its scope would not have to require their employees to be vaccinated.  But if EO 14042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.[8]

## CONCLUSION

For the foregoing reasons, Florida's motion for a preliminary injunction should be denied.

DATED: November 17, 2021       Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director

*/s/ Kevin Wynosky*
ZACHARY A. AVALLONE
LEE REEVES
KEVIN WYNOSKY (PA Bar No. 326087)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12400
Washington, D.C. 20005
(202) 616-8267
Kevin.J.Wynosky@usdoj.gov

---

[8] Allowing COVID-19 safety clauses to be included but not enforced will not precipitate layoffs or a rush to vaccination if the injunction is dissolved.  Covered contractor employers have flexibility to "determine the appropriate means of enforcement" and to craft "polic[ies] that encourage[] compliance."  Safer Federal Workforce, Federal Contractor FAQs, available at https://perma.cc/RGR9-ZTES.  In other words, covered contractors would not need to immediately discharge unvaccinated employees once the injunction is dissolved.  Rather, covered contractors should provide for a "period of counseling and education, followed by additional disciplinary measures if necessary," before terminating employees or putting them on leave. *Id.*

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On November 17, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Middle District of Florida, using the electronic case filing system of the Court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ Kevin Wynosky</u>
KEVIN WYNOSKY
Trial Attorney
U.S. Department of Justice
