## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff,*

    v.                                                      No. 8:21-cv-2524-SDM-TGW

BILL NELSON, et al.,

    *Defendants.*

_____/

## FLORIDA'S REPLY IN SUPPORT OF AND
## AMENDMENT TO ITS MOTION FOR PRELIMINARY INJUNCTION

In response to Florida's suit and others like it, the government has all but conceded that it promulgated an unlawful rule. It attempts to clean up its mess by rescinding that rule and issuing a new one, which it did on the verge of a preliminary injunction hearing in Arizona's similar challenge. The government also now admits that it misled Florida when it represented in writing that the executive order requires Florida's Division of Blind Services to agree to the challenged conditions. In light of the government's about-face, Florida offers additional evidence that it will lose contracts as a result of the challenged actions. In any event, because of new legislation enacted by Florida, the challenged actions compel every federal contractor in the State to violate state law. This alone is irreparable harm. *See* Emergency Mot. for TRO or Prelim. Inj. at 12, 33–34, *United States v. Texas*, 1:21-cv-796 (W.D. Tex. Sept. 15, 2021) (arguing that, when one sovereign violates the "sovereign interest" of another, irreparable harm is established).

The government's game—of promulgating now and figuring out the legalities later—has not succeeded. Neither the new OMB rule nor the government's response solve the legal deficiencies identified by Florida. The government is all in on its argument that the President can issue regulations under 40 U.S.C. § 121(a), even suggesting that "[t]he words 'regulation,' 'policy,' and 'directive' are . . . synonym[ous]." Doc. 21 at 16 n.2. But the government makes no effort to ground this assertion in the text of the statute, nor does it point to any substantive provision of FPASA supporting its actions other than the general purpose statement in 40 U.S.C. § 101. Instead, it recycles a favorite defense of the government: We have always done it this way, so it must be legal. But "[p]ast practice does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)). Moreover, the government significantly overstates the settled nature of its unlawful practices.

Further, the government now recognizes that § 1707 requires the OMB Director to make a reasoned finding that "urgent and compelling circumstances" justify dispensing with notice and comment, yet even its revised determination fails to do so adequately. The government invokes the COVID-19 pandemic, as well as its desire to extend the December 8 vaccination deadline it created. But these circumstances— which are either not new or of the government's creation—would not even satisfy the APA's good cause standard, much less § 1707's stricter standard.

Finally, the government also recognizes its need to provide a reasoned explanation for why the contractual conditions in question advance economy and efficiency. But its reasoning remains deficient.

For these reasons, and many more, the Court should grant Florida's motion.

## ADDITIONAL BACKGROUND

Florida filed its complaint on October 28, 2021, and its motion for preliminary injunction on November 2. Docs. 1, 10. Several States have filed similar challenges. *See* Doc. 8. On November 10, the day of its first preliminary injunction hearing in these cases, the government released a new OMB rule purporting to rescind the old OMB rule. OMB published its new rule in the Federal Register on November 16. *See* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418 (Nov. 16, 2021).

Part 1 of the rule describes the requirements of the updated Task Force guidance, which—as best Florida can tell—are identical to the previous guidance other than changing the deadline from December 8 to January 18. *Id.* at 63,418–21. While the new OMB rule now includes the full text of the Task Force guidance, it does not include the text of the FAQs, instead identifying them with a hyperlink. 86 Fed. Reg. at 63,421. On the Federal Register's website, clicking on the FAQ link prompts a warning: "YOU ARE NOW LEAVING THE FEDERAL REGISTER."

Despite not being published in the Federal Register, contractors must comply with the FAQs, *see* FAR Council guidance at 5, which are quite substantive.[1] For example, two FAQs explain that proof of prior COVID infection—even with an antibody test proving natural immunity—does not exempt a person from vaccination. "Explain" is, of course, a generous term, given that the only "explanation" is another hyperlink, this time to the CDC's website. The FAQs similarly make clear that the vaccination requirements apply to pregnant women. And the FAQs even purport to give the FAR Council's contract clause preemptive effect, explaining that it "supersede[s] any contrary State or local law or ordinance." As best Florida can tell, the FAQs are subject to change or revision at any time by the Task Force, which includes White House staffers not appointed consistent with the Appointments Clause.[2]

Part 2 purports to offer an "economy-and-efficiency analysis." 86 Fed. Reg. at 63,421–23. It begins by confirming that the government relies on 40 U.S.C. §§ 101 and 121(a) as authority to issue the new rule. 86 Fed. Reg. at 63,421. It then explains the government's view that COVID-19 infections in the workplace increase costs, *id.* at 63,421–22, and that vaccination, masking, and social distancing requirements reduce those costs, *id.* at 63,422–23. Finally, the new OMB rule explains the government's

---

[1] FAQs – Contractors, Safer Federal Workforce Task Force [hereinafter FAQs], https://www.saferfederalworkforce.gov/faq/contractors/ (last visited November 28, 2021).
[2] Overview, Safer Federal Workforce Task Force, https://www.saferfederalworkforce.gov/overview/ (last visited November 28, 2021) (explaining that the Task Force includes the "White House COVID-19 Response Team").

view that vaccination, masking, and social distancing impose "limited" or "minimal" costs on contractors. *Id.*

Part 3 addresses "[p]rocedural [r]equirements." *Id.* It first explains the government's position that the notice and comment requirements of 41 U.S.C. § 1707 are inapplicable. 86 Fed. Reg. at 63,423. In the alternative, the new OMB rule finds that "urgent and compelling circumstances make compliance" with § 1707(a) "impracticable." 86 Fed. Reg. at 63,423 (quoting § 1707(d)). As grounds, it points to the "once in a generation" COVID-19 pandemic and emergence of the Delta variant. *Id.* Further, the new OMB rule reasons that notice and comment would be "incompatible with a fundamental purpose of issuing this determination" because contractors would "still be legally obligated to meet the December 8, 2021, vaccination deadline" in the old OMB rule, and this would cause "confusion and frustration" given the Administration's related vaccination deadlines in January. *Id.* at 64,423–24.

On November 18, 2021, Governor DeSantis signed legislation that prohibits state entities from mandating employee vaccinations and prohibits private employers from mandating the same without offering several exemptions—including exemptions based on pregnancy, natural immunity, submitting to testing, or wearing personal protective equipment. *See* §§ 381.00317, 112.0441, 381.00319, Fla. Stat.

With the consent of the government and leave of this Court, Florida has amended its complaint and now amends its motion for preliminary injunction.[3]

---

[3] Florida maintains its challenge to the old OMB rule insofar as necessary to prevent the government from reverting to that rule if Florida successfully invalidates the new OMB rule.

**ARGUMENT**

I.  **FLORIDA IS LIKELY TO SUCCEED ON THE MERITS.**

    *a.  The challenged actions are contrary to law.*

        i.  Only the FAR Council may issue government-wide procurement regulations.

As with the other challenged actions, the new OMB rule usurps the FAR Council's exclusive authority to issue government-wide procurement regulations. *See* 41 U.S.C. § 1303; Doc. 10 at 10–11.

The government argues that the new OMB rule is not within the scope of § 1303(a)(2)'s exclusivity provision, *see* Doc. 21 at 21, apparently because it believes the new OMB rule is not a "regulation[] relating to procurement issued by an executive agency." 41 U.S.C. § 1303(a)(2). But words have no meaning if that phrase does not perfectly describe the government-wide requirements at issue. And the government does not believe its own argument; after all, in defending its position that the President can issue regulations under 40 U.S.C. § 121(a), the government insists that "[t]he words 'regulation,' 'policy,' and 'directive' are . . . synonym[ous]." Doc. 21 at 16 n.2. The government cannot have it both ways. Either the President cannot issue "regulations," or his delegation of that regulatory power to an "executive agency" other than the FAR Council violates the express prohibition in § 1303(a)(2).

Unable to defend its rule on the statute, the government instead claims that no court has "found that the exercise of Presidential authority [under § 121(a)] violated Congress's separate grant of authority to the FAR Council to maintain the FAR." Doc. 21 at 21. But even if that is true, there are two obvious reasons for it. First, many of

the government's cases are from before 1988, the year § 1303 was enacted. Doc. 1 ¶¶ 38–40. Second, none of the cases the government cites addresses § 1303 one way or the other (presumably because no party advanced that argument).

In a last-ditch effort, the government invokes the exception in § 1303(a)(2)(A). But that provision only authorizes "regulations essential to implement Government-wide policies and procedures *within the agency*." 41 U.S.C. § 1303(a)(2)(A) (emphasis added). The new OMB rule does not implement the executive order within OMB; it mandates implementation across the government.

ii.   <u>FPASA does not authorize the President to issue regulations.</u>

Section 121(a) authorizes the President to prescribe "polices and directives." 41 U.S.C. § 121(a). The government misunderstands Florida's position as being that "the President has no power to direct federal contracting." Doc. 21 at 2. Section 121(a) authorizes the President to "direct[]" the exercise of procurement authorities throughout the government. The President could invoke this authority to direct, for example, the FAR Council to issue a government-wide procurement regulation. What it does not authorize is the President to issue regulations that bind third parties himself.

The latter power is the power the government claims. *See* FAR Council guidance at 2 ("In accordance with [the executive order,] agencies are *required* to include an implementing clause in solicitations and contracts for services." (emphasis added)); FAQs ("The *requirements* in the order apply to subcontractors at all tiers." (emphasis added)); Doc. 21 at 14–15 ("FPASA authorizes the President to *require* government contractors to comply with wage and price controls." (emphasis added)).

7

In addition to those identified in Florida's initial brief, Doc. 10 at 11–12, several considerations support the conclusion that § 121(a) does not grant the President that power.

First, even the government's principal case acknowledges that the purpose of § 121(a) was to clarify that GSA, then viewed as an "independent agency," was nonetheless subject to "direct and active . . . supervisi[on]" from the President. *AFL-CIO v. Kahn*, 618 F.2d 784, 788 (D.C. Cir. 1979). In other words, § 121(a) clarifies that the GSA Administrator's regulatory power in § 121(c) is subject to the President's direction. But that is a different thing entirely from allowing the President to exercise that same regulatory power himself.

Second, the government offers no response to the significant textual differences between subsection (a) and other provisions of § 121, other than to say that "[t]he words 'regulation,' 'policy,' and 'directive' are . . . synonym[ous]." Doc. 21 at 16 n.2. But that argument is contrary to the plain meaning of those words and the statutory context in which they appear. Surely the government does not believe that "policy" and "regulation" have the same meaning—otherwise, every official in the federal government with the power to make policies would have rulemaking power. More likely, it believes that "directive" and "regulation" have the same meaning. But "directive" is a noun form of "direct," which means to "aim," "cause . . . to move on a particular course," "guide," "govern," "instruct . . . with authority," or "address" something or someone. *Direct (vb.)*, Black's Law Dictionary (11th ed. 2019). In other

8

words, "directives" are instructions to inferior officials, not binding requirements on third parties.

Context confirms that reading. In addition to giving the President authority to issue "policies and directives" in § 121(a) and the GSA Administrator authority to issue "regulations" in § 121(c)(1), Congress distinguished between "regulations" and "directives" in § 121(c)(2). Specifically, § 121(c)(2) authorizes the GSA Administrator to issue "regulations," and other agency heads to issue "directives" to implement those regulations. If Congress believed that these words were coterminous, it would not have distinguished between the GSA Administrator's authority and the implementing agencies' authority in that manner.

Third, the government fails to respond to Florida's argument regarding § 603, which authorizes the President to "prescribe regulations establishing procedures to carry out" the establishment of motor vehicle pools and transportation systems. Doc. 10 at 12 (quoting 40 U.S.C. § 603). As Florida explained in its initial motion, the government's reading of § 121(a) renders that provision surplusage. Doc. 10 at 12.

Fourth, because the APA does not apply to the President, and given the "basic presumption of judicial review," *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020), Congress speaks clearly when it grants the President such authority. *See* Doc. 10 at 12 (collecting examples using "regulations"); *see also* 5 U.S.C. § 3302 ("rules"); *id.* § 7301 ("regulations"); 10 U.S.C. § 836 ("rules and regulations").

Finally, the government overstates the degree to which practice and precedent affirm the President's power to do so.[4] For example, the government relies on *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), but in that case, President Bush had implemented the challenged policy by instructing the FAR Council to "amend the FAR." *Id.* at 730. The FAR Council did so through notice and comment rulemaking. *Id.* at 731–32. In other words, President Bush did the very thing that Florida claims President Biden should have done here. The historical record is replete with similar examples, including under this Administration.[5]

For these reasons, § 121 does not authorize the President to issue regulations.

### iii.   FPASA does not authorize a vaccine mandate.

In its initial motion, Florida explained that the text of FPASA does not grant carte blanche authority to impose any condition that might promote economy and efficiency in procurement. Doc. 10 at 13–15. The government appears to recognize that it lacks even a plausible defense based on the text of FPASA because it does not offer one. Doc. 21 at 17–21. It does not identify any provision of FPASA authorizing its conduct other than the purpose statement in § 101; it does not explain why—contrary to blackletter law—this Court should view that purpose statement as a grant

---

[4] In fact, many of the cases the government relies on were resolved on preliminary grounds. *See Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 8–10 (3d Cir. 1964) (exhaustion); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632–33 (5th Cir. 1967) (cause of action); *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) (subject matter jurisdiction).

[5] *E.g.*, Exec. Order No. 13494, Economy in Government Contracting, 74 Fed Reg. 6,101 (Jan. 30, 2009); Exec. Order No. 13881, Maximizing Use of American-Made Goods, Products, and Materials, 84 Fed. Reg. 34,257 (July 15, 2019); Exec. Order No. 14005, Ensuring the Future Is Made in All of America by All of America's Workers, 86 Fed. Reg. 7,475 (Jan. 28, 2021).

of authority; and it does not explain how to give meaning to the more specific provisions of FPASA authorizing conduct to promote economy and efficiency if its reading is correct, *see* Doc. 10 at 13 (discussing those provisions).

Typically, when the government relies on non-binding precedent and its own practices to defend its conduct, it at least makes a half-hearted attempt to explain why that conduct is consistent with the text of relevant statutes. The government's failure to even try is telling. "[P]ast practice does not, by itself, create power.'" *Medellin*, 552 U.S. at 532 (quoting *Dames & Moore*, 453 U.S. at 686).[6]

Moreover, the government's interpretation of § 101 is less settled than it claims. For example, in *Liberty Mutual Insurance Co. v. Friedman*, the Fourth Circuit "[a]ssum[ed]," but did not "decid[e]," that the test from *Kahn* applied, and held that the government failed even that test. 639 F.2d 164, 170 (4th Cir. 1981). And in many other cases cited by the government, the relevant party simply failed to contest the government's statutory authority. *E.g.*, *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 8 (3d Cir. 1964) (noting that the defendant "does [not] maintain that the executive orders and regulations were issued without statutory authority"); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (noting that appellees made no argument that the executive order "should be treated as issued without statutory authority"). In fact, the government cites no case addressing, much less rejecting, Florida's argument that

---

[6] To the extent the government relies on pre-FPASA practices to support its generalizations about procurement authority, those cases are inapplicable given subsequent legislation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

§ 101 is not a grant of authority. Instead, the government claims for itself near-limitless power over appropriated funds based on silence from Congress and poor lawyering by its opponents.

The government's incorrect interpretation aside, its actions are unlawful even under its reading. The challenged actions attempt to regulate the personal health decisions of millions of Americans, and the government identifies no statute clearly authorizing it to do so. Generic authority to promote "econom[y] and efficien[cy]" would not be enough. *See* Doc. 10 at 14–15. Even the government's cases recognize that procurement actions must lie "reasonably within the contemplation of" FPASA. *Liberty Mutual*, 639 F.2d at 171–72. It strains credulity to think that Congress authorized the Executive Branch to impose a vaccination mandate on millions of Americans when it streamlined the federal government's property management system in the wake of World War II. *See* Doc. 1 ¶¶ 31–34.

### iv. The challenged actions violate the Competition in Contracting Act.

Defendants are required to provide for "full and open competition through the use of competitive procedures" in procurement. 41 U.S.C. § 3301(a)(1); Doc. 10 at 17. The government argues that *National Government Services v. United States*, 923 F.3d 977 (Fed. Cir. 2019), rejected Florida's argument that its vaccine mandate violates that provision. *See* Doc. 21 at 22–23. According to the government, "a solicitation requirement (such as a past experience requirement) is not necessarily objectionable

simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement." *Id.* at 23 (quoting 923 F.3d at 985–86).

But the government's contention misstates the court's holding. In *National Government Services*, the Centers for Medicare & Medicaid Services imposed caps on the number of contracts that any one bidder could win. 923 F.3d at 979–80. The government offered two defenses: (1) that its caps were lawful because they did not prevent a bidder from submitting a bid, only from winning one, and (2) that its requirements were merely "evaluation criteria," rather than requirements that would categorically disqualify a bidder. *Id.* at 983–85.

The Federal Circuit rejected the first argument because allowing a contractor to "submit[]" a "proposal in vain" is not enough to satisfy the full and open competition requirements. *Id.* at 984. And the court rejected the second argument because, notwithstanding its "doubts as to whether the [p]olicy should even be viewed as an evaluation factor," the policy was not "tailored to meet [the agency's] needs for a particular procurement." *Id.* at 986.

The statement quoted by the government was made in addressing the *second* argument. *See* Doc. 21 at 23 (quoting *Nat'l Gov't Servs.*, 923 F.3d at 985–86). In other words, the court said that "a solicitation requirement (such as a past experience requirement)" might be lawful as an *evaluation criteria*, but it assumed that a similar requirement operating as a categorical ban on contractors would be unlawful.

As explained in Florida's initial motion, the government must actually assess a contractor's ability to perform the contract. Doc. 10 at 17.

13

v. <u>The challenged actions improperly require compliance with the FAQs.</u>

The government is demanding that federal contractors "comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract." FAR Council guidance at 5. But "guidance" that is binding is not really "guidance" at all. And the new OMB rule makes no attempt to find that the FAQs promote economy and efficiency; it merely notes their existence. 86 Fed. Reg. at 63,421. And as best Florida can tell, the FAQs are subject to change at any time, without OMB approval. Thus, even assuming the new OMB rule is otherwise valid, the government's scheme is unlawful because it purports to make the FAQs binding requirements.

Insofar as the government argues that the new OMB rule *did* approve the FAQs, this too would be unlawful because the FAQs were not published in the Federal Register. *See* 5 U.S.C. § 552(a)(1)(D). And even if the government were correct that the APA does not apply to the new OMB rule, the Federal Register Act would apply. *See* 44 U.S.C. § 1505(a).

Finally, even if the government argues that the new OMB rule incorporated the FAQs by reference, that argument too is foreclosed because the government did not comply with 1 C.F.R. part 51, which sets out detailed requirements and an approval process before materials are incorporated by reference in the Federal Register.[7]

---

[7] Florida assumes the government will not argue that the FAQs are binding on their own because the Task Force includes officials not appointed pursuant to the Appointments Clause.

b. *Defendants failed to conduct notice and comment.*

In response to Florida's argument that it violated § 1707 by failing to conduct notice and comment, the government now purports to find that "urgent and compelling circumstances" justify dispensing with that requirement. 86 Fed. Reg. at 63,423 (quoting 41 U.S.C. § 1707(d)). But the government cannot satisfy that exception.

As a matter of plain text, § 1707(d)'s "urgent and compelling" language is far more demanding than the APA's "good cause" exception. *Compare* 41 U.S.C. § 1707(d), *with* 5 U.S.C. § 553(b)(3)(B). The government cannot even satisfy the APA's good cause standard, which is itself quite demanding. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

The government relies on the COVID-19 pandemic, including the Delta variant, which surfaced in the United States in May.[8] 86 Fed. Reg. at 63,423. But neither qualify as urgent and compelling circumstances, especially given the government's delay. *See Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018); *accord Chamber of Com. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006); *Florida v. Becerra*, 8:21-cv-839, 2021 WL 2514138, at \*45 (M.D. Fla. June 18, 2021); *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 48–49 (S.D.N.Y. 2020).

---

[8] Ed Browne, *When Were the First U.S. COVID Delta Variant Cases, and How Did It Mutate?*, Newsweek Aug. 10, 2021), https://www.newsweek.com/first-us-covid-delta-variant-cases-how-did-it-mutate-1617871.

This is especially so given that—at least according to the government—the challenged actions are not public health measures but purport to be measures to improve economy and efficiency in federal contracting. Thus, the government need not just show that COVID-19 *in general* is an urgent and compelling circumstance; it must show that COVID-19's effect *on procurement* is an urgent and compelling circumstance. Instead of offering such a rationale, the government all but admits Florida's pretext argument, relying on the effects of "a once in a generation pandemic" on public health. 86 Fed. Reg. at 63,423.

The new OMB rule also relies on the government's desire to avoid the earlier deadline set by the old OMB rule. *Id.* But if the government wanted to move more slowly, it should have done notice and comment when it issued the old OMB rule months ago. Instead, it is using *its own failure* to comply with § 1707 in the old OMB rule as a basis for "urgent and compelling circumstances" to ignore § 1707 in the new OMB rule.[9]

Finally, the OMB rules aside, the executive order and FAR Council guidance violate § 1707 because they order (or advise) the agencies to take actions inconsistent with § 1707. Exec. Order No. 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50,985, 50,986 (Sept. 9, 2021) (directing the FAR Council to assist agencies in employing a deviation clause before the FAR is amended); FAR Council guidance at 2–3 (discussing the deviation clause); *Navajo*

---

[9] Moreover, reliance on the December 8 deadline is nonsensical. In the event that § 1707 applies to the OMB rules, the old OMB rule (including its deadline) is a nullity.

*Refining Co., L.P. v. United States*, 58 Fed. Cl. 200, 207–09 (2003) (concluding that class deviations accompanied by a proposed revision to the FAR require notice and comment).

### c.   The challenged actions are arbitrary and capricious.

The new OMB rule attempts to remedy the serious issues raised by the old OMB rule, but it is still arbitrary and capricious for several reasons.

**1.** The new OMB rule, like the old one, fails to consider costs to the States, reliance interests, or lesser alternatives. *See* Doc. 10 at 20. Like the old OMB rule, the new OMB rule does not "display an awareness that the government is imposing requirements on the States at all, which is reason alone to find [it] arbitrary and capricious." Doc. 10 at 20.

As to reliance interests, the government admits that it did not "specifically address reliance interests," but it claims that "there was no need to do so" because "OMB was not changing a longstanding position." Doc. 21 at 27. That argument is as remarkable as it is incorrect. The government does not claim that it has ever required its contractors to be vaccinated, and it recently said that vaccine mandates are "not the role of the federal government"[10] Imposing this mandate is not just a changed position, it is a sea change.

---

[10]   Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

Similarly, the government did not consider the lesser alternatives of exempting people who work outdoors or of recognizing natural immunity, Doc. 10 at 16, nor did it consider the efficacy of therapeutics, which is now approaching that of vaccines.[11] It did not even consider testing, which the Occupational Safety and Health Administration claims is an "effective" alternative to protect workers. *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402, 61,450 (Nov. 5, 2021).

**2.** Even where the new OMB rule claims to consider issues, it fails "to consider . . . important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The government claims to "know of no systematic evidence" that resignations by the unvaccinated have "been a widespread phenomenon, or that it would be likely to occur among employees of [f]ederal contractors." 86 Fed. Reg. at 63,422. But the CNBC article cited in footnote 14, *id.*, acknowledges nationally reported data, which indicates that 72% of unvaccinated workers would quit in lieu of vaccination.[12] The government's statement is therefore at best mistaken and at worst untruthful.

---

[11] Pfizer's Novel Covid-19 Oral Antiviral Treatment Candidate Reduced Risk of Hospitalization or Death by 89% in Interim Analysis of Phase 2/3 Epic-Hr Study, Pfizer (Nov. 5, 2021), https://www.pfizer.com/news/press-release/press-release-detail/pfizers-novel-covid-19-oral-antiviral-treatment-candidate (explaining the efficacy of a new treatment); Manas Mishra, U.S. to buy 10 mln courses of Pfizer's COVID-19 pill for $5.3 bln, Reuters (Nov. 18, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/us-govt-buy-10-mln-courses-pfizers-covid-19-pill-529-bln-2021-11-18/ (explaining that the government has purchased a high volume of those new treatments).

[12] *See* Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: October 2021*, KFF (Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-october-2021/.

Similarly, the Acting OMB Director failed to consider whether the FAQs promote economy and efficiency, even though the FAQs are purportedly binding.

**3.** Finally, the analysis in the new OMB rule underscores that the government seeks to regulate public health, not improve the efficiency of contracting, rendering its actions pretextual. *See* Doc. 10 at 20–21. For example, in finding that urgent and compelling circumstances justify foregoing notice and comment, the government points to the "once in a generation pandemic, which has already resulted in more than 46,405,253 cases of COVID-19, hospitalized more than 3,283,045 Americans, and taken more than 752,196 American lives." 86 Fed. Reg. at 63,423. Stopping the spread of COVID-19 is an admirable goal—one Florida shares—but pretending that the government is not doing so, but instead improving the efficiency of its contracts, is pretextual.

> d.   *The OMB rules are reviewable under the APA.*

The government argues that both OMB rules are unreviewable under the APA because the APA does not apply to the President and the Acting OMB Director exercised authority purportedly delegated under 3 U.S.C. § 301. Doc. 21 at 23–24. The government is wrong for two reasons.

First, the government's argument proceeds from the premise that § 121(a) authorizes the President to issue regulations. Because—as explained—that premise is false, the OMB rules are reviewable. *See Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1375 (Fed. Cir. 2000) ("[A] President may only confer by Executive Order rights that Congress has authorized the President to confer.").

19

Second, the government cites no binding—or even circuit—authority for the proposition that agency action is unreviewable under the APA because it involves a presidential delegation. *See* 86 Fed. Reg. at 63,423; Doc. 21 at 24. And it is incorrect. Unlike, for example, Congress, *see* 5 U.S.C. § 701(b)(1), the President's exemption is not based on the text of the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 ("[T]extual silence is not enough to subject the President to the provisions of the APA."). Extending that rule to an agency expressly covered by the APA that is implementing a presidential directive would be inconsistent with the APA's "basic presumption of judicial review." *See Regents*, 140 S. Ct. at 1905. The APA expressly applies here because—whatever the source of the agency's authority—it is the *agency* that is carrying it out.

Moreover, exercising powers delegated from the President is a common feature of agency action. *E.g.*, *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1216 (9th Cir. 2015); *Clarry v. United States*, 85 F.3d 1041, 1048 n.4 (2d Cir. 1996). Just as agencies cannot invoke Congress's express APA exemption when exercising delegations from Congress, they cannot invoke the President's implied exemption. *See Franklin*, 505 U.S. at 828–29 (Scalia, J., concurring) (explaining that "[r]eview of the legality of Presidential action" can be obtained in the same manner as review of "unlawful legislative action," by suing the "agents who carry" it out). This explains why many district courts have disagreed with the government's cases. *See Protect Our Cmtys. Found. v. Chu*, No. 12-cv-3062, 2014 WL 1289444, at *6 (S.D. Cal. Mar. 27, 2014); *Sierra Club*

*v. Clinton*, 689 F. Supp. 2d 1147, 1156–57 (D. Minn. 2010); *Indigenous Envt'l Network v. U.S. Dep't of State*, No. cv-17-29, 2017 WL 5632435, at *6 (D. Mont. Nov. 22, 2017). This Court should too.[13]

> e.   *The FAR Council guidance is reviewable under the APA.*

The government also argues that the FAR Council guidance is unreviewable because, in its view, it is not final agency action. Doc. 21 at 28–29. But the FAR Council guidance (1) marks the "consummation of the agency's decisionmaking process" and (2) either determines "rights or obligations" or causes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Canal A Media Holding, LLC v. USCIS*, 964 F.3d 1250, 1255 (11th Cir. 2020) (The "core question" about finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

The FAR Council guidance marks the consummation of the agency's decisionmaking process because Defendants are including the contract clause in countless contracts throughout the country and requiring vaccination by January 18. The government does not dispute this. Instead, the government argues that "it is not the FAR Council's final word on the contract clause" because the FAR Council will eventually issue regulations. Doc. 21 at 28. But the fact that an agency may "revise" its decision "is a common characteristic of agency action and does not make an

---

[13] The government does not appear to contest that Florida has a cause of action where presidential action violates a statute. Thus, its argument—even if accepted—would seem to foreclose only Florida's claims that the OMB rules are arbitrary and capricious.

otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

The guidance also determines rights and obligations and causes legal consequences because it is being "applied by the [government] in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The government disagrees, claiming that the guidance has no independent effect "unless an agency chooses to incorporate it into a procurement contract." Doc. 21 at 30. That may be true, but Defendants are doing that in droves. They do not suggest otherwise. And the FAQs—which the government also says are binding—expressly address the scope of the guidance's contact clause, suggesting it is the unitary, definitive contract clause being used across the government. *See* FAQs (stating that the clause "supersede[s] any contrary State or local law or ordinance").

Finally, if the Court finds the FAR Council guidance unreviewable on its own, it should review Defendants' use of the FAR Council's contract clause in their deviation clauses and new contracts. *See* Doc. 23, count 11.

f.   *The challenged actions violate the Constitution.*

The government points out that "Florida cites no case subjecting a federal procurement policy or contract to the Spending Clause's requirement[s]." Doc. 21 at 31. That is true. But Florida *does* identify authority demonstrating the requirements of the Spending Clause, Doc. 10 at 21–22, and the government neither disputes that government contracts are an exercise of the Spending Clause nor cites authority recognizing a federal-contract exception. (Neither does it ask the Court to create such

22

an exception.). What is more, the government does not even argue that its conduct would comply with the Spending Clause assuming it applies.

For these reasons, and those explained in Florida's initial brief, the challenged actions violate the Spending Clause. *See* Doc. 10 at 21–22.

## II.   FLORIDA HAS STANDING AND IS IRREPARABLY HARMED BY THE CHALLENGED ACTIONS.

In response to Florida's arguments in its initial motion, Doc. 10 at 22–24, including that its Division of Blind Services has contracts covered by the executive order, a GSA official now insists under penalty of perjury that "the inclusion of the contract clause described in section 2 of Executive Order 14042 is not mandatory in any new or existing" permit held by the Division of Blind Services because those permits are below the Simplified Acquisition Threshold of $250,000. Doc. 21-1 ¶ 11.

What GSA omits is that it told the Division the opposite in written correspondence on October 12. Supp. Ex. 1–2; *cf.* 18 U.S.C. § 1001 (making it a crime to make knowing misrepresentations regarding procurement matters in the Executive Branch).

Regardless, Florida clearly establishes standing and irreparable harm, especially given new evidence presented in its amended complaint and included with this amended motion.

First, on November 18, Florida enacted a statewide ban on vaccine mandates by public employers, and a ban on such mandates by private employers unless the mandates include exemptions far broader than those contemplated by the challenged

actions. *See* §§ 381.00317, 112.0441, 381.00319, Fla. Stat. (requiring private employers to provide exemptions from vaccine mandates for pregnancy or anticipated pregnancy, natural immunity, submission to periodic testing, or the use of personal protective equipment).[14] Because the challenged actions now seek to compel every federal contractor in the State to violate state law, Florida can show sovereign injury. That injury is irreparable, especially given the government's assertion that its contracts have preemptive effect. *See* FAQs.

"[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *accord Hand v. Scott*, 888 F.3d 1206, 1215 (11th Cir. 2018). As does federal action that infringes on a State's "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001); *accord West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465, 2021 WL 5300944, at *19 (N.D. Ala. Nov. 15, 2021); *Texas v. United States*, 95 F. Supp. 3d 965, 981–82 (N.D. Tex. 2015).

Second, Florida contracts with the federal government as a matter of course. The government admits that Florida currently has nine contracts with NASA alone. *See* Doc. 21-2. And Florida plans to continue bidding on government contracts. Indeed, according to an official at the University of Florida, that university "has approximately 100 [pending] proposals" for research opportunities. Supp. Ex. 3.

---

[14] Florida's position is that § 381.00316(2) already prohibited vaccine mandates by public employers (but not private employers). *See* Doc. 10 at 8–9. There was, however, litigation regarding the interpretation of that statute, and the new legislation resolves any doubt.

Third, the government admits that NASA "possess[es] the authority to unilaterally include the COVID-19 safety protocols in its contracts" with Florida. Doc. 22 at 2. While it says that it "does not plan to do so," *id.*, Florida is now perpetually at the mercy of the Defendants, whose conduct so far gives little comfort. *See* Doc. 10 at 1 (quoting the Press Secretary, only months ago, saying that mandating vaccines is "not the role of the federal government"); Supp. Ex. 1 (making misrepresentations to Florida).

### III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The government claims that it wants to stop the spread of COVID-19. Doc. 21 at 35. Florida shares that goal. But if we are to remain "a government of laws and not men," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966), then the government must follow the law—"even a public health emergency does not absolve [it] of that responsibility." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2604 (2020) (Alito, J., dissenting). Further, the government admits that "COVID-19 vaccines provide strong and persistent protection against infection, illness, and hospitalization." 86 Fed. Reg. at 63,422. Any person who wants a vaccine can get one.

### CONCLUSION

The Court should preliminarily enjoin Defendants from implementing or enforcing the executive order, OMB rules, or FAR Council guidance in Florida.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY
*Lead Counsel

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2021, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
James H. Percival
