IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| STATE OF FLORIDA,<br><br>    Plaintiff,<br><br>  v.<br><br>BILL NELSON, in his official capacity as Administrator of NASA, et al.,<br><br>    Defendants. | No. 8:21-cv-2524-SDM-TGW |

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND AMENDMENT**

  Florida has filed an entirely new complaint, and a "reply" that is even longer than its opening preliminary injunction motion. But it has done nothing to change the legal principle at the heart of this case: "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). Contrary to the manner in which Florida has framed this dispute, EO 14042 and its implementing regulations are not actions taken by the President in a regulatory capacity. Instead, they are better viewed as the actions of the CEO of the Executive Branch issuing a policy for how the government will act as a market participant— exactly the type of action Presidents have taken, Congress has accepted, and courts have affirmed for half a century. Florida's procedural complaints also do not stand up to scrutiny. As another court recently held, EO 14042 and its implementing regulations "followed the procedures required by statute" and "provide[] ample

support for the premise that a vaccine mandate will improve procurement efficiency." *Kentucky v. Biden*, No. 3:21-CV-00055-GFVT, 2021 WL 5587446, at *10 & 13 (E.D. Ky. Nov. 30, 2021). Florida has failed to carry its heavy burden to justify preliminary relief—relief that would turn our federal system on its head by preventing the United States from entering contracts with third parties on its own terms.

I.    **Florida Is Still Unlikely To Succeed On Its Statutory Claims.**

    A.    **The Government Complied With Applicable Statutory Authority.**

Florida's reply ignores that the President, OMB Director, and the FAR Council are all acting within their well-settled statutory authority. Defendants are not arguing that the President "issue[d] regulations that bind third parties himself." Reply at 7. The President and the OMB Director have issued government-wide policies and directives, the FAR Council is working on a government-wide rulemaking for Federal contractors, and in the meantime, individual agencies have used their agency-specific authority to implement the President's directive within their respective agencies.

All parties agree that "Section 121(a) authorizes the President to 'direct[]' the exercise of procurement authorities throughout the government." Reply at 7 (citing 40 U.S.C. § 121(a)); *id.* at 10. Florida acknowledges that the "President could invoke this authority to direct, for example, the FAR Council to issue a government-wide procurement regulation." *Id.* But Florida ignores that this is *exactly* what the President did when he directed "[t]he [FAR] Council, [to] the extent permitted by law, [to] amend the Federal Acquisition Regulation." EO, § 3. And FAR Council is doing just that. FAR Case No. 2021-021, https://perma.cc/ZQ4Y-8Y9W.

2

Florida's brief focuses on what happens before the FAR Council finalizes its government-wide regulation, when the Executive Order directs agencies "to exercise any applicable authority to ensure that contracts" covered by the Order "include the clause" requiring vaccinations. EO, § 3(b); *id.* § 2. Florida acknowledges that 41 U.S.C. § 1303(a)(2)(A) authorizes agencies to issue "regulations essential to implement Government-wide policies and procedures *within the agency*." Reply at 7. And agencies have used that statutory authority and other pre-existing procurement authorities, consistent with procurement regulation FAR 1.404, to issue agency-specific class deviations directing contracting officers to include the clause into contracts until the FAR Council issues its final government-wide regulation.[1] Florida does not appear to challenge each agency's independent authority to do so.

### B. OMB's Determination Demonstrates The Required Nexus To Efficiency and Economy in Procurement Required By FPASA.

The President is well-within his power to direct policies regarding federal procurement because 40 U.S.C. § 121(a) authorizes him to "prescribe policies and directives that the President considers necessary" for federal procurement. "'When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum.'" *AFL-CIO v. Kahn*, 618 F.2d 784, 787 n. 13 (D.C. Cir. 1979) (quoting *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 635–36 (Jackson, J., concurring)). Florida is wrong to argue that the power exercised here to direct federal

---

[1] *See, e.g.*, NASA Class Deviation 21-03A, https://perma.cc/7VQH-X38F; Memo. for All GSA Contracting Activities, https://perma.cc/M9J6-7L4D; DoD Memo re Class Deviation, https://perma.cc/XZ7J-5U9Y.

procurement is "based on silence from Congress." Reply at 12. Congress expressly authorized the President to prescribe federal procurement policies so long as those policies are "consistent" with U.S.C. Title 40, Subtitle I. In other words, Presidential procurement policies are authorized so long as they "reasonably relate[] to the Procurement Act's purpose of ensuring efficiency and economy in government procurement" as described in 40 U.S.C. § 101.[2] *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981); *accord UAW v. Chao*, 325 F.3d 360, (D.C. Cir. 2003); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967).[3]

The President here set a government-wide policy of requiring certain contractors to include a clause requiring compliance with Task Force Guidelines that the OMB Director determines would promote economy and efficiency in procurement. Order, § 2(a). The OMB Director's robust explanation that requiring contractors to comply with the Guidelines promotes economy and efficiency easily satisfies the "lenient" nexus requirement in FPASA. *Chao*, 325 F.3d at 366. Florida's arguments to the contrary, Reply at 10–12, have no basis in the text of the statute, have no support from any case law, and ignore decades of precedent.

### C. EO 14042 and its Implementing Guidance Do Not Violate the Competition in Contracting Act.

The EO does not violate the Competition in Contracting Act (CICA) because it

---

[2] Defendants agree that Section 101 is not a "grant of authority." Reply at 10–11. If anything, Section 101 supplies a limiting principle. Because Section 121 requires any Presidential policy to be consistent with the rest of the Act, Section 101 sets an outer bound on the President's FPASA authority.
[3] Fifth Circuit decisions handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

does not "operat[e] as a categorical ban on contractors." Reply at 13. Contractors who refuse to agree to a performance clause in a government contract are making a *choice* not to agree to the government's terms—that does not make the contract's requirements illegal. Nothing in *National Government Services v. United States*, 923 F.3d 977 (Fed Cir. 2019), holds to the contrary. As Defendants noted in their earlier opposition brief, *National Government Services* upholds "the unremarkable proposition that a solicitation requirement . . . is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot" or (as in this case) simply refuse to "satisfy that requirement." 923 F.3d at 985–86. Even the portion of the opinion Florida invokes teaches that solicitation requirements excluding bidders do not violate CICA when an agency includes the requirement because it will "likely result in reduced overall cost for the procurement." *Id.* at 986. In other words, when the Government includes a clause that promotes efficiency and economy, it does not run afoul of the CICA, even if some contractors refuse to enter a contract with that clause and decline to submit a bid. For the same reason, the district court in *Kentucky* erred when it held that the EO 14042 violated CICA based on its belief that the contractor mandate excludes contractors who offer "the best value to the government." 2021 WL 5587446, at *8 (quoting *Nat'l Gov't Servs.*, 923 F.3d at 990). Here, the OMB Director determined that contractors with fully vaccinated workforces offer the best value to the government, so including the clause does not violate CICA.

### D. The FAQs Have Not Yet Been Approved By the OMB Director.

Florida's concern about the FAQs is unfounded. The FAR Council's COVID

deviation clause contains this language: "The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/." Florida argues that requiring compliance with the current FAQs is improper since the OMB Director has not yet made an efficiency and economy determination. Reply at 14. But the Government is not requiring compliance with the current FAQs. That clause language refers to the FAQs that the Director previously adopted (that determination has been rescinded). The bottom line is that unless the OMB Director determines that compliance with any particular set of FAQs promotes efficiency and economy in procurement, compliance with the posted FAQs is not required. *See* EO, § 2(a), (c).[4]

### E. OMB's Determination Satisfies Any Notice Requirement.

Section 1707 does not apply because the OMB Director was acting pursuant to Presidential authority. But to the extent that 41 U.S.C. § 1707 applies, there is no dispute that the OMB Determination satisfied any notice requirement. Section 1707(b) requires notice of a "proposed procurement policy" to be published in the Federal Register and open for comment for at least 30 days. 41 U.S.C. § 1707(b).

While Section 1707 usually requires a procurement policy to "not take effect until 60 days after it is published for public comment in the Federal Register," that

---

[4] Even if the FAQs were binding, Florida also fails to articulate what would be "unlawful" about incorporating the FAQs by reference.

requirement can be waived if "urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. 1707(d). The OMB Determination describes the "urgent and compelling circumstances" that required the determination take immediate effect while receiving comments, which is currently open until December 16, 2021. 86 Fed. Reg. at 63,423–24.

There is no precedential or textual support for Florida's conclusory contention that § 1707's urgent-and-compelling-circumstances waiver "is far more demanding than the APA's 'good cause' exception." Reply 15. Florida cites to no regulations, cases, or examples in support of that contention. FAR section 1.501-3(b), which implements the statutory exception in § 1707(d), states that "Advance comments need not be solicited when urgent and compelling circumstances make solicitation of comments impracticable prior to the effective date of the coverage, such as when a new statute must be implemented in a relatively short period of time." Indeed, another district court in this Circuit held that urgent and compelling circumstances existed when an interim Department of Defense procurement rule was made effective immediately because it was "intended 'to implement' a new statute." *United States v. AEY, Inc.*, 603 F. Supp. 2d 1363, 1376 (S.D. Fla. 2009). And the Executive Branch regularly invokes § 1707(d) to harmonize deadlines and enable regulatory certainty and to clarify compliance obligations, as it did here. *Compare, e.g.*, FAR: Non-Retaliation for Disclosure of Compensation Information 81 Fed. Reg. 67732 (Sept. 30, 2016), *with* 86 Fed. Reg. at 63423-24; *see also* 66 Fed. Reg. 17,754, 17,755 (Apr. 3, 2001) (invoking § 1707(d) to immediately stay a FAR rule because "otherwise the rule

imposes burdens that the Government and contractors are not prepared to meet").

The OMB Determination satisfies the "urgent and compelling circumstances" requirement because it implements policy pursuant to a new Executive Order. *See AEY*, 603 F. Supp. 2d at 1376. And it would have been impracticable and create regulatory uncertainty for the Determination, which revoked prior policy, to become effective *after* the prior policy's deadline. *See* 86 Fed. Reg. at 63,423–24. Another court found urgent and compelling circumstances here because "the compliance date was delayed to benefit federal contractors and ensure that they would have sufficient time to comply with the mandate." *Kentucky,* 2021 WL 5587446, at *12.

Florida also suggests, for the first time in its reply, that urging agencies to use their existing authorities to include clauses in contracts before the FAR is amended would be "inconsistent with § 1707." Reply at 16–17 (citing *Navajo Refining Co. L.P., v. U.S.*, 58 Fed. Cl. 200, 207–09 (2003)). First, Florida waived this potential argument by raising for the first time in a reply brief. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014).[5] Second, the *Navajo* court explained that while the predecessor to Section 1707 "does not specifically address class deviations," "changes in procurement policy" are covered by the section. *Navajo*, 58 Fed. Cl. at 209. In other words, only the change in policy needs to be published—not every single class deviation. And here, the OMB Determination that establishes government-wide procurement policy has been published in accordance with § 1707.

---

[5] While Florida was free to "brief additional issues raised by OMB's [November Determination," ECF No. 19 & 20 (Order), it was not authorized to raise entirely unrelated issues for the first time on reply.

### F. OMB Director's Determination Does Not Violate the APA.

#### 1. The OMB Director's Determination Is Not Subject To the APA.

Florida raises two arguments for why the APA applies to the OMB Director exercising presidential authority, but both miss the mark. Reply 19–20. First, Florida argues that the President does not have the authority to direct procurement. But, as explained above, the EO and the OMB Director's determination are policy determinations and completely consistent with FPASA. *See infra*, I.A–B. Second, all parties agree that the President is not subject to the APA. *See* Reply at 20 (citing *Franklin v. Mass.*, 505 U.S. 788, 800–01 (1992)). Florida does not challenge the President's ability to delegate pursuant to 3 U.S.C. § 301 the decision of whether the Guidelines promote economy and efficiency to the OMB Director. And Florida cites no binding—or even circuit—authority for the proposition that presidential action delegated pursuant to Section 301 is reviewable under the APA. Reply at 20–21. Florida's comparison to delegated Congressional authority is misplaced: although Congress specifically requires compliance with the APA for agencies exercising delegated legislative authority, "when Congress has imposed duties on the President, they have specifically mentioned that office." *Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). There is a difference between directing agency actions and delegating Presidential authority, and adopting Florida's position would deprive the President of the flexibility that Congress provided in Section 301. "Any argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order

9

to receive the deference Congress has chosen to give to presidential action." *Tulare*, 185 F. Supp. 2d at 28–29.

## 2. OMB's Determination Is Not Arbitrary Or Capricious.

Even assuming that the APA applies to the OMB Director's Determination, the policy is not arbitrary or capricious. Florida does not dispute that arbitrary-and-capricious review is deferential and judicial review "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, the OMB Determination clears that deferential standard: it includes a "thorough and robust economy-and-efficiency analysis" that "provide[s] ample support for the premise that" requiring federal contractor vaccination "will improve procurement efficiency." *Kentucky*, 2021 WL 5587446, at *12-13. Florida's three principal arguments fail.

First, the OMB Director considered costs of the mandate and found them to be low because vaccination is free and administrative costs associated with "distributing information" and "tracking employees' vaccination status" are small. 86 Fed. Reg. at 63,422. And to the extent compensation is part of the negotiations between parties, a contractor can always seek an equitable adjustment to cover any unexpected costs. Florida relatedly points to reliance interests, but ignores Defendants' argument that the Executive Order exempts existing contracts, thus protecting reliance interests.

Second, Florida points to one survey that claims 72% of unvaccinated workers would quit in lieu of vaccinations. Reply at 18. The OMB Determination considered

that survey and cited to an article describing its findings, but ultimately concluded that real-life data from companies that had imposed a mandate was more compelling than a survey. 86 Fed. Reg. at 63425.

Third, Florida claims that discussion of the impact of COVID-19 on American society makes this policy pretextual. Reply at 19. But Florida provides no reason why the Government cannot have a policy that has incidental benefits: increasing efficiency and economy in procurement by decreasing the spread of COVID-19 among federal contractors is not an impermissible objective merely because it will redound to the benefit of the economy and society generally. *See Carmen*, 669 F.2d at 821 (presidential exercise of FPASA authority does not "become[] illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well"). The OMB determination "provided ample support" for its economy-and-efficiency rationale, and "'a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons.'" *Kentucky*, 2021 WL 5587446, at *13 (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019)).

  **G. The FAR Council Memo Is Not Final Agency Action.**

As Defendants explained in their response, the APA does not apply to the FAR Council Memo because it is not final agency action. Response at 28–29; *see also Kentucky*, 2021 WL 5587446 at *3. Florida first argues that this guidance is the "consummation of the agency decisionmaking process" because at least some agencies are following it. Reply at 21. Florida cites no case law in support of that proposition, and

11

for good reason: if adopted, that argument would convert *any* non-binding guidance into final agency action any time any agency acted consistent with that guidance. Second, there is no dispute that the FAR Council is in the process of revising the FAR. When promulgated, the FAR Council's amendment to the FAR will be a binding, government-wide regulation—the challenged interim guidance is not.[6]

### H. The Challenged Actions Are Constitutional.

Florida offered no reply in support of its non-delegation doctrine argument. And for its Spending Clause argument, EO 14042 and its implementing guidance unambiguously put contractors on notice of any obligations. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), requires nothing more, which is why *Pennhurst*'s holding does not apply to contracts. *See Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004). *Pennhurst* concerned a federal grant program that "was unclear as to whether the states incurred *any* obligations *at all* by accepting federal funds." *See id.* (emphasis added). But "the *existence* of the condition itself" here is "explicitly obvious" because it is included as a contract clause. *Id.* (emphasis added); *see also Kentucky*, 2021 WL 5587446 at *7 n.9 (rejecting a similar Spending Clause argument on this basis).

## II. Florida Still Has Not Shown Irreparable Harm.

Florida's failure to show imminent harm attributable to EO 14042 is fatal to its request for emergency relief. In its initial motion, Florida identified 21 GSA future vending contracts. Defendants responded that of these putative contracts, many

---

[6] Florida alludes to use of agency- or contract-specific authority to add COVID safety clauses, Reply at 22, but fails to challenge any such action and raised the issue for the first time in its reply.

12

would not be awarded until 2023 or 2024, and that only two would be awarded by April 2022. Response at 32–33. Defendants also noted that all of these GSA contracts were below the Simplified Acquisition Threshold (SAT), and thus were expressly beyond the scope of EO 14042. *Id.* at 10, 33. Florida effectively concedes both points in its reply. It makes no attempt to show why any potential GSA contracts shows imminent harm, nor does Florida show that any of these will exceed the SAT. Florida now pivots to "new evidence presented in its amended complaint and included with [its] amended [preliminary injunction] motion." Reply at 23.

Florida's refashioned efforts to meet its burden fare no better. Florida avers that "it contracts with the federal government as a matter of course," and "that it plans to continue bidding on government contracts." Reply at 24. In support, Florida claims that since October 15, 2021, the University of Florida (UF) "has submitted 37 proposals for new federal research contracts or subcontracts," Dkt. 24-3 ¶ 3, and further notes that UF "intends to continue to submit proposals for federal research projects" "[d]uring the next twelve months." *Id.* at ¶ 5. It is unclear whether these are grants and exempt from EO 14042's requirements, but regardless these bare assertions cannot support the "extraordinary and drastic" relief that Florida seeks now. *Mazurek v. Armstrong*, 520 U.S. 960, 972 (1997). There is no evidence about whether any proposal has been granted or denied, and if denied, why. Florida offers no evidence to show that any proposal falls within the ambit of EO 14042, or that any award will be contingent on the inclusion of a COVID-19 safety clause, let alone that the award of any contract will occur in the near future. Even had Florida shown with certainty

13

that it would lose a contract, Florida would still fail to meet its burden to demonstrate irreparable harm. As Defendants noted in their opposition, Florida could seek monetary redress under the Contract Disputes Act. *See* Response at 11, 34.[7]

Having failed to carry its burden to identify any contract award/rebid for which EO 14042 would require the inclusion of a COVID-19 safety clause, Florida leans heavily on its purported sovereign injury to show irreparable harm. Noting Florida's "statewide ban on vaccine mandates by public employers"—legislation enacted during this litigation, after Defendants filed their opposition brief—Florida asserts that its "inability to enforce its duly enacted plans clearly inflicts irreparable harm." Reply at 23-24. But nothing in EO 14042 purports to "compel every federal contractor in [Florida] to violate state law"; it directs federal-contracting policy. And to the extent state law interferes with a federal contract, state law does not apply. Florida is free to decide not to contract with United States. But what it cannot do, and seeks to do here, is to compel the United States to contract with Florida (and with private parties) on terms of *Florida's* choosing. "Those wishing to do business with the Government must meet the Government's terms; others need not." *Kahn*, 618 F.2d at 794.

But Florida's real focus is not that its laws are preempted or its "sovereign interests and public policies" are infringed, Reply at 24, but that the EO purportedly harms a subset of its citizenry; namely, Floridians who work for federal contractors

---

[7] Having failed to address this point in its reply, Florida has conceded that an adequate remedy at law would exist to address the (hypothetical) event of Florida losing a contract. *McCray v. Deitsch & Wright, P.A.*, 2019 WL 5269074, *2 (M.D. Fla. 2019) (collecting cases on failure to respond).

who do not wish to receive a COVID-19 vaccine. To the extent Florida seeks to litigate on its citizens' behalf, it cannot do so. "A State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982); *see also Florida ex rel. Cobb v. U.S. Dep't of Justice*, No. 5:10-cv-118, 2010 WL 3211992, at *1 (N.D. Fla. Aug. 12, 2010), *affirmed* 440 Fed. App'x. 860 (11th Cir. 2011). Whatever injuries Florida citizens may claim because they are employed by a contractor that profits from the Federal Government, the State of Florida is not in a position to bring suit on their behalf.

### III. The Public Interest and Balance of Equities Favor Defendants.

As defendants previously explained, the balance of the equities and of the public interest tilt decisively in the federal government's favor for three reasons. *First*, enjoining EO 14042 would harm the public interest by allowing federal procurement to be disrupted by contractors exposed to, infected with, or killed by COVID-19. Put simply, enjoining EO 14042 means it will take the government longer to resume normal, pre-pandemic operations. *Second*, enjoining EO 14042 would frustrate the public's "unquestionably [] compelling interest" in "[s]temming the spread of COVID-19." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). *Third*, enjoining a government policy is an act of "judicial intervention" that "alter[s] the legal status quo." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009). As discussed in Defendant's response, any relief should merely block enforcement—not inclusion—of a COVID-19 safety clause in contracts between the federal government and Florida.

DATED: December 3, 2021                    Respectfully submitted,

                                                          BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director

*/s/ Zachary A. Avallone*
ZACHARY A. AVALLONE
KEVIN WYNOSKY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 514-2705
Zachary.A.Avallone@usdoj.gov

*Counsel for Defendants*

16

## CERTIFICATE OF SERVICE

On December 3, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Middle District of Florida, using the electronic case filing system of the Court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary A. Avallone*
ZACHARY A. AVALLONE
Trial Attorney
U.S. Department of Justice