UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                                    CASE NO. 8:21-cv-2524-SDM-TGW

BILL NELSON, et al.,

     Defendants.

_____/

## **ORDER**

In a fourteen-count complaint, Florida sues President Biden, the Office of

Management and Budget (OMB), and the General Services Administration (GSA),

among others, and claims that the vaccination requirement in the recent executive

order exceeds the President's authority and violates procedural requirements.  Flor-

ida moves (Docs. 10, 24) to preliminarily enjoin Executive Order 14042.  The de-

fendants respond (Docs. 21, 26) in opposition.

### **BACKGROUND**

1.    <u>Executive Order 14042</u>

On September 9, 2021, President Biden announced his "Path Out of The Pan-

demic: COVID-19 Action Plan" and issued Executive Order 14042, titled "Ensuring

Adequate Safety Protocols for Federal Contractors."  By a several-step process, the

executive order requires each employee of a federal contractor or subcontractor (in-

cluding each subcontractor of a subcontractor, subcontractor of a subcontractor of a

subcontractor, and so forth) to become "fully vaccinated" against COVID-19.  First, Executive Order 14042 requires the Safer Federal Workforce Task Force, established by another executive order in January 2021, to publish "guidance" that prescribes "adequate COVID-19 safeguards" with which each employee of each federal contractor, subcontractor, and so forth must comply.  Executive Order 14042 states in Section 5(b) that by September 24, 2021, the task force:

> [S]hall, as part of its issuance of Task Force Guidance, provide definitions of relevant terms for contractors and subcontractors [and] explanations of protocols required of contractors and subcontractors to comply with workplace safety guidance[.]

Second, Executive Order 14042 states in Section 2(c) that after the task force issues the guidance the Director of OMB "shall, as an exercise of the delegation of [the President's] authority under the Federal Property and Administrative Services Act . . . determine whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors."  If OMB determines that the executive order promotes "economy and efficiency," OMB must publish the guidance in the Federal Register.

Third, Executive Order 14042 in Section 2(a) states, "Executive departments and agencies, including independent establishments . . . shall, to the extent permitted by law, ensure that contracts and contract-like instruments . . . include a clause" specifying "that the contractor or subcontractor shall, for the duration of the contract, comply" with task force guidance that OMB approves.  Executive Order 14042 applies expansively "to any new contract; new contract-like instrument; new

- 2 -

solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument" that "is a procurement contract or contract-like instrument for services, construction or a leasehold interest in real property"; "is a contract or contract-like instrument for services"; "is a contract or contract-like instrument for concessions"; or "is a contract or contract-like instrument entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public."

Further, Executive Order 14042 requires each covered contractor to include in each subcontract at "any tier" the clause requiring compliance with the task force's guidance. However, Executive Order 14042 in Section 5(b) excludes, among other things, grants and contracts and subcontracts not exceeding the "simplified acquisition threshold" of $250,000. Executive Order 14042 under Section 6 "is effective immediately and shall apply" to contracts executed, exercised, extended, renewed, or modified after October 15, 2021.

Fourth, although "effective immediately" and directing each agency to include the compliance clause in every procurement contract, Executive Order 14042 requires the Federal Acquisition Regulatory Council, an entity charged under 41 U.S.C. § 1303 with establishing "a single Government-wide procurement regulation," to "amend" the Federal Acquisition Regulation (FAR) to "provide for

inclusion [of the compliance clause] in Federal procurement solicitations and contracts subject to this order."

In sum, the executive order (1) requires the task force to prepare "guidance" about "adequate COVID safety protocols," (2) requires the Director of OMB to determine whether the guidance "promotes economy and efficiency," (3) requires each federal agency to include in federal contracts a clause requiring compliance with the task force's guidance if approved by OMB, and (4) directs separately the FAR Council to amend the FAR to include the clause requiring compliance with task force guidance approved by OMB.  In effect, the executive order requires inclusion of a contract clause that serves as a vehicle through which approved task force guidance and any amendments approved by OMB become binding on private parties and their employees, including those who directly contract with the government and those who contract with those who contract with the government and so forth without bound until a contract fails to exceed the $250,000 threshold.

2.   The task force's guidance

On September 24, 2021, the task force issued "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors."  The guidance states that "[o]ne of the main goals" of President Biden's "Path Out of the Pandemic: COVID-19 Action Plan" is "to get more people vaccinated" and that "[a]s part of that plan, the President signed Executive Order 14042."

The task force's guidance requires "covered contractor employees" to become "fully vaccinated" against COVID-19 by December 8, 2021, or by the "first day of

- 4 -

the period of performance" on "a newly awarded covered contract" or on "an exercised option or extended or renewed contract[.]"  Under the guidance, "full vaccination" against COVID-19 occurs two weeks after an employee receives a single-dose vaccine or the final dose of a two-dose vaccine.  But an employee is "required to be vaccinated" even if the employee recovered from an earlier COVID-19 infection or received a positive antibody test.[1]

The guidance defines "covered contractor employee" to mean "any full-time or part-time employee of a covered contractor" (1) "working on or in connection with a covered contract" or (2) "working at a covered contractor workplace" even if the employee is not "working on or in connection with a covered contract."  The guidance defines "covered contract" to mean "any contract or contract-like instrument that includes the clause" required by the expansive scope of Section 5(a) of Executive Order 14042.

The guidance explains that an employee works "in connection with" a covered contract if the employee "perform[s] duties necessary to the performance of the covered contract" even if the employee is "not directly engaged in performing the specific work called for by the covered contract, such as human resources, billing, and legal review[.]"  An employee working "in connection with" a covered contract must become fully vaccinated even if working exclusively from home and "never

---

[1] The guidance acknowledges that the requirement to receive a booster injection will "be considered by the Task Force and OMB for possible updating of this Guidance."

work[ing] at either a covered contractor workplace or Federal workplace during the performance of the contract."

The guidance defines "covered contractor workplace" to include (1) a "Federal workplace," meaning "any place, site, installation, building, room, or facility in which any Federal executive department or agency conducts official business, or is within an executive department or agency's jurisdiction, custody, or control" and (2) "a location controlled by a covered contractor" at which "any employee working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." A location remains a "covered contractor workplace" even if entirely outdoors.

Further, the guidance requires the contractor to include the clause in subcontracts and states:

> The prime contractor must flow the clause down to first-tier subcontractors; higher-tier subcontractors must flow the clause down to the next lower-tier subcontractor, to the point at which subcontract requirements are solely for the provision of products.

(Guidance at 12)

In sum, an employee working "in connection with" a federal contract must become fully vaccinated even if the employee works exclusively from home. And an employee not working in connection with a federal contract must nonetheless become fully vaccinated unless, as the guidance elaborates, the employer "can affirmatively determine" that the employee "will not come into contact with a covered contractor employee," including contact "through use of common areas such as lobbies,

security clearance areas, elevators, stairwells, meeting rooms, kitchens, dining areas, and parking garages."

Also, the task force's guidance imposes masking and physical distancing requirements.  An unvaccinated employee isolated from employees working "on or in connection with" a federal contract nonetheless "must wear a mask . . . regardless of the level of community transmission in the area" and must "[t]o the extent practicable . . . maintain a distance of at least six feet from others at all times, including in offices, conference rooms, and all other communal work spaces."

The masking and physical distancing requirements apply even to a non-employee visiting a location controlled by the contractor.  Further, the guidance requires a fully vaccinated employee to "wear a mask in indoor settings" if the employee is "[i]n areas of high or substantial community transmission" according to the COVID-19 Integrated County View.  On December 21, 2021, CDC's Integrated County View showed that 78.86% of counties in the United States have "high" community transmission and 12.17% of counties in the United States have "substantial" community transmission.  (https://covid.cdc.gov/covid-data-tracker/#county-view).  Accordingly, in approximately 91% of counties in the United States an employee working at a location controlled by a federal contractor must wear a mask even if fully vaccinated.

3.    The Director of OMB's First Determination

On September 28, 2021, four days after the task force issued the vaccination guidance, the Director of OMB in accord with Section 2(c) of Executive Order 14042

issued a three-sentence notice of determination, 86 FR 53691, finding "that compliance by Federal contractors and subcontractors with the COVID-19-workplace safety protocols detailed in that guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." Because of the OMB Director's notice of determination, the task force's guidance became effective within the compliance clause, which Executive Order 14042 requires each agency to include in federal contracts exceeding $250,000. The determination offers no opportunity for notice and comment and is effective immediately.

4.    <u>The FAR Council Memorandum</u>

Besides directing each agency to include the compliance clause in federal contracts, Executive Order 14042 directs the FAR Council to conduct rulemaking to amend the FAR to include the compliance clause. Pending the rulemaking, Executive Order 14042 requires the FAR Council to prepare a clause that each agency must implement by "deviation" from the FAR (that is, until the FAR Council amends the FAR to include the compliance clause).

On September 30, 2021, the FAR Council published the "deviation" clause that agencies must include:

> The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https://www.saferfederalworkforce.gov/contractors . . . .

Also, the FAR Council's clause states that the contractor "shall include the substance of this clause . . . in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in [FAR] 2.101 on the date of subcontract award[.]"

5.   <u>The Director of OMB's Second Determination</u>

On November 10, 2021, the task force "updated" the guidance, 86 FR 63418, to extend the vaccination deadline from December 8, 2021, to January 18, 2022.  On November 16, 2021, the Director of OMB in a notice of determination states that the updated guidance "promote[s] economy and efficiency in Federal contracting" and "rescinds and supersedes" the first notice of determination.  Unlike the first notice of determination, the second notice of determination at 86 FR 63422 states that COVID-19 infection hinders "efficiency and economy in federal contracting" because "[w]orkers unable to work generate substantial costs on employers," which costs the employers "would be expected to . . . pass[] on to the Federal Government, either in direct cost or lower quality, including delays."  Although acknowledging "anecdotal reports suggest[ing] that vaccine mandates may lead some workers to quit their jobs rather than comply, which could create some cost associated with replacing them," the second notice of determination at 86 FR 63423 claims to "know of no systematic evidence that this has been a widespread phenomenon, or that it would be likely to occur among employees of Federal contractors."

Also, unlike the first notice of determination, the second notice of determination states that "urgent and compelling circumstances justify departing from the notice-and-comment and delayed-effective-date requirements in 41 U.S.C. [§] 1707,"

which states that "a procurement policy, regulation, procedure, or form . . . may not take effect until 60 days after it is published for public comment in the Federal Register" unless "urgent and compelling circumstances make compliance with the requirements impracticable."  The second notice of determination contends that 41 U.S.C. § 1707 remains inapplicable because the Director of OMB acts through a delegation of presidential authority under 3 U.S.C. § 301 (authorizing the president to empower the head of any agency "to perform . . . any function which is vested in the President by law") to determine whether the task force's guidance promotes economy and efficiency in federal contracting.  Despite the putative inapplicability of 41 U.S.C. § 1707, the second notice of determination contends that "urgent and compelling" circumstances exist because, according to OMB, the guidance "is critical to avoiding worker absence and unnecessary labor costs."

Also, because the task force extended the vaccination deadline from December 8, 2021, to January 18, 2022, the second notice of determination contends that delayed effectiveness would result in the task force's December 8, 2021 deadline remaining in effect and as a practical matter would nullify the deadline extension.  In other words, the second notice of determination contends that the need immediately to effect the deadline extension warrants waiving an opportunity for the public to fully comment on the mandatory vaccination of almost every employee of every covered contractor, subcontractor, subcontractor of a subcontractor, and so forth.  Finally, the second notice of determination finds that complying with the sixty-day delayed-effectiveness requirement of 41 U.S.C. § 1707 results in the January 18, 2022

- 10 -

deadline's becoming legally effective not sooner than January 9, 2022 (that is, sixty days after December 8, 2021), a day beyond which, according to OMB, the deadline "would fundamentally undermine the effort to provide private companies with aligned deadlines and regulatory certainty."  In other words, the second notice of determination contends that delayed effectiveness — a procedural safeguard that affords a federal contractor an opportunity to adapt to the requirements of an impending rule — interferes with OMB's avowed goal of affording "regulatory certainty."  Because of the Director of OMB's second notice of determination, the task force's updated guidance and extended deadline became effective immediately.

6.   Florida's claims

On October 28, 2021, Florida sued (Doc. 1), and on November 2, 2021, Florida moved (Doc. 10) for a preliminary injunction.  After the Director of OMB rescinded the first notice of determination and issued a second notice of determination, Florida amended (Doc. 23) the complaint and amended (Doc. 24) the motion for preliminary injunction.  In Counts I–IX, Florida claims that the Director of OMB's first notice of determination, the second notice of determination, and the FAR Council's guidance each exceeds legal authority, violates notice and comment requirements, and constitutes arbitrary and capricious agency action.  In Count X, Florida claims that the President acted *ultra vires*.  In Count XI, Florida claims that the "implementation" of Executive Order 14042 violates the APA.  In Count XII, Florida claims that the President exercises an unconstitutionally delegated legislative power.

In Count XIII, Florida claims an unconstitutional exercise of Congress's spending power.  In Count XIV, Florida demands a declaratory judgment.

## STANDING

The defendants insist that Florida possesses no constitutional "standing."  According to the defendants, Florida fails to plead "how it has been harmed at all, much less that it faces irreparable harm."  (Doc. 21 at 2)  First, the defendants argue that Florida's contracts fall below the $250,000 "simplified acquisition threshold."  According to the defendants, each contract on which Florida relies for standing remains exempt from the executive order.  Second, the defendants argue that "other than contracts that Florida has already agreed to modify, Florida provides no evidence that it is a party to a federal contract that already has this clause, or a party to an existing covered contract that is up for an option, extension, or renewal that must include the challenged clause."  (Doc. 21 at 2–3)  Third, the defendants argue that Florida fails to "identify any specific solicitations that it plans to bid on or contracts that it plans to enter" in the "immediate future."  (Doc. 21 at 2)

In reply, Florida argues that the amended complaint "clearly establishes standing and irreparable harm."  (Doc. 24 at 23)  First, Florida alleges a "sovereign injury."  (Doc. 24 at 24)  On November 18, 2021, Florida enacted Section 112.0441, Florida Statutes, which bans a vaccination requirement by a public employer and Section 381.00317, Florida Statutes, which bans a vaccination requirement by a private employer.  According to Florida, because the challenged agency action compels

every federal contractor in the state to violate state law, the state suffers an irreparable injury to state sovereignty.

Second, Florida insists the state suffers an immediate economic injury from contracting "as a matter of course" with the federal government.  (Doc. 24 at 24)  Florida identifies a host of existing contracts and pending proposals subject to the executive order.  (Doc. 24 at 24–25)  The amended complaint alleges that Space Florida, an arm of the state, holds "several contracts with NASA."  (Doc. 23 at 17)  This group of "several contracts" includes contracts for leasing land to NASA and contracts for rendering services to NASA.  (Doc. 23 at 17)  Next, Florida identifies pending solicitations by the University of Florida to contract with the federal government.  Florida appends (Doc. 24-3 at 2) the affidavit of a University of Florida officer, who states that since October 15, 2021, the university has submitted "approximately thirty-seven proposals for new federal research contracts or subcontracts, which, if awarded, would total approximately $10.5 million."  On November 29, 2021, the University of Florida awaited "sponsor decision" for about a hundred proposals "for research funding through federal contracts with total requested budget of approximately $50 million."  (Doc. 24-3 at 2)  Further, the University of Florida intends to submit throughout 2022 additional proposals for federal research contracts.

The parties intermingle precedent discussing injury-in-fact with precedent discussing prudential standing, including cases discussing *parens patriae* capacity.  Constitutional standing and prudential standing remain distinct.  *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006).  Article III imposes the requirement of

constitutional standing, the "irreducible [] minimum" requirement that a plaintiff must allege an injury-in-fact that is fairly traceable to the defendant's allegedly unlawful conduct and that is likely redressable by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 550, 560–61 (1992). "Beyond the constitutional requirements," the federal judiciary imposes "a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982); *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Service Employees Int'l Union Health and Welfare Fund v. Philip Morris, Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001) ("[T]he doctrine of *parens patriae* is merely a species of prudential standing[.]").

"Like the prudential component, the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition." *Allen v. Wright*, 468 U.S. 737, 751 (1984*), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) ("Generalizations about standing to sue are largely worthless as such."); William Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 221 (1988) ("The structure of standing law in the federal courts has long been criticized as incoherent.").

But reasonably constant principles of constitutional standing appear. To present a justiciable case or controversy for a preliminary injunction, the complaint "must show a sufficient likelihood" that Florida "will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323,

1328 (11th Cir. 2013) (quotation marks omitted).  Showing a "sufficiently likeli-hood" requires "a real and immediate — as opposed to a merely conjectural or hypo-thetical — threat of future injury." *Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001).

In addition to satisfying the constitutional standing requirement, "a plaintiff may have to satisfy several prudential principles." *Chiles v. Thornburgh*, 865 F.2d 1197, 1204 (11th Cir. 1989).  "States are not normal litigants for the purposes of in-voking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).  Still, a state can sue "in a number of different capacities — and sometimes in more than one capacity in a single litigation."  R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, *Hart & Wechsler's The Federal Courts and The Federal System* 279 (7th ed. 2015); Erwin Chemerinsky, *Federal Jurisdiction* 125 (8th ed. 2021) ("[A] distinction must be drawn between a government entity suing to remedy injuries it has suffered and suing in a representative capacity on behalf of its citizens.").  For examples, a state has standing to challenge (1) "an injury to some proprietary interest[,]" (2) "an injury to its sover-eign interest, that is its ability to exercise its power[,]" or (3) "[an] injury to its quasi-sovereign interest, or its *parens patriae* interest." *Chiles*, 865 F.2d at 1208 (citing *Alfred L. Snapp v. Puerto Rico*, 458 U.S. 592, 609 (1982)).

1.    Florida's proprietary interest

"There is no difficulty in recognizing [a state's] standing to protect proprietary interests or sovereign interests." 13B Wright & Miller, *Federal Practice & Procedure* § 3531.11.1 (3d ed. 2008).  A state's proprietary interests include "participat[ing] in a

- 15 -

business venture" and extend to interests that are the same as a similarly situated private proprietor. *Alfred L. Snapp*, 458 U.S. at 601.

If a claim challenges an impediment to future contracting opportunity, a plaintiff demonstrates an immediate injury by showing "that sometime in the relatively near future [the plaintiff] will bid on another Government contract[.]" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995).  The defendants challenge that "what a new or renewed contract might require" in the future "is a matter of pure speculation." (Doc. 21 at 10)  But immediacy "requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a number of days, weeks, or months." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008); *Adarand Constructors*, 515 U.S. at 211–12 (holding that a plaintiff likely to suffer injury within a year enjoys standing).

Florida demonstrates a strong likelihood of immediate injury resulting from the inability to modify existing contracts and the possible denial of proposals currently submitted to the defendants.  Out of the University of Florida's thirty-seven proposals (with a sum of $10.5 million) submitted since October 15, 2021, at least one necessarily (that is, mathematically) must qualify as a covered contract.  Similarly, of the hundred (approximately) contracts (with a sum of approximately $50 million) awaiting a sponsor's decision, at least one necessarily (that is, mathematically) must qualify as a covered contract.  Further, as Florida's counsel confirmed

without dispute during a December 7, 2021 hearing, the proposed contracts are not "grants" exempted by Executive Order 14042.

As Florida's reply shows, the University of Florida, for example, is trapped in a bind.  If the federal government awards a contract proposal subject to the executive order, the university's compliance with the mandatory clause will conflict with the university's duty to obey state law prohibiting a vaccination requirement.  Florida insists persuasively that the state's inability under state law to modify existing contracts by including the proposed deviation clause will result in the federal government's unwillingness to renew or enter contracts with Florida.  For example, the GSA "strongly encouraged" acceptance of the deviation and emphasized, "[t]he modification is *mandatory* before GSA will renew, extend the period of performance, . . . or exercise an option, as applicable."  (Doc. 24-1 at 2) (emphasis in original)  Also, Florida cites to an e-mail in which NASA's procurement office states that under the proposed deviation, "we are required to incorporate these clauses into the current contract."  (Doc. 10-4 at 6)  As President Biden announced plainly and forcefully to all, "If you want to do business with the federal government, vaccinate your workforce."  *Remarks by President Biden on Fighting the COVID-19 Pandemic*, White House (Sept. 9, 2021).

Florida demonstrates an immediate threat to a substantial source of income for the state.  Absent a preliminary injunction, the defendants' challenged actions will force each state agency to comply with Florida law and lose existing and prospective contracts.  If a state agency forgoes the opportunity to contract with the

federal government, no judicial relief can remedy the loss.  Even a state agency's hesitation — in deference to state law — to acquiesce to the defendant's request to modify an existing contract might sour and end present and prospective contracts that benefit Florida and the nation.  Florida shows a strong likelihood of suffering an injury-in-fact traceable to the challenged executive action and redressable by a favorable decision.  This proprietary injury, rooted in existing and proposed contracts between Florida and the defendants, satisfies any prudential hurdle also.

2.    Florida's sovereign interest

Because Florida's economic injury satisfies the constitutional and prudential requirements for standing, Florida need not establish another basis for standing.  But, continuing to that end, Florida argues persuasively that the state enjoys standing to protect against a "sovereign injury."  (Doc. 10 at 23, Doc. 24 at 23–24)  The task force's guidance — by the peculiar and condescending mechanism of an answer to a "FAQ" or "frequently asked question" — purports to "supersede any contrary state or local law."  (Guidance at 13)  Florida's legislature passed and Florida's governor signed Sections 112.0441 and 308.00317, Florida Statutes, which together ban public and private employers from implementing a vaccination mandate.  In Florida's view, this federal action infringes the state's sovereign interests and interferes with the implementation of public policy.  As a result, Florida claims a *parens patriae* capacity "to protect quasi-sovereign interests — *i.e.*, public or governmental interests that concern the state as a whole."  *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (internal quotations omitted).

In opposition, the defendants (1) argue that Florida cannot sue in a *parens patriae* capacity because Florida suffers no injury and (2) urge that "a state does not have standing as *parens patriae* to sue the federal government to vindicate the rights of [the state's] citizens." *Chiles v. Thornburgh*, 865 F.2d at 1209. But the defendants intermingle the requirements of establishing a constitutional injury-in-fact with prudential requirements and exaggerate the limits on a state's *parens patriae* capacity.

The judiciary characterizes *parens patriae* as a prudential limitation to standing. *People's Counsel v. FERC*, 760 F.2d 318, 320–22 (D.C. Cir. 1985) (defining *parens patriae* as a component of prudential standing rather than constitutional standing). "Far from being a substitute for Article III injury, *parens patriae* actions raise an additional hurdle for a state litigant: the articulation of a 'quasi-sovereign interest' 'apart from the interests of particular private parties.'" *Massachusetts v. EPA*, 549 U.S. at 538 (Roberts, C.J., dissenting) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)). As Florida correctly insists, federal executive action that adversely affects Florida's economy and that violates federal law governing procurement and administrative procedure amounts to a constitutional injury. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (holding a state suffers a constitutional injury if federal government action that "violates federal law may adversely impact the environment and economy"). Satisfying constitutional standing, Florida must still demonstrate that the state can overcome prudential standing to vindicate a quasi-sovereign injury against the federal government.

- 19 -

*Massachusetts v. EPA* disposes of any notion that prudential standing bars states as *parens patriae* from suing the federal government.  549 U.S. at 520 n.17.  The defendants point to *Massachusetts v. Mellon's* reasoning that "[w]hile the State, under some circumstances, may sue in [*parens patriae*] capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government.  In that field it is the United States, and not the State, which represents them as *parens patriae*."  *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) (internal citation omitted); *see also Alfred L Snapp & Son*, 458 U.S. at 610 n.16.  But *Mellon* stops short of categorically denying a state as *parens patriae* from suing the federal government.  *Mellon*, 262 U.S. at 485 ("We need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here.").

Instead, "[a] distinct set of cases involves states as *parens partriae* suing not other states or private parties but rather the federal government or its officials.  The decisions seem to depend in part upon the kind of claim that the state advances, but they are hard to reconcile."  Fallon, R. et al., *Hart & Wechsler's The Federal Courts and The Federal System* 283; *United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968 (2d Cir. 1984) ("Once quite limited, the concept of *parens patriae* standing has been expanded to include actions in which a state seeks to redress quasi-sovereign interests, such as damage to its general economy or environment, even where the injury is to a fairly narrow class of persons.").

Although defining quasi-sovereign interests as "a matter for case-by-case development," *Alfred L. Snapp* clarifies that a state at least enjoys "a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents in general." 458 U.S. at 607. Also, a state possesses "a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp*, 458 U.S. at 607. In other words, a state can sue to ensure "that the benefits of the federal system are not denied to its general population." *Alfred L. Snapp*, 458 U.S. at 607; *see also Georgia v. Pa. R.R. Co.*, 324 U.S. 439 (1945) (authorizing Georgia to sue "for her own injuries" as a "person" within the meaning of the Clayton Act).

Further, under *Massachusetts v. EPA*, a state enjoys standing if a statute, such as the APA, confers on the state a procedural right to challenge potentially unlawful action that infringes on the state's sovereign interest. 549 U.S. at 520. *Massachusetts v. EPA* notes "a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17.

A state retains a sovereign interest in enacting and enforcing state law, and "the inability to enforce . . . duly enacted [law] clearly inflicts" injury on the state. *Abbott v. Perez*, 138 S. Ct. at 2324 n.17. For example, a state suffers sovereign injury when a federal court enjoins the enforcement of state law, *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Abbott*, 138 S. Ct. at 2324; *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018). Also, the state suffers sovereign injury

- 21 -

when unlawful agency action preempts state law. *See Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001) (recognizing Kansas's standing to challenge under the APA an agency's decision that a tract of land in Kansas constituted "Indian lands" because the decision "plainly has a direct and immediate impact on the sovereign rights which . . . the State of Kansas exercise[s] over the tract); *Florida v. Dept. of Health & Human Servs.*, No. 21-14098, 2021 WL 5768796 at *31–33, (11th Cir. Dec. 6, 2021) (Lagoa, J., dissenting) (explaining that Florida suffers irreparable sovereign injury from a likely unlawful mandate preempting Florida state law).

The uniform duty that the task force's guidance imposes on each federal contractor likely preempts Florida's contrary state law. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504–10 (1988) (Scalia, J.). This preemption, along with the task force's claim that the guidance "supersede[s] contrary state and local law" and along with the practical difficulty of enforcing a state law that directly conflicts with a uniform duty imposed on federal contractors, likely infringes Florida's sovereign interest in enforcing state law. Accordingly, because the APA confers on Florida a procedural right to challenge the agency action causing this infringement, Florida likely enjoys standing to bring this action under *Massachusetts v. EPA*.

In sum, the amended complaint sufficiently pleads a likelihood that Florida incurs an injury-in-fact that is traceable to allegedly unlawful conduct and that is redressable by the requested relief. Further, Florida overcomes the prudential hurdle for a state to sue the federal government. The complaint evinces Florida's right to sue in a proprietary capacity based on contracting with the federal government. In

addition, Florida likely enjoys a sovereign interest capacity to sue the federal government. Florida asserts a procedural right to challenge executive action and likely suffers an injury based on an inability to enforce a duly enacted law. Executive Order 14042 directs stringent regulation, opposes state law, and risks widespread harm. Florida enjoys a strong likelihood of standing.

## LIKELIHOOD OF SUCCESS

1. <u>Authority under FPASA</u>

Florida argues that OMB's determination that the guidance promotes "economy and efficiency in procurement" lacks legal effect because the Federal Procurement and Administrative Services Act (FPASA) "contains no authority for the President to leverage the federal government's procurement authorities into a nationwide vaccine mandate[.]" (Doc. 10 at 13) The defendants respond that OMB's determination satisfies the "lenient" standard of review under FPASA.

a. Presidential authority under FPASA

Enacted in 1949, FPASA, Title 40, Subtitle I, United States Code, creates the General Services Administration (GSA) and establishes a system for federal procurement. Section 121(a) authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle" but states that the President's policies "must be consistent with this subtitle," which comprises chapters entitled "General," "Organization of [GSA]," "Property Management," "Foreign Excess Property," "Urban Land Use," "Selection of Architects and Engineers," and "Public Property." These chapters collectively grant the president authority "over

- 23 -

those larger administrative and management issues . . . that . . . should be used in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency."  *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979).

Because of the limited subject matter delineated in the chapters composing the subtitle, presidents historically have relied on the "purpose" statement in Section 101, embedded in the "General" chapter, to require federal contracts to include a clause requiring compliance unrelated to the chapters composing the subtitle.  Section 101 states, "The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:"

> (1)  Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

> (2) Using available property.

> (3) Disposing of surplus property.

> (4) Records management.

Only sparse authority (none in the Eleventh Circuit) addresses the power of the president to invoke FPASA's "purpose" statement to require every federal agency to extract from every federal contractor, subcontractor, and subcontractor of

- 24 -

a subcontractor, and so forth submission to federal dictates that bear only a highly attenuated and tenuous connection to the subjects of the subtitle.

For example, *Kahn* analyzes whether FPASA authorized President Carter to direct (by executive order) inclusion of a clause that required compliance with an Office of Federal Procurement policy designed to suppress inflation by controlling wage and price increases. *Kahn* finds a "sufficiently close nexus" between the required clause and FPASA's "touchstone" of "economy and efficiency" because the clause "in the context of a negotiated contract . . . will likely have the direct and immediate effect of holding down the Government's procurement costs" and because the executive order directly "act[ed] to restrain procurement costs across the entire Government." *Kahn*, 618 F.2d at 793. However, *Kahn* "emphasize[s] the importance . . . of the nexus between the wage and price standards and likely savings to the Government" and forewarns, "[O]ur decision today does not write a blank check for the President to fill in at his will." *Kahn*, 618 F.2d at 793. Rather, the "procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Kahn*, 618 F.2d at 793. For example, *Kahn* notes that attempting to establish by executive order a proposed but unenacted labor law, banning from federal contracts a willful violator of the NLRA, "might raise serious questions about the validity of such an order." *Kahn*, 618 F.2d at 793, n.50.

*Liberty Mutual v. Friedman*, 639 F.2d 164, 169 (4th Cir. 1981), analyzes whether FPASA authorizes President Johnson's Executive Order 11,246, which directs certain federal contractors and subcontractors to include a clause requiring

compliance with certain anti-discrimination and affirmative action measures.  After

acknowledging criticism of *Contractors Association v. Secretary of Labor*, 442 F.2d 159

(3d Cir. 1981), which upholds application of Executive Order 11,246 to federally-as-

sisted construction contracts after finding that excluding minority workers from the

labor pool increases the cost of labor on federal contracts, *Liberty Mutual* "[a]ssume[s]

without deciding" that FPASA authorizes "some applications of Executive Order

11,246" but concludes "the authorization could validly extend no further than to

those applications satisfying the nexus test used in *Contractors Association* and *Kahn*."

*Liberty Mutual*, 639 F.2d at 170.  Rejecting the contention of other decisions declaring

that "equal employment goals themselves, reflecting important national policies, val-

idate the use of the procurement power in the context of [Executive Order 11,246],"

*Liberty Mutual* reasons:

> [T]o the extent [this contention] reflects a considered rejection
> of the requirement of nexus between Procurement Act purposes
> and Executive Order objectives that we read in *Contractors Asso-
> ciation* and *Kahn* and that we apply here, we simply disagree.
> The plain implication of such a rejection would be that regula-
> tions promulgated under an Executive Order that traces its law-
> making authority to a particular statute need bear no relation to
> the purposes of that authorizing statute so long as the regula-
> tions bear relation to national policies reflected in other sources
> common law, statutory, or constitutional. This would render
> meaningless the simple, fundamental separation of powers re-
> quirement, recently reasserted by the Supreme Court in *Chrys-
> ler*, that such an "exercise of quasi-legislative authority by gov-
> ernmental departments and agencies must be rooted in a grant
> of (legislative) power by the Congress . . . ," 441 U.S. at 302, 99
> S.Ct. at 1718, and lie "reasonably within the contemplation of
> that grant of authority." [*Chrysler*], 99 S.Ct. at 1720."

*Liberty Mutual*, 639 F.2d at 171.

Holding that this "fundamental requirement" of executive power lying "reasonably within the contemplation" of statutory authority "dictates application of the sort of nexus test [applied] here," *Liberty Mutual* finds "plain" that the executive order's application to an insurer "do[es] not lie 'reasonably within the contemplation of '" this fundamental requirement. *Liberty Mutual*, 639 F.2d at 171. Further, *Liberty Mutual* notes that *Contactors Association* benefited from a record of administrative findings and public hearings, which showed that the exclusionary practices of trade unions artificially restricted the labor pool; *Liberty Mutual* enjoyed the support of "no such findings[.]" *Liberty Mutual*, 639 F.2d at 171.

   b.   Executive Order 14042 exceeds FPASA's authorization.

Resolving similar challenges to Executive Order 14042, *Kentucky, et al., v. Joseph R. Biden, et al.,* 3:21-cv-55, ECF 50 (E.D. Ky. Nov. 11, 2021) (Van Tatenhove, J.), *Georgia, et al., v. Joseph R. Biden, et al.*, 1:21-cv-163, ECF 94 (S.D. Ga. Nov. 30, 2021) (Baker, J.), and *Missouri, et al. v. Joseph R. Biden, et al.*, 4:21-cv-1300, ECF 36 (E.D. Mo, Dec, 20, 2021) (Noce, M.J.) hold that Executive Order 14042 exceeds FPASA's authorization. Because the record in this action presents only a threadbare and conclusory rationalization that is incommensurate with the boundless expansiveness of the executive order's application, with the invasiveness of the executive order's requirement, and with the intrusion of the executive order into a state prerogative with which even Congress likely cannot interfere, I join Judges Van Tatenhove, Baker, and Noce in *Kentucky*, *Georgia*, and *Missouri* in concluding that Executive Order 14042 almost certainly exceeds the President's authority under FPASA.

*A threadbare and conclusory rationalization*

Announcing the task force's guidance as promoting "economy and efficiency" in procurement, OMB's second notice of determination at 86 FR 63418 states that the vaccination requirement and other safety measures "will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors performing work for the Federal Government."  COVID-19, however, appeared in the United States almost two years ago, but OMB fails in the second notice to identify any instance in which absenteeism attributable to COVID-19 among contractor employees resulted in delayed procurement or increased costs also attributable to COVID-19.  Although an executive order might enjoy flexibility to combat a predicted disruption in procurement, the anticipation of which was based on history, experience, and other fact-based reasons, the absence in the record of evidence suggesting that in the last two years contractor absenteeism has impeded federal contracting both discredits OMB's second notice and suggests a ruse, a mere contrivance, superficially attempting to justify a sweeping, invasive, and unprecedented public health requirement imposed unilaterally by President Biden.  In other words, although the executive order purports to advance "economy" and "efficiency" by reducing absenteeism, nothing in the executive order, the task force's guidance, OMB's hollow notices of determination, or the defendants' other papers advances an explanation, much less a reasoned and persuasive explanation, commensurate with the expansiveness and invasiveness of Executive Order 14042.  The extent of any absenteeism attributable to COVID-19 among contractors and subcontractors is unexplained.

The frequency and duration of any procurement delay attributable to COVID-19 is unexplained.  The extent of any cost increases attributable to COVID-19 is unexplained.  In other words, the extent of any procurement problem, past or future, attributable to COVID-19 is undemonstrated and is merely a hastily manufactured but unproven hypothesis about recent history and a contrived speculation about the future.  Obviously, no massive extension and expansion of presidential power is necessary to cure a non-existent problem and certainly neither "good cause" nor "urgent and compelling circumstances" exists to justify summary disregard of the requirements of administrative law and rulemaking.

*The expansiveness of the executive order's application*

By requiring vaccination of private employees working "in connection with a covered contract" or at a location controlled by a contractor or the federal government, the executive order results in an application of dizzying expansiveness.  Under the definitions in the task force's guidance, the executive order would require the vaccination of, for example:

- a janitor who cleans the offices of a contractor's legal department,

- an accountant who works exclusively from home,

- a student who works part-time in a contracting university's library, and

- a lumberjack working on a federal logging contract.

That is, absent hermetic isolation, the likelihood that an employee of an entity that happens to contract (or subcontract) with the federal government can remain unvaccinated appears trivial at most.

- 29 -

Unlike the price controls in *Kahn*, which excepted a non-compliant contractor if the controls would "threaten the contractor's or subcontractor's ability to survive," Executive Order 14042 requires each agency to include the vaccination clause without exception and without consideration of the burden to which the vaccination clause might subject a contractor and without consideration of the attenuated and speculative benefit, if any, that vaccination of a contractor's workforce might produce for procurement.  Further, by requiring inclusion of the vaccination clause in each subcontract (at any tier), the vaccination requirement, extending and repeating like a fractal, yields results utterly detached from the proffered (but fatally flawed) "finding."  No item in the executive order, the task force's guidance, OMB's notice of determination, or the defendants' papers tethers the expansive and monolithic application of the vaccination requirement to documented need to reduce absenteeism among federal contractors' employees or to solve any real problem in procurement.

*The invasiveness of the executive order's imposition*

Unlike the executive order in *Kahn*, which requires contractors to comply with price controls (directly related to the price of procurement); unlike the executive order in *Liberty Mutual*, which requires contractors to comply with prohibitions on racially exclusionary hiring (required by the law); unlike the executive order in *Chamber of Commerce of U.S. v. Napolitano*, 648 F.2d 726, which requires contractors to use a program to verify the lawfulness of immigration status (established by law); and unlike the executive order in *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.2d 360 (D.C. 2003), which requires contractors to post notices about the statutory right to

decline union membership (informing employees of a legal right); Executive Order 14042 compels employees to accept injection of a COVID-19 vaccine — not demonstrably connected to procurement and not required by federal or state law — or else confront termination of employment.

*The intrusion of the executive order into state affairs*

By requiring the vaccination of employees of contractors and subcontractors, Executive Order 14042 intrudes into a matter traditionally committed to the state. Under the Tenth Amendment to the Constitution, "The Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people."  A power not delegated includes the state's police power, which "is defined as the authority to provide for the public health, safety, and morals" of the state's population.  *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991).  The state's police power entails authority over compulsory vaccination.  *See Zucht v. King*, 260 U.S. 174, 176 (1922) ("Long before this suit was instituted, *Jacobson v. Massachusetts* . . . had settled that it is within the police power of a state to provide for compulsory vaccination.").

Dissenting from a non-precedential order denying an injunction pending appeal in a challenge to the Center for Medical Service's vaccination requirement for healthcare workers and others, Judge Logoa writes compellingly:

> The [CMS] mandate, thus, is a federal foray into an area historically understood as a core power of the States and significantly alters the balance of power between them and the federal government. I find no such clear statement from Congress in any of the statutory sections relied on by CMS to justify this intrusion

> by a federal agency into the police power traditionally reserved
> to the States.

*Florida v. Dept. of Health & Human Servs.*, No. 21-14098, 2021 WL 5768796, at *29 (11th Cir. 2021).  Further, no constitutional provision likely authorizes Congress to intrude into the state's authority over compulsory vaccination.  Congress likely cannot invoke the Commerce Clause to compel vaccination because "[a] person's choice to remain unvaccinated and forgo regular testing is noneconomic inactivity. . . . The Commerce Clause power may be expansive, but it does not grant Congress the power to regulate noneconomic inactivity traditionally with the States' police power."  *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 617 (5th Cir. 2021); *United States v. Lopez*, 514 U.S. 549, 584 (Thomas, J., concurring) ("[W]e always have rejected readings of the Commerce Clause . . . that would permit Congress to exercise a police power.")  Quoted by Judge Lagoa in *Florida v. Dept. of Health & Human Servs.*, Chief Justice Roberts explains:

> People, for reasons of their own, often fail to do things that would be good for them or good for society. Those failures—joined with the similar failures of others—can readily have a substantial effect on interstate commerce. Under the Government's logic, that authorizes Congress to use its commerce power to compel citizens to act as the Government would have them act.
>
> That is not the country the Framers of our Constitution envisioned. James Madison explained that the Commerce Clause was "an addition which few oppose and from which no apprehensions are entertained." The Federalist No. 45, at 293. While Congress's authority under the Commerce Clause has of course expanded with the growth of the national economy, our cases have "always recognized that the power to regulate commerce, though broad indeed, has limits." *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968).

*NFIB v. Sebelius*, 567 U.S. 519, 554 (2012).  And although the Spending Clause might authorize the conditioning of federal money on the acceptance of a vaccination requirement, Congress must express the condition "unambiguously."  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  That Congressional expression, even assuming the Constitution permits, remains neither requested nor granted (and, given a recent vote in the Senate, appears unavailable).

In this action, the President — not Congress — purports to require by contract the vaccination of employees of contractors and subcontractors.  Because the executive branch intends the "federal encroachment upon a traditional state power" and invokes "the outer limits of Congress' power, we expect a clear indication that Congress intended that result."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).  The defendants identify no section of FPASA demonstrating that Congress "clearly intended" to authorize the President (assuming Congress can) to impose a public health requirement as a condition of a contractor's supplying services.

Of course, the defendants maintain that contractors remain free to refuse to contract with the world's largest buyer of goods and services.  But because the President must rely, at best, on Congress's authorization under FPASA, the President's attempt to impose under FAPSA a requirement both that Congress itself likely lacks the power to impose and that traditionally remains textually committed by the Constitution to the states demands a rationale beyond that required for the posting of

notices in the workplace, the use of a centralized employment eligibility system, and the like.

\*     \*     \*

*Kahn* confirms that FPASA confers no "blank check for the President to fill in at his will" and requires power to "be exercised consistently with the structure and purposes" of FPASA.  And *Liberty Mutual* confirms that the exercise of power under FPASA must lie "reasonably within the contemplation" of the grant of authority. Because the record presents only a feeble rationalization incommensurate with the expansiveness of the executive order's application, with the invasiveness of the executive order's requirement, and with the intrusion of the executive order into a state prerogative into which Congress likely cannot intrude, Executive Order 14042 likely exceeds the structure and purpose of FPASA and falls outside Congress's contemplated grant of authority under FPASA.

2.    Procedural challenges

In addition to challenging Executive Order 14042 as exceeding the President's authority under FPASA, Florida asserts procedural, APA, and similar challenges to the Executive Order, to OMB's first and second notice of determination, and to the FAR Council's memorandum, among other things.  Some of these challenges could fail for the reasons identified in *Kentucky, et al., v. Joseph R. Biden, et al.,* 3:21-cv-55, ECF 50 at 20–28 (E.D. Ky. Nov. 11, 2021).  However, a December 9, 2021 order (Doc. 31) permits supplemental briefing on whether, among other things, the procedural requirements of 41 U.S.C. § 1707 apply to an agency implementing class-wide

deviations to implement Executive Order 14042.  Accordingly, the motion for a preliminary injunction based on claims other than whether the President exceeded his authority under FPASA will remain under advisement pending the review of further briefing.

## IRREPARABLE HARM

Florida must also demonstrate a substantial likelihood that the challenged action will inflict irreparable harm.  As the defendants note, "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm").  To that end, Florida asserts that absent an injunction the state (1) will suffer an irreparable economic injury because sovereign immunity precludes monetary recovery and (2) will suffer an irreparable sovereign injury because the defendants' actions conflict with state law.  The defendants oppose both grounds.

First, the defendants argue that even if Florida loses a contract, no irreparable harm results.  The defendants point to the Contract Disputes Act and insist that under 28 U.S.C. § 1491(b)(1)–(2) Florida "would have ample opportunity" to sue for monetary redress.  (Doc. 21 at 34)  Under 28 U.S.C. § 1491(b)(1), a district court:

> [S]hall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed

> award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

But 28 U.S.C. § 1491(b)(2) limits the available relief.  Section 1491(b)(2) permits a district court to "award any relief that the court considers proper, . . . except that any monetary relief shall be limited to bid preparation and proposal costs."  Because recompense for bid preparation and proposal costs falls short of adequately compensating Florida for lost contracts (likely worth millions of dollars), 28 U.S.C. § 1491(b)(1)–(2) provides no corrective relief and Florida shows a likelihood of irreparable economic injury.

Florida asserts that the defendants' actions "seek to compel every federal contractor in the State to violate state law" and thus cause a sovereign injury.  (Doc. 24 at 24)  The defendants maintain that Florida suffers no sovereign injury and argue that nothing in Executive Order 14042 purports to compel a contractor to violate state law.  Although the defendants urge that the executive order merely "directs federal-contracting policy," the defendants state that "to the extent state law interferes with a federal contract, state law does not apply."  (Doc. 26 at 14)

As noted in the standing discussion, a state's "inability to enforce [the state's] duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (explaining that a state "suffers a form of irreparable injury" if enjoined "from effectuating statutes enacted by representatives of its

people[.]") (internal quotations omitted).  The task force guidance prescribes a vaccination requirement that Sections 112.0441 and 308.00317, Florida Statutes, prohibit.  Florida demonstrates a likely irreparable harm to sovereign interests absent a stay.

### PUBLIC INTEREST

Finally, the balance of the harms and public interest support preliminarily enjoining the vaccine requirement because "any abstract 'harm' [an injunction] might cause . . . pales in comparison and importance to the harms the absence of [an injunction] threatens to cause countless individuals and companies." *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021). An injunction poses little injury to the defendants, who retain the right to recommend vaccination among contractors and to seek contractual remedy for delay or failure to perform a contract.  In contrast, denial of the proposed injunction would substantially injure Florida entities faced with violating either a federal contract or state law. Further, the proposed injunction is in the public interest, which supports protecting an individual reluctant employee from likely-unlawful government action and supports stemming the "economic uncertainty [and] workplace strife" caused by the vaccine requirement.  *BST Holdings*, 17 F.4th at 618–19.  Thus, the balance of the harms and the public interest weigh in favor of a preliminary injunction.

### CONCLUSION

Because Florida demonstrates a substantial likelihood that Executive Order 14042 exceeds the President's authority under FPASA, the motion (Doc. 24) is

**GRANTED** on Florida's claim that Executive Order 14042 exceeds the President's authorization under FPASA, and the balance of the motion remains **UNDER ADVISEMENT**. After review of the supplemental briefing, an order will resolve the balance of the motion.

Because an injunction limited to protecting only the State of Florida and its political subdivisions (1) would likely prove unworkable given that the State of Florida is (unsurprisingly) the largest entity within the state and routinely enters federal contracts and subcontracts with entities throughout the state and (2) would fail to protect the State of Florida's quasi-sovereign interest, a preliminary injunction prohibiting enforcement of Executive Order 14042 in any covered contract in Florida warrants issuance. Not later than **DECEMBER 29, 2021**, the parties may propose a preliminary injunction consistent with this order. Of course, by proposing an order the defendants waive no otherwise preserved objection to the preliminary injunction. The motion (Doc. 32) to stay is **DENIED**. Not later than **JANUARY 21, 2022**, the defendants must respond to the complaint.

ORDERED in Tampa, Florida, on December 22, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 38 -